

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

FILED
J.N
APR 1 8 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT
APR 1 8 2008

|  |  |
|---|---|
| **UNITED STATES SECURITIES** | : |
| **AND EXCHANGE COMMISSION,** | : |
|  | : 08cv2224 |
| **Plaintiff,** | : JUDGE LINDBERG |
|  | : MAG. JUDGE MASON |
| **v.** | : |
|  | : |
| **JASON R. HYATT,** | : **JURY DEMANDED** |
| **JAY JOHNSON, and** | : |
| **HYATT JOHNSON CAPITAL, LLC** | : |
|  | : |
| **Defendants.** | : |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC"), alleges as follows:

### NATURE OF THE ACTION

1.    This matter centers on a fraudulent scheme in which Jason R. Hyatt ("Hyatt"), Jay Johnson ("Johnson") and their company, Hyatt Johnson Capital, LLC ("HJ Capital") (collectively, "the Defendants"), from 2003 through the present, acting as unregistered broker-dealers and investment advisers, offered and sold to investors membership shares in at least ten Limited Liability Corporations ("LLCs") controlled and managed by HJ Capital ("HJ Capital LLCs"). The Defendants promised to use investor funds to purchase securities sold by LLCs managed by BCI Aircraft Leasing, Inc. ("BCI") on behalf of the HJ Capital LLCs. In reality at least $5.4 million was misappropriated, among other thing, to operate a Latin-themed restaurant in Chicago named De La Costa and to pay for Defendant Hyatt's personal expenses including

numerous mortgage payments and substantial home improvements for two homes, as well as at least $155,000 worth of art and antiques, a Maserati, a Mercedes, a Hummer H2, a Yukon Denali, and other vehicles.

2.      According to the Defendants' representations to investors, the BCI LLCs would use investor funds, along with other sources of funds, to purchase commercial aircraft on lease to commercial airlines. Investors were told that the BCI LLCs would make monthly payments to the HJ Capital LLCs from monthly lease income. HJ Capital would then distribute monthly payments to the individual investors from these payments.

3.      In addition, through the sale of a promissory note, the Defendants raised another $2 million from an individual investor, representing to that investor that his funds would be invested in a joint venture between BCI and HJ Capital called Chicago Aviation Partners, which would use the funds to purchase a group of commercial aircraft.

4.      Based on these and other representations, from approximately 2003 through approximately 2007, the Defendants raised at least $24.5 million from approximately 120 investors in at least twelve states.

5.      Unbeknownst to HJ Capital investors, BCI and its owner and CEO Brian Hollnagel ("Hollnagel") had been defrauding investors by, among other things, failing to use investor funds to purchase aircraft as represented (sometimes never purchasing aircraft at all), misappropriating investor profits in certain LLCs in order to fund other unrelated purchases on behalf of BCI, and using some investors' funds to make payments to other investors as purported returns.

6.      Also, unbeknownst to HJ Capital investors, from July 2006 to March 2007, Defendant Hyatt, through Defendant HJ Capital, misappropriated nearly $1.6 million in investor

2

funds for his personal use, including at least $155,000 worth of art and antiques, a Maserati, a Mercedes, a Hummer H2, a Yukon Denali, and other vehicles.

7.      In August 2007, the SEC brought an emergency enforcement action in U.S. District Court in Chicago against BCI and Hollnagel.  SEC v. Hollnagel et al., 1:07-cv-4538 (J. Bucklo).  As a result of this action and an evidentiary hearing, the Court made findings of fraud, issued a preliminary injunction against BCI and Hollnagel, and ordered BCI to repay all investors, including the HJ Capital LLCs, within 60 days.  Nevertheless, most of the HJ Capital investors have not been fully repaid.

8.      In February 2006, the Defendants offered and sold a note to an investor for $2 million ("the $2 million investment"), purportedly to be invested in a BCI – HJ Capital joint venture called Chicago Aviation Partners to purchase a group of commercial aircraft.

9.      Instead, Defendant Hyatt, through Defendant HJ Capital, misappropriated this $2 million investment to fund the startup costs of a Latin-themed restaurant in Chicago named De La Costa, which Hyatt co-owned with several other partners.

