UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

# FILED

APR 1 8 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| Plaintiff, | : : | CASE NO. |
| v. | : : : | 08cv2224 |
| JASON R. HYATT, JAY JOHNSON, and HYATT JOHNSON CAPITAL, LLC | : : : : | JUDGE LINDBERG MAG. JUDGE MASON |
| Defendants. | : : | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF EMERGENCY EX PARTE MOTION FOR ASSET FREEZE AND OTHER ANCILLARY RELIEF AND MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Plaintiff, the United States Securities and Exchange Commission ("SEC"), respectfully submits this memorandum in support of its Emergency Ex Parte Motion for Asset Freeze and Other Ancillary Relief and Motion for Preliminary Injunctive Relief ("Emergency Motion"). Financial records obtained recently by the SEC confirmed the existence of a brazen fraudulent scheme orchestrated by Defendants Jason Hyatt ("Hyatt"), Jay Johnson ("Johnson"), and Hyatt Johnson Capital, LLC ("HJ Capital") (collectively, "the Defendants") in which more than $5.4 million of investor funds have already been misappropriated. In particular, Defendant Hyatt used HJ Capital to misappropriate investor funds to support his lavish lifestyle and to operate a restaurant he co-owns. Defendant Johnson then participated in a scheme with Hyatt to divert investor funds to conceal Hyatt's misappropriation. The Defendants also made numerous

additional material misrepresentations to investors regarding their investments. In January 2008

depositions, Defendants Hyatt and Johnson repeatedly invoked their Fifth Amendment privilege

against self-incrimination, refusing to answer any questions about HJ Capital or their personal

finances. Due to repeated attempts by the Defendants to prevent the SEC from obtaining

documents, the SEC only recently received certain important bank records for the Defendants,

which uncovered the extent of the Defendants' fraud.

The SEC is seeking emergency relief, including an immediate asset freeze against Hyatt

and HJ Capital, because: (i) the Defendants are still managing a significant amount of investor

assets that are at risk of further misappropriation; and (ii) there is a risk that millions of dollars

worth of investor assets misappropriated by Hyatt will be further dissipated, in light of attempts

by Hyatt to liquidate properties purchased with stolen funds.

In particular, the danger of further misappropriation of investor funds is immediate and

acute. The SEC's analysis of recently obtained financial records indicates that Defendant Hyatt

is experiencing personal financial difficulties. In the meantime, significant amount of cash due

to investors continues to be deposited in HJ Capital bank accounts. Since Hyatt currently has

little personal liquid assets, Hyatt again will be tempted to steal from HJ Capital bank accounts

to alleviate his personal financial difficulties.

Finally, the SEC is taking the extraordinary step of submitting this Motion ex parte in

order to prevent Defendant Hyatt from draining the HJ Capital bank accounts once he becomes

aware of the SEC's emergency action, particularly since Hyatt has the ability to swiftly and

unilaterally remove all of the cash from the HJ Capital bank accounts without notice to anyone.

For these reasons, and the others discussed below, the SEC respectfully asks this Court

for an Emergency *Ex Parte* Order, including (1) an immediate freeze of all assets of Defendants

Hyatt and HJ Capital; (2) an order requiring Defendants Hyatt, Johnson, and HJ Capital to provide an immediate accounting of all funds received from investors as well as an accounting of any and all assets of the Defendants; (3) expedited discovery in anticipation of a preliminary injunction hearing; (4) an order prohibiting the destruction, mutilation, concealment, alteration, or disposition of any books and records; and (5) such further relief as the Court may deem appropriate. Upon notice to Defendants and a hearing, pursuant to Rule 65 of the Federal Rules of Civil Procedure, the SEC also respectfully asks this Court for a preliminary injunction against future violations by Defendants Hyatt, Johnson, and HJ Capital.

## STATEMENT OF FACTS [1]

Between 2003 and 2007, Defendants Hyatt, Johnson, and HJ Capital, while acting as unregistered broker-dealers and investment advisers, raised approximately $24.5 million from approximately 120 investors through the offer and sale of equity interests in at least 10 limited liability corporations ("LLCs") managed and operated by HJ Capital ("HJ Capital LLCs"). Hlavacek Decl. at ¶ 4. The Defendants represented to investors that the HJ Capital LLCs would invest their funds in LLCs operated by another company called BCI Aircraft Leasing, Inc. ("BCI"), which is owned and operated by its CEO Brian N. Hollnagel ("Hollnagel"). [2]  Id. at ¶ 5.

---

[1]      The facts set forth in this Memorandum are supported by the SEC's Attachments in Support of its Motion for Emergency Relief. The Attachments consist of: (A) transcripts of depositions of Defendants Hyatt and Johnson before the SEC staff on January 23, 2008; and (B) a Declaration from Scott J. Hlavacek, an Assistant Regional Director with the SEC's Division of Enforcement, executed April 18, 2008, and exhibits ("Hlavacek Decl."). Attachment C contains cases cited by this Memorandum that are not reported in the West National Reporter System.