10.     When Defendant Johnson became aware of Hyatt's misappropriation of the $2 million investment, Johnson chose to participate in a scheme with Hyatt to cover up his fraud, diverting at least $2.4 million that belonged to other investors to repay the note investor, thereby concealing the past misappropriation.  At the request of the Defendants, BCI wired these funds directly to the investor.

11.     From 2003 to 2006, Defendant Hyatt, through Defendant HJ Capital, misappropriated nearly $1.8 million of investor funds in the form of undisclosed commissions from BCI in connection with the capital invested by HJ Capital LLCs in BCI offerings.  BCI paid these commissions out of the investor funds it received from HJ Capital.

3

12. Defendant Johnson knew or was reckless in not knowing that Hyatt was receiving undisclosed commissions, and yet failed to disclose this fact, and made other misleading statements to investors, in connection with subsequent offers or sales of securities.

13. Among other things, the Defendants falsely assured investors that, as part of their management of the HJ Capital LLCs, they had performed and would continue to perform due diligence regarding BCI's use of investor funds.

14. Contrary to their representations, the Defendants did little, if anything, to verify the legitimacy of the BCI offerings.

15. In fact, the Defendants received records indicating that BCI was diverting HJ Capital investor funds for improper uses, specifically, diversion to undisclosed, materially different BCI LLCs. Defendants thus knew or were reckless in not knowing of BCI's improper diversion of investor funds. Despite this, the Defendants failed to either adequately review or take action to follow up on these red flags. The Defendants also failed to disclose this information to HJ Capital investors.

16. It appears that the Defendants were still depleting the HJ Capital bank accounts as recently as March 2008 as evidenced by $20,000 in checks drawn against the HJ Capital account payable directly to Hyatt and signed by Johnson.

17. Through the activities alleged in this complaint, Defendants Hyatt, Johnson, and HJ Capital have, and unless enjoined, will continue to, directly and indirectly, engage in transactions, acts, practices or courses of business which are violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b) [15 U.S.C. § 78j(b)] and 15(a)(1) [15 U.S.C. § 78o(a)(1)] of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 206(1),

4

206(2) and 206(4) of the Investment Advisers Act of 1940 (the "Advisers Act") [15 U.S.C. §§ 80b-6(1) and 80b-6(2)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder.

18.     The SEC brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)], Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)], and Section 209(d) of the Advisers Act [15 U.S.C. §§ 80b-9(d)]

## JURISDICTION

19.     This Court has jurisdiction pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1331.

20.     The acts, practices and courses of business constituting the violations alleged herein occurred within the jurisdiction of the United States District Court for the Northern District of Illinois and elsewhere.

21.     The Defendants are inhabitants of, and transact business in, the Northern District of Illinois.

22.     The Defendants, directly or indirectly, have made, and are making, use of the mails or the means or instrumentalities of interstate commerce in connection with the transactions, acts, practices and courses of business alleged herein.

## DEFENDANTS

23.     Jason Hyatt, age 34, is a resident of St. Charles, Illinois.  Defendant Hyatt is a founder and managing partner of HJ Capital and was formerly registered with as a securities broker.  In a January 2008 deposition, Defendant Hyatt repeatedly invoked his Fifth Amendment privilege against self-incrimination, refusing to answer any questions about HJ Capital, BCI, or his personal finances.

24.    Defendant Hyatt worked for BCI and Hollnagel from at least 2001 until 2003 as the Director of Corporate Finance for BCI.

25.    Jay Johnson, age 48, is resident of Downers Grove, Illinois.  Defendant Johnson is a founder and managing partner of HJ Capital.  In a January 2008 deposition, Johnson repeatedly invoked his Fifth Amendment privilege against self-incrimination, refusing to answer any questions about HJ Capital, BCI, or his personal finances.

26.    Hyatt Johnson Capital, LLC is a privately-held Illinois corporation with its principal place of business in Downers Grove, Illinois.  HJ Capital is operated out of the homes of Hyatt and Johnson, the only owners and managers.  HJ Capital is owned and controlled equally by Hyatt and Johnson.