[2]      In August 2007, the SEC filed an emergency action against BCI and its CEO Brian Hollnagel for operating a fraudulent scheme in which BCI raised $83 million from investors, including HJ Capital, in connection with the offer and sale of membership interests in BCI LLCs which purportedly purchased ownership interests in commercial aircraft. SEC v. Hollnagel et al., 1:07-cv-4538 (J. Bucklo). As a result of the emergency action, the Court made findings of fraud, issued a preliminary injunction against BCI and Hollnagel, and ordered BCI to repay all investors, including HJ Capital investors, within 60 days.

BCI, purportedly, would in turn use investor funds, along with other sources of funds, to purchase aircraft on lease to commercial airlines. Id. at ¶ 6.

Defendant Hyatt misappropriated at least $5.4 million in investor funds. Hlavacek Decl. at ¶¶ 10-13, 16-20, 38-44. Although Defendant Johnson did not personally receive any of the misappropriated funds, Johnson was aware of Hyatt's fraud, made misrepresentations to investors to conceal some of Hyatt's misappropriations, and furthered the fraud. Id. at ¶¶ 15, 27-37, 43-54. Contrary to the Defendants' representations that investor funds would be invested with BCI, Defendant Hyatt misappropriated nearly $1.6 million in investor funds from approximately 15 investors, who were told that their money would be invested in BCI LLCs. Id. at ¶¶ 16-20. Instead, Defendant Hyatt diverted these investor funds to support his luxurious personal lifestyle, including numerous mortgage payments and substantial home improvements for two of his homes, at least $155,000 worth of art and antiques, a Maserati, a Mercedes, a Hummer H2, a Yukon Denali, and other vehicles, as well as payments to the St. Charles Country Club. Id. at ¶¶ 57-58. Defendant Hyatt concealed from these investors that their $1.6 million was misappropriated, and have continued to mislead the investors into believing that their funds were properly invested in BCI LLCs, by among other things, paying them purported monthly distributions from aircraft lease income belonging to other investors. Id. at ¶ 26. In reality, the funds that these 15 investors have received were taken from other HJ Capital investors whose funds actually went to BCI. Id.

In addition, in February 2006, the Defendants offered and sold a note to an investor in the amount of $2 million ("the note investor"). Hlavacek Decl. at ¶¶ 10-15. The note investor was told that his $2 million would be invested in a BCI – HJ Capital joint venture that would use the funds to purchase a group of commercial aircraft. Id. at ¶ 11. Instead, Defendant Hyatt diverted

4

this money to a Latin-themed restaurant in Chicago named De La Costa, which Hyatt co-owned with several other partners. Id. at ¶¶ 12-14.

When Defendant Johnson became aware of Hyatt's misappropriation of the $2 million from the note investor, Johnson did not take any steps to inform the note investor, instead participating in a scheme with Hyatt to cover up this fraud. Hlavacek Decl. at ¶¶ 15, 29-32. Specifically, Defendants Hyatt and Johnson diverted at least $2.4 million from other HJ Capital investors to the note investor. Id. at ¶¶ 23-32. The Defendants failed to disclose to the other HJ Capital investors that the $2.4 million payment to the note investor was misappropriated from proceeds of HJ Capital's sale of the investors' BCI investments back to BCI, which belonged to the other investors, and not to the note investor. Id. at ¶ 30. In fact, when HJ Capital investors confronted Defendant Johnson with their concerns that the note investor's $2.4 million should not be paid out of the their funds, Johnson made false representations to these HJ Capital investors regarding the source of that $2.4 million payment. Id.

In addition, Hyatt misappropriated nearly $1.8 million of investor funds in the form of undisclosed commissions. Hlavacek Decl. at ¶¶ 38-43. Some of HJ Capital LLCs' offering materials disclosed that HJ Capital would be entitled to "organization fees" of certain specific percentages of the total investment, i.e. commissions. Id. at ¶ 41. Based on the percentages disclosed, HJ Capital disclosed total potential fees of $770,000. Id. at ¶ 42. Instead, between 2003 and 2006, BCI paid over $2.5 million in total commissions out of HJ Capital investor funds, primarily through checks payable to Hyatt, which Hyatt then deposited into his personal bank accounts. Id. at ¶¶ 38, 43-44. Defendant Johnson received and reviewed tax records received from BCI indicating that Hyatt had been receiving excess commissions. Id. at ¶ 45.

Defendants Hyatt and Johnson never disclosed these excess commissions to investors while continuing to solicit additional investments. Id. at ¶¶ 42-43, 45.

The Defendants also made certain assurances to investors regarding the legitimacy of the BCI securities in which the HJ Capital LLCs were invested, without having any reasonable basis for such assurances. In particular, the Defendants falsely assured investors that, as part of their management of the HJ Capital LLCs, they had performed and would continue to perform due diligence regarding BCI's use of investor funds. Hlavacek Decl. at ¶¶ 47-54. The Defendants had in fact done little, if anything, to verify the legitimacy of the BCI offerings. See, e.g., id. Furthermore, the Defendants received records indicating that BCI was diverting HJ Capital investor funds for improper uses, but failed to disclose this fact to investors or follow up on these inappropriate diversions. Id. at ¶¶ 48-52.