## OTHER RELEVANT PARTIES

27.    BCI Aircraft Leasing, Inc. ("BCI") is a privately-held Illinois corporation with its principal place of business in Chicago, Illinois.

28.    Brian N. Hollnagel ("Hollnagel"), age 34, is the Chief Executive Officer ("CEO") and founder of BCI and resides in Chicago, Illinois.

29.    Hollnagel and BCI are defendants in the SEC's litigation initiated on August 13, 2007.  SEC v. Hollnagel et al., 1:07-cv-4538 (J. Bucklo).

## FACTS

## BACKGROUND

30.    Between 2003 and 2007, Defendants Hyatt, Johnson, and HJ Capital communicated with potential investors to solicit their purchase of membership shares of LLCs controlled by HJ Capital.  Such communications occurred variously in person, through telephone conversations, or in writing, or in other ways making use of interstate commerce.

6

31.     Between 2003 and 2007, the Defendants raised at least $22.5 million from approximately 120 investors through offers and sales of equity interests in at least 10 LLCs managed and operated by HJ Capital ("HJ Capital LLCs") to invest in LLCs operated by BCI. The Defendants told investors that these LLCs were formed to pool investor funds to invest in BCI LLCs, which were also offered to other investors in addition to the HJ Capital LLCs.

32.     The Defendants represented to investors that as part of the HJ Capital offerings, and in exchange for what was described as an "Asset Management Fee," HJ Capital would manage the HJ Capital LLCs as a fiduciary with including the authority to make investment decisions on behalf of the HJ Capital LLCs.

33.     The BCI LLCs would then make monthly distributions to the HJ Capital LLCs of free cash from the aircraft leases as monthly returns. The HJ Capital LLCs then made corresponding monthly payments to their investors as returns. Investors were also told that they would receive a percentage of the profits from the sale or refinance of the aircraft.

34.     The Defendants also represented that BCI would in turn use the funds from HJ Capital LLCs, along with other sources of funds, to purchase commercial aircraft on lease to commercial airlines.

35.     The Defendants received compensation in exchange for investment advice, i.e. the authority to make investment decisions on behalf of the HJ Capital LLCs.

36.     The Defendants exercised their authority to make investment decisions on behalf of the HJ Capital LLCs when, in July 2007, they sold all of the HJ Capital LLCs' interests in BCI LLCs back to BCI in exchange for a promissory note. Defendants made no disclosure to investors of conversion of their interests in the LLCs in exchange for a note until well after the

7

transaction had been concluded.  In addition, there are no documents releasing the individual investors' interests to HJ Capital or to BCI.

37.    In addition, through the sale of a promissory note, the Defendants raised another $2 million from an individual investor, representing to that note investor that his funds would be invested in a joint venture between BCI and HJ Capital called Chicago Aviation Partners, which would use the funds to purchase a group of commercial aircraft.

38.    Unbeknownst to HJ Capital investors, BCI and Hollnagel were engaged in a fraudulent scheme in which they improperly diverted a substantial portion of the approximately $83 million in investor funds they raised.  The Defendants knew or were reckless in not knowing that BCI had improperly diverted investor funds.

39.    BCI and Hollnagel defrauded investors by, among other things, failing to use investor funds to purchase aircraft as represented (sometimes never purchasing aircraft at all), misappropriating investor profits in certain offerings in order to fund other unrelated purchases on behalf of BCI, and using some investors' funds to make payments to other investors as purported returns.  To date, most HJ Capital investors have yet to be fully repaid.

40.    In August 2007, the SEC brought an emergency enforcement action in U.S. District Court in Chicago against BCI and Hollnagel.  SEC v. Hollnagel et al. 1:07-cv-4538 (J. Bucklo).  As a result of this action and an evidentiary hearing, the Court made findings of fraud, issued a preliminary injunction against BCI and Hollnagel, and ordered BCI to repay all investors, including HJ Capital investors, within 60 days.  The Court, among other things, made factual findings that "It is undisputed that BCI made material misrepresentations in its LLC offering documents..." to investors and that "[t]here can be no doubt that BCI and Hollnagel

acted with scienter." August 22, 2007 Order, pages 7-8, SEC v. Hollnagel et al., 1:07-cv-4538 (J. Bucklo), Docket No. 35.