In the meantime, the Defendants continue to maintain control over millions of dollars in investor funds and assets. In July 2007, BCI negotiated a purported buy out of all of the investments in BCI by HJ Capital. Hlavacek Decl. at ¶ 23. Specifically, the HJ Capital LLCs would sell their interests in the BCI LLCs back to BCI in exchange for a single $22.7 million promissory note and $2.35 million in cash. Id. In September 2007, this promissory note was then sold back to BCI in exchange for ownership of six aircraft on lease and certain future cash payments to HJ Capital. Id. In particular, Defendant HJ Capital owns aircraft on behalf of its investors, which are currently generating excess lease revenue. Id. at ¶ 55. Within the next month, HJ Capital will receive $292,084 in excess monthly lease revenue, including $50,000 on April 22nd, which will be deposited into an HJC Asset Holdings bank account controlled by the Defendants. Id.

In addition, financial records recently obtained by the SEC indicate that Defendant Hyatt may be experiencing personal financial difficulties. Defendant Hyatt has been severely delinquent in paying two personal credit cards since April and November 2007 respectively, has been accumulating late payment charges and finance charges, and has total outstanding balances of approximately $113,000 on those two credit cards. Hlavacek Decl. at ¶ 56. In addition, assets purchased with misappropriated investor funds are at risk of further dissipation because Defendant Hyatt has been attempting to sell assets purchased with stolen investor funds, including two homes and his restaurant, De La Costa, which were all at least partially financed with investor funds. Id. at ¶¶ 57-60. As recently as March 2008, Johnson endorsed at least $20,000 in checks drawn against the HJ Capital account payable to Hyatt. Id. at ¶ 62.

In January 2008 depositions in connection with the SEC's action against BCI, Defendants Hyatt and Johnson repeatedly invoked their Fifth Amendment privilege against self-incrimination, refusing to answer any questions about HJ Capital, BCI, or their personal finances. See Attachment A. In addition, Defendant Hyatt may have already improperly destroyed relevant evidence of his fraud. The SEC has been attempting to obtain HJ Capital documents from Mr. Hyatt since June 2007. During an April 14, 2008 hearing in SEC v. Hollnagel, 1:07-cv-4538 (J. Bucklo), counsel for Defendant HJ Capital represented to the Court that a forensics consultant hired by HJ Capital had examined two computers used by Defendant Hyatt for HJ Capital business, and that this forensics consultant discovered that "scrubbing software," which is used to "wipe" or permanently erase files contained on computer hard drives, had been installed on these computers. Hlavacek Decl. at ¶ 63.

## ARGUMENT

I.    **THE DEFENDANTS VIOLATED THE FEDERAL SECURITIES LAWS.**

A.    **The Defendants Violated of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.**

Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)]

prohibits fraudulent conduct by any person in the offer or sale of securities, and Section 10(b) of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. § 240.10b-5] prohibit fraud in connection with the purchase or sale of a

security.  See, e.g., United States v. Naftalin, 441 U.S. 768, 772, 778 (1979); Ernst & Ernst v.

Hochfelder, 425 U.S. 185, 195-96 (1976).  To establish a violation of these provisions, the SEC is

required to show that the Defendants made material misrepresentations or omissions and that

they acted with scienter in doing so.[3]  See Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988);

SEC v. Jakubowski, 150 F.3d 675, 681 (7th Cir. 1998).  "Reckless conduct is, at the least, conduct

which is highly unreasonable and which represents an extreme departure from the standards of

ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that

the defendant must have been aware of it."  Rehm v. Eagle Fin. Corp., 954 F. Supp. 1246, 1255

(N.D. Ill. 1997) (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)

(alteration in original)).  A company may have imputed to it the scienter of the individuals who

control it.  See SEC v. Montana, 464 F. Supp. 2d 772, 784 (S.D Ind. 2006).

---

[3]    Reckless conduct also satisfies the scienter requirement.  See SEC v. Blavin, 760 F.2d 706, 711 (6th Cir. 1985).  Scienter is only required to establish a violation of Section 17(a)(1) of the Securities Act. A showing of negligence is sufficient to establish violations of Section 17(a)(2) and (3).  See Aaron v. SEC, 446 U.S. 680, 696-97 (1980).