41.     Despite the allegations in the SEC complaint and the Court's factual findings of fraud, the Defendants continued to deal with BCI and Hollnagel. Furthermore, the Defendants continued to mislead investors regarding, among other things, the true state of their investments.

42.     As part of the SEC's ongoing litigation against BCI and Hollnagel, the SEC issued subpoenas to Hyatt, Johnson, and HJ Capital. In response, Defendants Hyatt and Johnson both repeatedly asserted their Fifth Amendment privileges against self-incrimination in depositions and with respect to the production of documents.

43.     The SEC currently also has a pending Motion for Contempt against Defendant HJ Capital for its failure to produce HJ Capital documents, including emails and telephone records, in response to the SEC's subpoenas. See SEC v. Hollnagel et al., 1:07-cv-4538 (J. Bucklo), Docket No 102.

44.     On April 14, 2008, during a hearing in SEC v. Hollnagel et al., 1:07-cv-4538 (J. Bucklo), counsel for HJ Capital represented to the Court that a forensics consultant hired by HJ Capital had examined two computers used by Defendant Hyatt for HJ Capital business, and that this forensics consultant discovered that "scrubbing software," which is used to "wipe" or permanently erase files contained on computer hard drives, had been installed on these computers. It appears likely that the scrubbing software was used to destroy information potentially relevant to the SEC's subpoenas to the Defendants.

45.     Defendants Hyatt and Johnson also filed motions to quash regarding the SEC's subpoenas for their personal bank records, which the Court denied. As a result, the SEC only recently received certain bank records, from which the SEC discovered the existence of

additional personal bank accounts for Hyatt and Johnson. These recently obtained personal bank records uncovered further evidence of fraud by Hyatt and HJ Capital.

## HYATT MISAPPROPRIATED NEARLY $5.4 MILLION IN INVESTOR FUNDS.

### Hyatt Diverted Nearly $1.6 Million in Investor Funds for Personal Use.

46.     From July 2006 through March 2007, Defendants Hyatt, Johnson, and HJ Capital raised nearly $1.6 million in investor funds through two HJ Capital offerings known as HJ United 2005 LLC and HJ T2 2005 LLC in which the Defendants offered and sold securities to investors ("the post-June 2006 investments").

47.     The Defendants represented to investors in HJ United 2005 LLC and HJ T2 2005 LLC that their funds would be invested in BCI LLCs known as BCI United 2005-20 LLC and BCI TUI LLC, respectively.

48.     Instead, the post-June 2006 investments were wired to separate entities controlled by Hyatt: UAL BCI 2006-1 LLC and TUI BCI 2005-17 LLC. Defendant Hyatt created these entities in July 2006.

49.     Between July 2006 and April 2007, virtually all of this nearly $1.6 million was transferred from UAL BCI 2006-1 LLC and TUI BCI 2005-17 LLC to one of Defendant Hyatt's personal bank accounts.

50.     Defendant Hyatt then spent this nearly $1.6 million on personal expenditures, including $155,000 worth of art and antiques, a Maserati, a Mercedes, a Hummer H2, a Yukon Denali, and other vehicles.

51.     Because this nearly $1.6 million was never invested in BCI LLCs, BCI's monthly distributions were insufficient to support these investors' monthly returns.

52.     To conceal his fraudulent scheme, Defendant Hyatt made monthly payments from his personal bank account to HJ Capital to create the appearance of monthly returns from the non-existent investments to make up this shortfall.

53.     At least in connection with those instances where investor money was diverted by Hyatt, false tax forms were issued to investors in regard to their supposed investments.

54.     Hyatt, Johnson and HJ Capital knew or were reckless in not knowing that false and misleading tax forms were being issued to HJ Capital investors.

55.     Defendant Hyatt used misappropriated investor funds to fund mortgage payments and substantial home improvements for two homes that he owns.

### Hyatt Diverted $2 Million in Investor Funds to Operate a Restaurant.

56.     In February 2006, the Defendants offered and sold a promissory note to an investor for $2 million ("The $2 million investment").