    1.    **Defendant Hyatt Misappropriated Nearly $5.4 Million from Investors, While Defendant Johnson Made Misrepresentations and Further Misappropriated Funds to Conceal Hyatt's Fraud.**

Contrary to Defendants' representations that investor funds would be invested with BCI, Defendant Hyatt misappropriated nearly $5.4 million in investor funds for his own personal use. Defendants Hyatt and Johnson raised nearly $3.6 million in investor funds from approximately 15 investors, purportedly to invest in BCI LLCs or a BCI – HJ Capital joint venture, and another nearly $1.8 million in the form of undisclosed commissions, which Defendant Hyatt misappropriated for his personal use. A reasonable investor would have found these misrepresentations regarding the use of proceeds and undisclosed commissions to be material. See SEC v. Smith, 2005 U.S. Dist. LEXIS 21427 at *14-16 (S.D. Ohio 2005) (holding that uses of proceeds are material); SEC v. Softpoint, Inc., 958 F. Supp. 846, 863 (S.D.N.Y. 1997) (company's payments to brokerage firms were omitted from the press releases and SEC filings and were "material information"); Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 242 (2d Cir. 1985) (commissions are material and must be disclosed). Defendant Hyatt clearly acted with scienter; he was fully aware of what investors were told regarding the use of their funds and the size of commissions that the Defendants were entitled to, and yet he misappropriated investor funds for his personal use. While Defendant Johnson did not receive any of these stolen investor funds, he knew or was reckless in not knowing that Hyatt had misappropriated investor funds, and yet he failed to disclose this fact to any investors, instead making further misrepresentations and improperly diverting $2.4 million from other investors to conceal Hyatt's fraud.

2.    **The Defendants made False Assurances to Investors Regarding BCI Offerings Without a Reasonable Basis.**

The Defendants made certain assurances to investors regarding the legitimacy of the BCI securities in which the HJ Capital LLCs were invested, without having any reasonable basis for such assurances. The Defendants made various statements to investors to assure them of the legitimacy of the BCI LLC investments, including but not limited to, falsely assuring investors that, as part of their management of the HJ Capital LLCs, they had performed and would continue to perform due diligence regarding BCI's use of investor funds. In fact, the Defendants did little if anything to verify the legitimacy of the BCI securities. In particular, the Defendants failed to take any action even though they had access to records BCI sent to HJ Capital that indicated that BCI was improperly diverting HJ Capital investor funds. A reasonable investor would find these false assurances regarding the legitimacy of the BCI offerings to be material.

The Defendants acted with scienter regarding these false assurances to investors. The Defendants knew or were reckless in not knowing that they had not performed due diligence. As a result, the Defendants had no basis for the assurances they made to investors regarding the legitimacy of the BCI offerings and BCI's use of HJ Capital investor funds, and thus, at a minimum, they acted recklessly. See SEC v. Infinity Group, 212 F.3d 180, 194 (3rd Cir. 2000) ("Although defendants assert a good faith belief that their representations were true, 'an opinion that has been issued without a genuine belief or reasonable basis is an 'untrue' statement which, if made knowingly or recklessly, is culpable conduct actionable under [the securities laws].'").

B.    **The Defendants Violated Section 15(a)(1) of the Exchange Act.**

Hyatt and Johnson, through their alter ego HJ Capital, acted as brokers in connection with the HJ Capital LLCs' investment in BCI LLCs. However, HJ Capital, Hyatt, and Johnson failed to register as broker-dealers, in violation of Section 15(a)(1) of the Exchange Act. Section 15(a)(1) of

10

the Exchange Act [15 U.S.C. § 78o(a)(1)] requires the registration of "any broker or dealer who makes use of the mails or interstate facilities to engage in securities transactions."[4] Section 3(a)(4) of the Exchange Act defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." [15 U.S.C. § 78c(a)(4)]

The Defendants violated Section 15(a)(1) of the Exchange Act by acting as broker-dealers without registering with the SEC. As described above, Hyatt and Johnson, through their alter ego HJ Capital, bought and sold BCI securities on behalf of the HJ Capital LLCs and received commissions from BCI in connection with these investments. These activities are central characteristics of being a broker-dealer. See, e.g., Cornhusker Energy Lexington, LLC v. Prospect St. Ventures, 2006 U.S. Dist. LEXIS 68959 (D. Neb. 2006) (citing John Woods, Loofbourrow Associates, Inc., 2006 SEC No-Act. LEXIS 523 at *5 (June 29, 2006) ("Transaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer")). See also SEC v. Montana, 2007 U.S. Dist. LEXIS 40490 at *2, *7-8 (D. Ind. 2007) (individual defendant, who "owned and operated [entity defendant] as an alter ego," also violated Section 15(a)(1)). Though Defendants HJ Capital, Hyatt and Johnson acted as broker-dealers, they did not register as such with the SEC. Hlavacek Decl. at ¶ 46. Accordingly, the Defendants violated Section 15(a)(1) of the Exchange Act.

## C.    The Defendants Violated Sections 206(1) and (2) of the Advisers Act.

Defendants Hyatt, Johnson, and HJ Capital acted as investment advisers who directly violated Sections 206(1) and 206(2) of the Advisers Act, in connection with their management of the HJ Capital LLCs. Section 202(a)(11) of the Advisers Act defines an investment adviser as any person who, (a) for compensation, (b) engages in the business of advising others as to the

---

[4]      Scienter is not an element of a violation of Section 15(a). See SEC v. National Executive Planners, Ltd., 503 F. Supp. 1066, 1073 (M.D.N.C. 1980); Eastside Church of God v. National Plan, Inc., 391 F.2d 357, 361-62 (5th Cir.), cert. denied, 393 U.S. 913 (1968).