57.     The Defendants told this investor (the "note investor") that his $2 million would be invested in a BCI – HJ Capital joint venture called Chicago Aviation Partners. The note investor was told that Chicago Aviation Partners would, in turn, use the $2 million investment to purchase a group of commercial aircraft.

58.     Instead, Defendant Hyatt, through Defendant HJ Capital, improperly diverted this money to a Latin-themed restaurant in Chicago named De La Costa, which Hyatt co-owned with several other partners.

59.     Specifically, Defendant Hyatt used the $2 million investment to fund startup costs of the restaurant, which opened a few months later, in July 2006.

60.     These startup costs included over $400,000 for interior decorating and furniture and over $1,000,000 in construction costs.

11

**The Defendants Committed Further Fraud to Conceal Past Instances of Fraud.**

61.    Defendant Johnson was aware of Hyatt's misappropriation of investor funds.

62.    For example, Defendant Johnson was aware that Hyatt had directed the $2 million investment to Panacea Partners, LLC, the holding company of Hyatt's restaurant De La Costa.

63.    However, Defendant Johnson never took any steps to inform the note investor about the misappropriation of his $2 million investment.

64.    Defendant Johnson chose instead to participate in a scheme with Defendant Hyatt to cover up the misappropriation of the $2 million investment, specifically by improperly diverting other investors' funds to repay the note investor.

65.    In July 2007, BCI and the Defendants negotiated a purported buy out of all HJ Capital investor interests in BCI offerings.  As a result of these negotiations between BCI and the Defendants, the Defendants purportedly caused the HJ Capital LLCs to sell their interests in the BCI LLCs back to BCI in exchange for a single promissory note.  In September 2007, pursuant to an agreement between the Defendants and BCI, this July 2007 promissory note was then sold back to BCI in exchange for six aircraft and certain future cash payments to HJ Capital.

66.    Defendants did not disclose to investors the July or September 2007 transactions described in paragraph 65 above until after the September 2007 agreement was executed.

67.    Because BCI never received the $2 million investment, that specific investment was not included in the July and September transactions described in paragraph 65 above.

68.    In addition, because the nearly $1.6 million in post-June 2006 investments described in paragraphs 46 through 49 above were misappropriated by Defendant Hyatt, and not sent to BCI, these investments were also not included in the July and September transactions described in paragraph 65 above.

69.     In connection with the July and September transactions described in paragraph 65 above, in January 2008, BCI paid $3.5 million to HJ Capital on behalf of the HJ Capital investors.

70.     This $3.5 million payment belonged to the investors whose money had been invested, through the HJ Capital offerings, in BCI offerings.

71.     This $3.5 million payment was made in connection with BCI's purchase of the HJ Capital investors' interests, pursuant to the transactions described in paragraph 65 above.

72.     However, the Defendants instructed BCI to wire $2.4 million of this $3.5 million payment directly to the note investor, who had made the $2 million investment, and BCI did so.

73.     The Defendants failed to disclose to any HJ Capital investors that this $2.4 million was misappropriated in order to repay the note investor.

74.     Certain HJ Capital investors confronted Defendant Johnson, asking whether the note investor was going to be repaid out of funds belonging to other HJ Capital investors.

75.     Defendant Johnson falsely assured these investors that their funds would not be misappropriated to repay the note investor, because the note investor's $2 million investment was sent to BCI, and thus this investment was part of the July and September transactions described in paragraph 65 above.

76.     Defendant Johnson, through Defendant HJ Capital, specifically represented to the note investor that this wire transfer from BCI was a repayment of his $2 million investment.

77.     However, the Defendants failed to disclose to the note investor that, despite the fact that this repayment was coming from BCI, his investment had been misappropriated for use by Mr. Hyatt's restaurant, and had never reached BCI or Chicago Aviation Partners.

78.    The Defendants also failed to disclose to the note investor that they had misappropriated this $2.4 million from the other HJ Capital investors in order to repay the $2 million investment.

### Hyatt misappropriated another $1.8 million in investor funds in the form of undisclosed commissions.

79.    Defendant Hyatt, through Defendant HJ Capital, misappropriated nearly $1.8 million of investor funds in the form of undisclosed commissions from BCI in connection with funds invested by HJ Capital LLCs in BCI offerings.