11

value of securities or as to the advisability of investing in, purchasing, or selling securities. Hyatt and Johnson each provided investment advice to investors "by exercising control over what purchases and sales [were] made with [investor] funds" on behalf of the HJ Capital LLCs. Abrahamson v. Fleschner, 568 F.2d 862, 871 (2d Cir. 1977); see also SEC v. Haligiannis, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) (quoting Abrahamson). As noted above, investors were told that as part of each HJ Capital LLC offering, and in exchange for an "Asset Management Fee," HJ Capital would manage the HJ Capital LLCs as a fiduciary with the authority to make investment decisions on behalf of the particular HJ Capital LLC. Furthermore, the Defendants exercised their authority to make investment decisions on behalf of the HJ Capital LLCs when, in July 2007, they sold all of the HJ Capital LLCs' interests in BCI LLCs back to BCI in exchange for a promissory note.

Defendants Hyatt and Johnson may be charged under Section 206 because their conduct coupled with their complete ownership and control of HJ Capital satisfy the broad definition of "investment adviser." See, e.g., John J. Kenny and Nicholson/Kenny Capital Management, Inc., IA Rel. No. 2128 (May 14, 2003) (stating that an associated person of an investment adviser may be charged as a primary violator under Section 206 where the activities of the associated person cause him or her to meet the broad definition of "investment adviser"). Both Hyatt and Johnson owned HJ Capital, controlled its operations, controlled every investment decision made by HJ Capital, and were responsible for its management. Furthermore, the Supreme Court has held that the Advisers Act establishes a statutory fiduciary duty for investment advisers to act for the benefit of their clients. Transamerica Mortgage Adviser, Inc. v. Lewis, 444 U.S. 11, 17 (1979). An adviser's fiduciary duties include "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 191-

94 (1963); Decker v. SEC, 631 F.2d 1380, 1384 (10th Cir. 1980). A fact is considered material if

there is a substantial likelihood that a reasonable investor would consider it important. Basic,

4875 U.S. at 233.

Section 206 of the Advisers Act makes it unlawful for any investment adviser to deceive

or defraud any client or prospective client. Sections 206(1) and 206(2) of the Advisers Act make

it unlawful for an investment adviser to employ any device, scheme, or artifice to defraud clients

or to engage in any transaction, practice, or course of business that defrauds clients or

prospective clients. These provisions require that the fraud concern a material fact. Capital

Gains, 375 U.S. at 200. Materiality is defined by the same standard used under the antifraud

provisions of the Securities Act and the Exchange Act. Steadman v. SEC, 603 F.2d 1126, 1130

(5th Cir. 1979), aff'd, 450 U.S. 91 (1981). Thus, misrepresented or omitted information is

material under Section 206 if it would be considered important by a reasonable client or

prospective client. Basic, 485 U.S. at 231-32. Finally, scienter is required to establish a

violation of Section 206(1); simple negligence suffices to establish a violation of Section 206(2).

SEC v. Steadman, 967 F.2d 636, 647 (D.C. Cir. 1992).

As explained above, the Defendants acted as investment advisers and therefore were

fiduciaries to their investment advisory clients, in this case, the HJ Capital LLCs. In addition,

offering materials explicitly represented to investors that HJ Capital, as manager of the HJ

Capital LLCs, acted as a fiduciary to the LLCs. In Capital Gains, the Supreme Court addressed

the care owed clients by their investment adviser and explained that obligation as: "[an]

affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts,' as well

as an affirmative obligation 'to employ reasonable care to avoid misleading' his clients." 375

U.S. at 194. In this capacity, Defendants defrauded the HJ Capital LLCs by misappropriating

13

assets from the funds. Defendant Hyatt misappropriated nearly $3.6 million in investor funds for his personal use. Defendant Johnson, aware of Hyatt's misappropriation, made misleading statements to investors to help conceal Hyatt's misappropriation, and then participated in the misappropriation of $2.4 million from other LLCs to repay the note investor.

**D.    The Defendants Violated Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder.**

Section 206(4) of the Advisers Act prohibits an investment adviser from, directly or indirectly, engaging in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. Rule 206(4)-8, which became effective on September 10, 2007, defines such prohibited conduct. Advisers to "pooled investment vehicles" are barred from making false or misleading statements to investors or prospective investors in those pools or otherwise defrauding investors or prospective investors. 17 C.F.R. § 275.206(4)-8; Prohibition of Fraud by Advisers to Certain Pooled Investment Vehicles, SEC Release No. IA-2628 (Aug. 9, 2007). Pooled investment vehicles include hedge funds, private equity funds, venture capital funds, and other types of offered pools that invest in securities. Id. This rule is modeled on Sections 206(1) and (2) of the Advisers Act and prevents advisers to investment pools from making a misstatement or omission, which renders statements that were made misleading, of a material fact to current or prospective investors. Scienter is not required – conduct that is negligently, recklessly, or deliberately deceptive is sufficient. SEC Release No. IA-2628 (Aug. 9, 2007).