80.    Defendants Hyatt and HJ Capital directly received commissions from BCI in connection with seven of the ten LLCs in which HJ Capital made offers and sales of securities to investors, in exchange for HJ Capital's placement of its investors' pooled funds in BCI offerings.

81.    According to BCI's accounting and tax records, these commissions were taken from the investors' funds.

82.    Based on the commission amounts disclosed to investors and the amount of HJ Capital investor funds invested in BCI LLCs, HJ Capital disclosed that it would receive approximately $770,000 in total "organization fees," which functioned as commissions, between 2003 and 2006.

83.    In reality, BCI paid over $2.5 million in total commissions to Defendants Hyatt and HJ Capital from 2003 to 2006, the vast majority of which were sent directly to Hyatt personally.  Thus, nearly $1.8 million of the commissions received from BCI were not disclosed to investors.

84.    Defendant Johnson received and reviewed 2004 tax records issued by BCI indicating that approximately 11% in commissions was being paid in connection with certain HJ

Capital LLCs' investment of capital in the BCI LLCs during 2004, accounted for as "syndication costs" for those investments.

85.    In fact, according to the offering materials provided to investors in connection with HJ Capital LLCs that invested money in BCI LLCs during 2004, HJ Capital should not have received any commissions in two of the LLCs, and no more than 5.5% in commissions in other LLCs.

86.    In 2005, none of the tax records issued by BCI to any of the HJ Capital LLCs disclosed any commissions being paid by BCI, although the offering materials for all of those LLCs disclosed that HJ Capital would receive a 5.5% commission.

87.    In connection with subsequent offers and sales of securities, whose offering materials stated that HJ Capital would receive commissions of only 5.5%, Defendant Johnson failed to disclose to investors the fact that Hyatt or HJ Capital had taken excess commissions in prior offers and sales of securities.

88.    Although they received commissions to sell securities, none of the Defendants were registered with the Commission as broker-dealers during any times relevant to this Complaint.

**THE DEFENDANTS FALSELY ASSURED INVESTORS REGARDING BCI'S USE OF INVESTOR FUNDS.**

89.    The Defendants made certain assurances to investors regarding the legitimacy of the BCI securities in which the HJ Capital LLCs were invested, without having any reasonable basis for such assurances.

90.    The Defendants made various statements to investors to assure them of the legitimacy of the BCI LLC investments, including but not limited to, falsely assuring investors

that, as part of their management of the HJ Capital LLCs, they had performed and would continue to perform due diligence regarding BCI's use of investor funds.

91.    These and other false assurances provided comfort to investors that the Defendants had verified the legitimacy of the BCI securities: specifically, that BCI would use investor funds as represented.

92.    In fact, the Defendants did little if anything to verify the legitimacy of the BCI securities.

93.    In particular, the Defendants failed to take any action even though they had access to records BCI sent to HJ Capital that indicated that BCI was improperly diverting HJ Capital investor funds.

94.    For example, in one 2003 offering known as HJ A3 2003, over $2 million in HJ Capital investor funds were supposed to be invested in a BCI LLC known as BCI 2002-4, which owned three aircraft on lease to Airpost, the French post office.

95.    Instead, BCI invested the over $2 million from HJ A3 2003 into another BCI LLC known as BCI 2003-2, which purportedly owned only one aircraft.

96.    In fact, BCI 2003-2 did not even own any aircraft. BCI instead misappropriated all investor funds for this offering.

97.    As early as April 2004, Defendants Johnson and HJ Capital were aware that HJ A3 2003 was not invested in BCI 2002-4 as HJ Capital investors were told. Despite this, the Defendants continued to provide monthly written updates to HJ A3 2003 investors, falsely reassuring them that their funds were invested by BCI as represented.

98.    Despite receiving information that HJ Capital investor funds in other LLCs were also improperly diverted to other BCI LLCs, the Defendants continued to provide monthly written updates falsely reassuring investors that their funds were invested by BCI as represented.

99.    Despite the Defendants' promises of due diligence, and receiving information that investor funds were being improperly diverted to other LLCs, the Defendants continued to reassure investors that due diligence had been performed, providing monthly written updates falsely reassuring investors that their funds were invested by BCI as represented.