The Defendants violated Sections 206(4) and Rule 206(4)-8 by making misrepresentations to the HJ Capital investors regarding the use of their investment funds. In addition, the Defendants directed that $2.4 million belonging to the LLCs be improperly diverted to the note investor in order to conceal Hyatt's earlier misappropriation of his investment. In connection with that transaction, and BCI's buy out of the HJ Capital LLC's interests in the BCI

14

LLCs, the Defendants also made numerous misrepresentations to investors regarding the assets

and money that BCI would be paying to HJ Capital investors. For example, when the

Defendants disclosed details regarding the size of payments from BCI belonging to investors,

they failed to also disclose the fact that they had diverted some of those payments to the note

investor for an unrelated investment. The Defendants also falsely assured investors that, as part

of their management of the HJ Capital LLCs, they had performed and would continue to perform

due diligence regarding BCI's use of investor funds. Furthermore, the Defendants failed to

disclose to investors, among other things, material facts regarding the use of investor proceeds

and the amount of commissions received from BCI, despite having an affirmative duty to

disclose such facts as investment advisers. As described above, these misrepresentations

regarding the use of proceeds and source of buyout funds were material.

     **E.**     **The SEC is Entitled to an Adverse Inference Against the Defendants for their Invocation of their Fifth Amendment Privileges Against Self-Incrimination During Their Depositions.**

     As noted above, in January 2008 depositions in connection with the SEC's action against

BCI, Defendants Hyatt and Johnson repeatedly invoked their Fifth Amendment privilege against

self-incrimination, refusing to answer any questions about HJ Capital, BCI, or their personal

finances. <u>See</u> Attachment A. As a result, the SEC is entitled to an adverse inference against

Defendants Hyatt and Johnson with regards to the matters for which they invoked their Fifth

Amendment privileges against self-incrimination. <u>See</u> <u>Baxter v. Palmigiano</u>, 425 U.S. 308, 318

(1976); <u>Pagel, Inc. v. SEC</u>, 803 F.2d 942, 946-947 (8th Cir. 1986) (in civil litigation a witness'

invocation of the Fifth Amendment permits a court to draw an "adverse inference" against an

individual who refuses to testify in the face of incriminating evidence).

## II.    THE COURT SHOULD GRANT AN EMERGENCY EX PARTE ASSET FREEZE AND OTHER ANCILLARY RELIEF.

### A.    An Emergency Ex Parte Order Freezing HJ Capital's and Hyatt's Assets

This Court should issue an emergency ex parte order freezing the assets of Defendants HJ Capital and Hyatt. Such an order will prevent HJ Capital and Hyatt from taking further steps to dissipate the funds that were misappropriated from investors. An ex parte order is necessary so that HJ Capital and Hyatt will not be able to dissipate assets prior to a hearing before this Court. Upon notice and hearing, the Court should freeze HJ Capital's and Hyatt's assets for the duration of this matter.

Based upon records recently obtained by the SEC, it appears that the Defendants are still depleting HJ Capital funds as recently as March 2008, as evidenced by $20,000 in checks drawn against the HJ Capital account payable directly to Hyatt and signed by Johnson. Hyatt also used investor funds to purchase at least $155,000 worth of art and antiques, a Maserati, a Mercedes, a Hummer H2, a Yukon Denali, and other vehicles. Hyatt has been attempting to sell at least two houses worth a total of at least $2 million and the restaurant De La Costa. In light of Hyatt's prior behavior, there is a continued risk that Hyatt may further misappropriate investor funds under HJ Capital's control.

It is well settled that Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] confer general equity powers upon the Court in an SEC action brought pursuant to these provisions. Manor Nursing Centers, Inc., 458 F.2d at 1103; SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1307 (2d Cir. 1971). Once the equity jurisdiction of the district court has been properly invoked, the full panoply of equitable remedies is available to the Court to effectuate the statutory purpose, including the ordering of non-injunctive relief in a variety of forms. See J.I. Case Co. v. Borak, 377 U.S. 426, 433 (1964);

SEC v. Materia, 745 F.2d 197, 200 (2d Cir. 1984). In particular, the Court may require the defendants to disgorge ill-gotten gains obtained from violating the federal securities laws. SEC v. Shapiro, 494 F.2d 1301, 1309 (2d Cir. 1974); Manor Nursing Centers, Inc., 458 F.2d at 1105.

In order to enforce the equitable remedy of disgorgement, this Court has the power to freeze a defendant's assets to ensure that the defendant will not secrete or dissipate any assets pending the entry of a final order. See SEC v. Cherif, 933 F.2d 403, 407 (7th Cir. 1991) (court entered ex parte asset freeze pending hearing for preliminary injunction). As stated in SEC v. Vaskevitch, 657 F.Supp. 312, 315 (S.D.N.Y. 1987), "...the Court certainly has the ability to ensure that the defendants' assets are not secreted or dissipated before entry of final judgment concluding this action." Indeed, courts have often recognized that a disgorgement order will be rendered meaningless unless an asset freeze is imposed prior to the time of entry of final judgment. See, e.g., SEC v. Lauer, 52 F.3d 667, 671 (7th Cir. 1995); International Controls Corp. v. Vesco, 490 F.2d 1334, 1347 (2d Cir. 1974).