100.    In fact, after the filing of the SEC's complaint against BCI and Hollnagel, the Defendants went so far as to falsely assure investors that they and HJ Capital would make investors whole in the event that BCI was unable to.

101.    Furthermore, the Defendants did not even bother to obtain any written agreements confirming that the HJ Capital LLCs owned shares in the BCI LLCs or what BCI was actually doing with the HJ Capital LLCs' funds.

102.    The Defendants had no basis for the assurances they made to investors regarding the legitimacy of the BCI securities and BCI's use of HJ Capital investor funds.

## DEFENDANTS CONTINUE TO MANAGE INVESTOR ASSETS AND ARE IN A POSITION TO DISSIPATE INVESTOR FUNDS.

103.    In July 2007, the Defendants purportedly agreed to sell all of the HJ Capital investors' interests in BCI offerings, in exchange for a $22.7 million unsecured promissory note from BCI and approximately $2.35 million in cash.

104.    In September 2007, the Defendants purportedly exchanged this $22.7 million promissory note for ownership of six aircraft on lease, as well as specific future cash payments.

105.    The Defendants created a new subsidiary to own these six aircraft and take custody of cash payments from BCI on behalf of investors.

17

106.   These aircraft are currently generating excess lease revenue and within the next month HJ Capital should receive $292,084 in excess monthly lease revenue, including $50,000 on April 22nd, which will be deposited into a HJC Asset Holdings bank account controlled by the Defendants.

107.   The Proposed Defendants are currently attempting to sell these aircraft, which belong to investors.

108.   Hyatt used misappropriated investor funds to fund mortgage payments and substantial home improvements for two of his three homes, and to fund most of the startup costs of his Chicago restaurant, De La Costa.

109.   It appears that the Defendants are still depleting HJ Capital funds as recently as March 2008, as evidenced by $20,000 in checks drawn against the HJ Capital account payable directly to Hyatt and signed by Johnson.

110.   In general, Defendants Hyatt and Johnson regularly took capital out of HJ Capital "whenever money was there."

111.   Through 2007, Hyatt was writing himself checks from De La Costa accounts.

112.   Hyatt also used investor funds to purchase at least $155,000 worth of art and antiques, a Maserati, a Mercedes, a Hummer H2, a Yukon Denali, and other vehicles. Hyatt has been attempting to sell at least two houses worth a total of at least $2 million and the restaurant De La Costa.

113.   Thus, in light of Hyatt's prior behavior, there is a continued risk that Hyatt may further misappropriate investor funds under HJ Capital's control.

## COUNT I

### Violations of Section 17(a)(1) of the Securities Act

114.    Paragraphs 1 through 113 are re-alleged and incorporated by reference as though set forth herein.

115.    By engaging in the conduct described above, Defendants Hyatt, Johnson, and HJ Capital, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have employed devices, schemes and artifices to defraud.

116.    Defendants Hyatt, Johnson, and HJ Capital intentionally or recklessly made the untrue statements or omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

117.    By reason of the foregoing, Defendants Hyatt, Johnson, and HJ Capital violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

### Violations of Sections 17(a)(2) and (3) of the Securities Act

118.    Paragraphs 1 through 113 are re-alleged and incorporated by reference as though fully set forth herein.

119.    By engaging in the conduct described above, Defendants Hyatt, Johnson, and HJ Capital, in the offer and sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, have:

   a. obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; and

b.    engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities.

120.    Defendants Hyatt, Johnson, and HJ Capital made the untrue statements and omissions of material fact and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

121.    Defendants Hyatt, Johnson, and HJ Capital at least negligently made the untrue statements or omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.

122.    By reason of the foregoing, Defendants Hyatt, Johnson, and HJ Capital have violated Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2)-(3)].

## COUNT III

### Violations of Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5

123.    Paragraphs 1 through 113 are re-alleged and incorporated by reference as though fully set forth herein.

124.    As more fully described in paragraphs 1 through 113 above, Defendants Hyatt, Johnson, and HJ Capital, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly: used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in

acts, practices and courses of business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

125.    Defendants Hyatt, Johnson, and HJ Capital knew, or were reckless in not knowing, the facts and circumstances described in paragraphs 1 through 113 above.