It is well-established that courts have the authority in securities fraud cases to grant ancillary relief, including an asset freeze, in order to preserve funds necessary to satisfy any final judgment. See, e.g., SEC v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1988); Unifund Sal, 910 F.2d at 1041. The SEC faces a lower threshold in order to establish an asset freeze. In this respect, the SEC need only establish that it is "likely to succeed on the merits." SEC v. Homa, 2000 U.S. Dist. LEXIS 16754 at **9-10 (N.D. Ill. 2000), aff'd 2001 U.S. App LEXIS 19127 (7th Cir. 2001); Cavanagh, 155 F.3d at 132. Moreover, where there are concerns that defendants might dissipate assets, a court need only find some basis for inferring a violation of the federal securities laws in order to impose an asset freeze. See Homa, 2000 U.S. Dist. LEXIS 16754 at ** 14-15; Infinity

Group Co., 212 F.3d at 197 (purpose of asset freeze is to preserve status quo by preventing dissipation and diversion of assets); Unifund Sal, 910 F.2d at 1041.

The entry of an order freezing the assets of Defendants HJ Capital (and all related entities including subsidiaries and entities under its control) and Hyatt (and any entities under his control) is necessary in this matter because the Defendants continue to maintain control over millions of dollars in investor funds and assets. In particular, Defendants continue to manage the six aircraft they received from BCI in the September transaction, including receiving monthly lease revenue. These aircraft are currently generating excess lease revenue and within the next month HJ Capital should receive $292,084 in excess monthly lease revenue, including $50,000 on April 22nd, which will be deposited into a HJC Asset Holdings bank account controlled by the Defendants. Investor funds thus remain at risk of being misappropriated.

In addition, financial records recently obtained by the SEC indicate that Defendant Hyatt may be experiencing personal financial difficulties. Defendant Hyatt has been severely delinquent in paying two of his personal credit cards since April and November 2007 respectively, has been accumulating late payment charges and finance charges, and has total outstanding balances of approximately $113,000 on those two credit cards. Since Defendant Hyatt currently has little personal assets that are liquid, the SEC is concerned that Hyatt may be tempted to again use funds from HJ Capital bank accounts to alleviate his personal financial difficulties. In addition, assets purchased with misappropriated investor funds are at risk of further dissipation because Defendant Hyatt has been attempting to sell assets purchased with stolen investor funds, including two homes and his restaurant, De La Costa, which were all at least partially financed with investor funds. As recently as March 2008, Johnson endorsed at least $20,000 in checks drawn against the HJ Capital account payable to Hyatt. Finally, since

18

Defendant Hyatt has the ability to swiftly and unilaterally remove all of the cash from the HJ Capital bank accounts without notice to anyone, emergency relief, including an ex parte asset freeze, is necessary to prevent Hyatt from draining the HJ Capital bank accounts once he becomes aware of the SEC's emergency action.

Furthermore, the SEC needs emergency ex parte relief because Defendant Hyatt may have already improperly destroyed relevant evidence of his fraud. During an April 14, 2008 hearing in SEC v. Hollnagel, 1:07-cv-4538 (J. Bucklo), Counsel for Defendant HJ Capital represented to the Court that a forensics consultant hired by HJ Capital had examined two computers used by Defendant Hyatt for HJ Capital business, and that this forensics consultant discovered that "scrubbing software," which is used to "wipe" or permanently erase files contained on computer hard drives, had been installed on these computers. Consequently, the SEC is also concerned that if Defendant Hyatt is informed of the SEC's action, he may take additional steps to destroy or conceal relevant evidence. Accordingly, the SEC respectfully asks that this Court enter an ex parte order freezing HJ Capital's and Hyatt's assets.

### B.    An Accounting of all Investor Funds

To determine accurately the scope of a fraud and a defendant's ability to disgorge illicit proceeds, courts frequently require defendants to provide an accounting of all monies or property obtained as a result of any fraudulent activity, as well as their current financial resources or assets. See, e.g., SEC v. International Swiss Inv. Corp., 895 F.2d 1272, 1276 (9th Cir. 1990). An accounting is needed from Defendants HJ Capital, Hyatt and Johnson to determine the scope of their involvement in the fraud and to determine the amount of assets available for disgorgement. The SEC thus asks for an order requiring Defendants Hyatt, Johnson, and HJ

19

Capital to provide an immediate accounting of all funds received from investors as well as an accounting of any and all assets of Defendants Hyatt, Johnson, and HJ Capital.

### C.    Other Ancillary Relief

In order to take meaningful discovery in anticipation of a hearing on the SEC's motion for a preliminary injunction, the SEC asks the Court for an order that discovery be expedited. Finally, the SEC asks the Court for an order prohibiting the destruction, mutilation, concealment, alteration, or disposition of any books and records in the possession or control of Defendants.