126.    By reason of the foregoing, Defendants Hyatt, Johnson, and HJ Capital violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### COUNT IV

### Violations of Section 15(a)(1) of the Exchange Act

127.    Paragraphs 1 through 113 are re-alleged and incorporated by reference as though fully set forth herein.

128.    At all times relevant to this Complaint, Defendants Hyatt, Johnson, and HJ Capital effected transactions in securities for the accounts of others, for which they received transaction based compensation in the form of commissions.

129.    Defendants Hyatt, Johnson, and HJ Capital made use of the mails and the means and instrumentalities of interstate commerce to effect transaction in and to induce or attempt to induce the purchase of securities.

130.    At all times relevant to this Complaint, Defendants Hyatt, Johnson, and HJ Capital were not registered with the Commission as broker-dealers, as required by Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

131.    By reason of the foregoing, Defendants Hyatt, Johnson, and HJ Capital violated Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

### COUNT V

**Violations of Sections 206(1) and 206(2) of the Investment Advisers Act of 1940**

132.    Paragraphs 1 through 113 are re-alleged and incorporated by reference as though fully set forth herein.

133.    At all times relevant to this Complaint, and as more fully described in paragraphs 1 through 113 above, Defendants Hyatt, Johnson, and HJ Capital acted as investment advisers to the HJ Capital LLCs and their investors.

134.    As more fully described in paragraphs 1 through 113 above, at all times alleged in this Complaint, Defendants Hyatt, Johnson, and HJ Capital, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, knowingly, willfully or recklessly: (i) employed devices, schemes or artifices to defraud its clients or prospective clients; and (ii) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon its clients or prospective clients.

135.    By reason of the foregoing, Defendants Hyatt, Johnson, and HJ Capital violated Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### COUNT VI

**Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8**

136.    Paragraphs 1 through 113 are re-alleged and incorporated by reference as though fully set forth herein.

137.    At all times relevant to this Complaint, and as more fully described in paragraphs 1 through 113 above, Defendants Hyatt, Johnson, and HJ Capital acted as investment advisers to the HJ Capital LLCs and their investors.

138.    Each of the Defendants, while acting as an investment adviser to a pooled investment vehicle, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, has engaged in transactions, practices, and courses of business which operate as a fraud or deceit upon investors in the HJ Capital LLCs. Defendants made untrue statements of a material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the HJ Capital LLCs, and otherwise engaged in acts, practices or courses of business that was fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the HJ Capital LLCs.

139.    By reason of the activities described herein, the Defendants violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder.

## RELIEF REQUESTED

**Wherefore**, the SEC respectfully requests that this Court:

### I.

Find that Defendants Hyatt, Johnson, and HJ Capital committed the violations charged and alleged herein.

### II.

Grant Orders of Preliminary and Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Defendants Hyatt, Johnson, and HJ Capital, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the

transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) [15 U.S.C. § 78j] and 15(a)(1) [15 U.S.C. § 78o(a)(1)] of the Exchange Act and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Sections 206(1), (2) and (4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-8[17 C.F.R. § 275.206(4)-8] thereunder.

### III.

Issue an Order requiring Defendants Hyatt, Johnson, and HJ Capital to disgorge the ill-gotten gains that they received as a result of their wrongful conduct, including prejudgment interest.

### IV.

With regard to Defendants Hyatt, Johnson, and HJ Capital's violative acts, practices and courses of business set forth herein, issue an Order imposing upon Hyatt, Johnson, and HJ Capital appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(e)].

### V.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant appropriate emergency relief to prevent further secretion or dissipation of assets

invested by investors.

**VII**

Grant an Order for any other relief this Court deems appropriate.

Respectfully submitted,

Gregory von Schaumburg, IL Bar No. 3127782
Robin Andrews, IL Bar No. 6285644
Sally Hewitt, IL Bar No. 6193997
Attorneys for Plaintiff
U.S. SECURITIES AND
EXCHANGE COMMISSION
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated: April 18, 2008