## III.    THE COURT SHOULD ALSO GRANT INJUNCTIVE RELIEF.

Preliminary and permanent injunctive relief is necessary and appropriate in this matter. Section 20(b) of the Securities Act, Section 21(d) of the Exchange Act, and Section 209(d) of the Advisers Act allow the Commission, "upon a proper showing," to seek "a permanent or temporary injunction." This "proper showing" has been described as a "justifiable basis for believing, derived from reasonable inquiry or other credible information, that such a state of facts probably existed as reasonably would lead the SEC to believe that the defendants were engaged in violations of the statutes involved." SEC v. Unifund Sal, 910 F.2d 1028, 1041 (2d Cir. 1990). Such a showing is made when the Commission presents a prima facie case that the defendants violated the law. SEC v. The Fundpack, Inc., [1979 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,951 (D.D.C. 1979); SEC v. Falstaff Brewing Corp., [1977-78 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 96,117 (D.D.C. 1977); SEC v. General Refractories Co., 400 F. Supp. 1248, 1255 (D.D.C. 1975); SEC v. American Institute Counselors Inc., [1975-6 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,388 (D.D.C. 1975).

In analyzing the need for injunctive relief, courts focus on whether there is a reasonable likelihood that the defendant, if not enjoined, will engage in future illegal conduct. SEC v.

Bonastia, 614 F.2d 908 (3d Cir. 1980); SEC v. Commonwealth Chemical Securities, Inc., 574

F.2d 90, 100-01 (2d Cir. 1978). In granting or denying injunctive relief, courts have considered

the following factors: (1) the egregiousness of the violations; (2) the isolated or repeated nature

of the violations; (3) the degree of scienter involved; (4) the sincerity of the defendant's

assurances, if any, against future violations; (5) the defendant's recognition of the wrongful

nature of his conduct;[5] (6) the likelihood that the defendant's occupation will present

opportunities (or lack thereof) for future violations; and (7) the defendant's age and health. See

Bonastia, 614 F.2d at 912; Commonwealth, 574 F.2d at 100; and SEC v. Youmans, 729 F.2d 413

(6th Cir. 1984).

The Commission is entitled to preliminary injunctive relief if it establishes 1) a prima

facie showing of violations, and 2) "a reasonable likelihood that the wrong will be repeated." [6]

SEC v. First Financial Group of Texas, 645 F.2d 429, 434-35 (5th Cir. 1981); see also SEC v.

Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972); SEC v. WACO Financial,

Inc., 518 F. Supp. 651, 654 (W.D. Mich. 1981). Based on the facts detailed above, a preliminary

injunction against the Defendants is warranted.

The facts in this case support the need for preliminary and permanent injunctions against

Hyatt, Johnson, and HJ Capital. The Defendants' conduct was particularly egregious, in that it

involved misappropriation, deception, and a substantial breach of their fiduciary duties.

Defendant Hyatt in particular misappropriated nearly $5.4 million from investors between 2003

---

[5]     This consideration is limited by SEC v. First City Financial Corp., 890 F.2d 1215, 1229 (D.C. Cir. 1989), in which the court stated that "'lack of remorse' is relevant only where the defendants have previously violated court orders, see SEC v. Koenig, 469 F.2d 198, 202 (2d Cir. 1972), or otherwise indicate that they do not feel bound by the law, see SEC v. Savoy Indus., 587 F.2d 1149, 1168 (D.C. Cir. 1978)."

[6]     Because the SEC is a government agency seeking an injunction in the public interest, it is not required to prove irreparable injury, a balance of the equities in its favor or the unavailability of remedies at law. Unifund Sal, 910 F.2d at 1035-36.

and 2007. Defendant Johnson was aware of Hyatt's misappropriation and yet failed to disclose any of Hyatt's prior fraud when soliciting subsequent investments. Defendant Johnson repeatedly made misleading statements to investors regarding BCI's use of the HJ Capital LLCs' funds, and the Defendants misled investors regarding their purported performance of due diligence regarding BCI's use of investor funds.

Furthermore, the Defendants pose a continuing threat to investors, as they continue to manage the six aircraft they received from BCI in the September transaction, including receiving monthly lease revenue. These aircraft are currently generating excess lease revenue and within the next month HJ Capital should receive $292,084 in excess monthly lease revenue, including $50,000 on April 22nd, which will be deposited into a HJC Asset Holdings bank account controlled by the Defendants. In addition, Defendant Hyatt has been attempting to sell assets purchased with pilfered investor funds, including two homes and his majority interest in the restaurant De La Costa.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court issue an order of Preliminary Injunction against the Defendants and the ancillary relief requested above.

Respectfully submitted,

Gregory von Schaumburg, IL Bar No. 3127782
Robin Andrews, IL Bar No. 6285644
Sally Hewitt, IL Bar No. 6193997
Attorneys for Plaintiff
U.S. SECURITIES AND
EXCHANGE COMMISSION
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated: April 18, 2008

22