**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES SECURITIES** | : |
| **AND EXCHANGE COMMISSION,** | : |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : **CASE NO.  1:08-cv-2224** |
| | : |
| **JASON R. HYATT,** | : |
| **JAY JOHNSON, and** | : **Honorable George W. Lindberg** |
| **HYATT JOHNSON CAPITAL, LLC** | : |
| | : **Magistrate Judge Michael T. Mason** |
| **Defendants.** | : |
| | : |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION TO PLACE ALL ASSETS OF DEFENDANT JASON R. HYATT**
**UNDER THE CONTROL OF THE EXISTING RECEIVER**

Plaintiff, the United States Securities and Exchange Commission ("SEC"), respectfully submits this Memorandum in Support of its Motion to place all assets of Defendant Jason R. Hyatt ("Defendant Hyatt") under the control of the existing receiver, Robert P. Handler, Esq., who is currently the receiver for Defendant HJ Capital.[1]  The SEC submits its Motion and this Memorandum in order to protect and recover investor funds and assets raised in a fraudulent scheme orchestrated by Defendants Hyatt, Hyatt Johnson Capital, LLC ("HJ Capital"), and Jay Johnson ("Johnson").

**STATEMENT OF FACTS** [2]

Between 2003 and 2007, Defendants Hyatt, Johnson, and HJ Capital, while acting as

---

[1]    On May 5, the Court entered an agreed order appointing Robert P. Handler, Esq. as receiver over Defendant HJ Capital.  Docket No. 34.

[2]    The facts set forth in this Memorandum are primarily supported by Attachment 1, a Declaration from Scott J. Hlavacek, an Assistant Regional Director with the SEC's Division of Enforcement, executed June 6, 2008, and exhibits ("Hlavacek Decl.").

unregistered broker-dealers and investment advisers, raised approximately $24.5 million from approximately 120 investors through the offer and sale of equity interests in at least 10 limited liability corporations ("LLCs") managed and operated by HJ Capital ("HJ Capital LLCs"). (Docket No. 14) Hlavacek Decl. at ¶ 4.  The Defendants represented to investors that the HJ Capital LLCs would invest their funds in LLCs operated by another company called BCI Aircraft Leasing, Inc. ("BCI"), which is owned and operated by its CEO Brian N. Hollnagel ("Hollnagel").  Id. at ¶ 5.  BCI, purportedly, would in turn use investor funds, along with other sources of funds, to purchase aircraft on lease to commercial airlines.  Id. at ¶ 6.

Defendant Hyatt misappropriated at least $5.4 million in investor funds.  Hlavacek Decl. at ¶¶ 10-13, 16-20, 23-29.  Contrary to the Defendants' representations that investor funds would be invested with BCI, Defendant Hyatt misappropriated nearly $1.6 million in investor funds from approximately 15 investors, who were told that their money would be invested in BCI LLCs.  Id. at ¶¶ 16-20.  Instead, Defendant Hyatt diverted these investor funds to support his luxurious personal lifestyle, including numerous mortgage payments and substantial home improvements for two of his homes, at least $155,000 worth of art and antiques, a Maserati, a Mercedes, a Hummer H2, a Yukon Denali, and other vehicles, as well as payments to the St. Charles Country Club.  Id. at ¶¶ 31-32.  Defendant Hyatt concealed from these investors that their $1.6 million was misappropriated, and have continued to mislead the investors into believing that their funds were properly invested in BCI LLCs, by among other things, paying them purported monthly distributions from aircraft lease income belonging to other investors. Id. at ¶ 26.  In reality, the funds that these 15 investors have received were taken from other HJ Capital investors whose funds actually went to BCI.  Id.

In addition, in February 2006, the Defendants offered and sold a note to an investor in the amount of $2 million ("the note investor"). Hlavacek Decl. at ¶¶ 10-15. The note investor was told that his $2 million would be invested in a BCI – HJ Capital joint venture that would use the funds to purchase a group of commercial aircraft. Id. at ¶ 11. Instead, Defendant Hyatt diverted this money to a Latin-themed restaurant in Chicago named De La Costa, which Hyatt co-owned with several other partners. Id. at ¶¶ 12-14. The holding company for this restaurant is called Panacea Partners.

In addition, Hyatt misappropriated nearly $1.8 million of investor funds in the form of undisclosed commissions. Hlavacek Decl. at ¶¶ 23-28. Some of HJ Capital LLCs' offering materials disclosed that HJ Capital would be entitled to "organizational fees" of certain specific percentages of the total investment, i.e. commissions. Id. at ¶ 26. Based on the percentages disclosed, HJ Capital disclosed total potential fees of $770,000. Id. at ¶ 27. Instead, between 2003 and 2006, BCI paid over $2.5 million in total commissions out of HJ Capital investor funds, primarily through checks payable to Hyatt, which Hyatt then deposited into his personal bank accounts. Id. at ¶¶ 23, 28-29. Defendant Hyatt never disclosed these excess commissions to investors and continued to solicit additional investments. Id. at ¶¶ 27-28.

In January 2008 depositions in connection with the SEC's action against BCI, Defendant Hyatt repeatedly invoked his Fifth Amendment privilege against self-incrimination, refusing to answer any questions about HJ Capital, BCI, Panacea Partners, LLC, discussed below, or his personal finances. In addition, Defendant Hyatt may have already improperly destroyed relevant evidence of his fraud. The SEC has been attempting to obtain HJ Capital documents from Mr. Hyatt since June 2007. During an April 14, 2008 hearing in SEC v. Hollnagel, 1:07-cv-4538 (J. Bucklo), former counsel for Defendant HJ Capital represented to the Court that a

forensics consultant hired by HJ Capital had examined two computers used by Defendant Hyatt for HJ Capital business, and that this forensics consultant discovered that "scrubbing software," which is used to "wipe" or permanently erase files contained on computer hard drives, had been installed on these computers.  Hlavacek Decl. at ¶ 33.

In addition, it appears that Defendant Hyatt may have destroyed documents contained on a third computer.  Since October 2007, the SEC has been attempting to obtain information from the Defendants regarding an HJ Capital computer used by Defendant Hyatt.  Hlavacek Decl. at ¶¶ 34.  Since October 2007, former counsel to HJ Capital repeatedly represented to the SEC, and at times to Judge Bucklo, that there was no such third computer.  Id.  The SEC recently reiterated to Defendant Hyatt's counsel evidence the SEC has of the existence of this third computer, which was purchased in 2003 using HJ Capital funds and subsequently carried as an asset of HJ Capital on its tax returns.  Id.  This week, for the first time, Defendant Hyatt's counsel confirmed that such a computer did in fact exist, but that since 2005, Defendant Hyatt has been unaware of the location of the computer and therefore cannot produce it to the SEC.  Id.  As this computer likely contained documents relevant to the SEC's allegations against Defendant Hyatt, the SEC is concerned that Defendant Hyatt acted to destroy documents contained on this computer as well.

On April 18, 2008, the Court granted an ex parte emergency asset freeze over all assets of Defendants Hyatt and HJ Capital.  Docket No. 8.  That day, Defendant Hyatt violated the asset freeze order when, apparently at Defendant Hyatt's direction, his wife Heidi Hyatt withdrew $57,000 from one of their joint bank accounts.  The SEC filed an emergency contempt motion against Defendant Hyatt and Heidi Hyatt on April 19, and on April 21, Judge Hibbler ordered that Defendant Hyatt return $50,000 of that total.  The Court also continued the SEC's contempt

motion, which is currently pending. Docket Nos. 9, 10, 15, 18. On April 29, 2008 the Court

entered an Agreed Order modifying the April 18, 2008 asset freeze over Defendant Hyatt's

assets so that Panacea Partners could have access to its bank accounts despite Defendant Hyatt's

involvement in the restaurant. Docket No. 22. As part of this modification of the freeze order,

Defendant Hyatt was ordered to have no role in decisions regarding business expenses incurred

by the company. On May 5, the Court entered an agreed order appointing a receiver over

Defendant HJ Capital. Docket No. 34. Then, on May 6, the Court entered an agreed order

continuing the asset freeze over all assets of Defendants Hyatt and HJ Capital for the remainder

of this litigation. Docket No. 37, 38.

    A receiver should now also be appointed over all assets of Defendant Hyatt because these

assets, currently frozen, must be preserved for the benefit of investors. Two of Defendant

Hyatt's homes have been the subjects of recent foreclosure proceedings. Hlavacek Decl. at ¶¶

35. On March 5, 2008 American Home Mortgage commenced foreclosure proceedings on

Hyatt's home at 38W387 Clubhouse Dr. St. Charles, IL and on March 6, 2008 American Home

Mortgage began foreclosure proceedings on Hyatt's home at 330 S River Ln. Geneva, IL. Id. A

receiver is needed to preserve these assets and handle these proceedings on behalf of Defendant

Hyatt.

    In addition, Defendant Hyatt is the majority owner of Panacea Partners, the holding

company for the restaurant De La Costa, which, as mentioned above, received at least $2 million

in misappropriated investor funds. Panacea Partners is currently making substantial expenditures

that may be in violation of the Court's April 18, 2008 asset freeze as modified on April 29, 2008.

First, Panacea Partners is currently repaying loans which, in part, benefited Defendant Hyatt

personally. Hlavacek Decl. at ¶ 36. Second, Panacea Partners is currently expending substantial

resources defending against allegations by Devonshire Partners that the company, and Defendant

Hyatt in particular, committed fraud against, and violated fiduciary duties to, investors in

Panacea Partners.  Id. at ¶ 37.  The factual allegations in the Devonshire litigation appear to

constitute possible further securities fraud by Defendant Hyatt and others.  Consequently, a

receiver should be appointed over all assets of Defendant Hyatt in order to preserve these assets

for the benefit of investors.  If no receiver is appointed to marshal and preserve these assets,

these assets may diminish in value.

## ARGUMENT

Section 22(a) of the Securities Act of 1933 [15 U.S.C. §77v(a)] ("Securities Act") and

Section 27 of the Securities Exchange Act of 1934 [15 U.S.C. §78aa] ("Exchange Act") confer

general equity powers upon the Court in a SEC action brought pursuant to these provisions.  SEC

v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103 (2nd Cir. 1972); SEC. v. Texas Gulf

Sulphur Co., 446 F.2d 1301, 1307 (2nd Cir. 1971).  Once the equity jurisdiction of the district

court has been properly invoked, the full panoply of equitable remedies is available to the Court

to effectuate the statutory purpose, including the ordering of non-injunctive relief in a variety of

forms.  See J.I. Case Co. v. Borak, 377 U.S. 426, 433 (1964); SEC v. Materia, 745 F.2d 197, 200

(2nd Cir. 1984).  In this regard, courts have specifically recognized their power to appoint a

receiver prior to a final determination on the merits in a securities fraud action brought by the

SEC if necessary to effectuate the purposes of the securities laws.  See, e.g., SEC v. Wencke, 622

F.2d 1363, 1369 (9th Cir. 1980); SEC v. Current Financial Services, Inc., 783 F. Supp. 1441,

1443 (D.D.C. 1992).  As one court noted, "there exists under the [Securities Act and Exchange

Act] the power and authority in the [SEC] to bring this action, and power in the district court, as

a court of equity, to appoint a receiver to maintain in status quo the assets of the [defendants] . . .

until such time as the [defendants] can comply with the law, or . . . other creditors may take the necessary steps to prove by regular and ordinary methods that the several [defendants] are insolvent and/or unable to meet their obligations." Los Angeles Trust Deed & Mortgage Exchange v. SEC, 285 F.2d 162, 181 (9th Cir. 1960).

Many courts have found that a receiver may be appointed prior to a final determination on the merits to conserve whatever assets remain for investors and to "preserve the status quo while arranging a defendant's complicated business records." Wencke, 622 F.2d at 1366; Current Financial Services, 783 F. Supp. at 1443; SEC v. Capital Counselors, Inc., 332 F. Supp. 291, 304 (S.D.N.Y. 1971). As courts have stated, "a receiver is particularly necessary in instances in which the corporate defendant, through its management, has defrauded members of the investing public; in such cases it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion." SEC v. First Financial Group, 645 F.2d 429, 438 (5th Cir. 1981); Current Financial Services, 783 F. Supp. at 1443-44. Courts also have held that a court may appoint a receiver prior to a final determination on the merits on a "*prima facie* showing of fraud and mismanagement." SEC v. Keller Corp., 323 F.2d 397, 403 (7th Cir. 1963); Current Financial Services, 783 F. Supp. at 1443.

A receiver over all assets of Defendant Hyatt is particularly warranted in this case. In its emergency motion and supporting documentation, the SEC has made a *prima facie* showing of both fraud and mismanagement by Defendant Hyatt. Millions of investor funds were misappropriated by Defendant Hyatt through HJ Capital, with which Hyatt acquired numerous valuable assets. Accordingly, a receiver is needed to preserve the status quo, prevent further dissipation of investor equity, and sort through Defendant Hyatt's records and assets in order to determine what funds and assets in Defendant Hyatt's control properly belongs to investors.

Furthermore, a receiver is needed to maximize the value of any remaining assets of Defendant

Hyatt, including real estate and Defendant Hyatt's ownership interest in Panacea Partners, in

order to recover funds to repay the investors.

## CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court issue the attached

proposed Order placing all assets of Defendant Hyatt under the control of the existing receiver,

Robert P. Handler, Esq., to preserve and protect whatever assets may be remaining for the

benefit of investors.

Respectfully submitted,

s/ Robin Andrews
Gregory von Schaumburg, IL Bar No. 3127782
Robin Andrews, IL Bar No. 6285644
Attorneys for Plaintiff
U.S. SECURITIES AND
EXCHANGE COMMISSION
175 W. Jackson Blvd., Suite 900 Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated:  June 6, 2008

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| Plaintiff, | : : | CASE NO.  08C-2224 |
| v. | : : : | **Judge Lindberg** **Magistrate Judge Mason** |
| JASON R. HYATT, JAY JOHNSON, and HYATT JOHNSON CAPITAL, LLC | : : : : | |
| Defendants. | : : | |

DECLARATION OF SCOTT J. HLAVACEK IN SUPPORT OF PLAINTIFF'S
MOTION FOR THE APPOINTMENT OF A RECEIVER OVER
ALL ASSETS OF DEFENDANT HYATT

I, Scott J. Hlavacek, do hereby declare under the penalty of perjury, in accordance

with 28 U.S.C § 1746, that the following is true and correct:[1]

1.      I am an Accountant with the United States Securities and Exchange

Commission ("Commission") in the Chicago Regional Office, located at 175 West

Jackson Blvd., Suite 900, Chicago, Illinois, 60604.  I have been employed with the

Commission since 1993.  My official duties with the Commission include participating in

fact-finding inquiries and investigations to determine whether the federal securities laws

---

[1]      Much of this declaration is identical to the declaration I submitted on April 18, 2008, which contained various exhibits. See Docket No. 14. In the interest of brevity, citations to exhibits already submitted to the court are indicated as "April 18, 2008 Declaration Exhibit X," instead of being attached again to this declaration. New exhibits are labeled Exhibits A and B.

have been, are currently, or are about to be violated, and assisting in the Commission's litigation of securities laws violations.

2.　　I received a BA degree from Illinois Wesleyan University and an MBA degree from DePaul University. I am a Certified Public Accountant. I worked in the banking industry for six years and have worked as an investigator of financial fraud for the Federal Government for the past eighteen years.

3.　　I was assigned to investigate and analyze certain financial transactions concerning the offering of investments to individuals by BCI Aircraft Leasing, Inc. ("BCI"), Hyatt Johnson Capital, LLC ("HJ Capital") and its affiliated companies, Jason R. Hyatt ("Hyatt"), and Jay Johnson ("Johnson"). In performing this assignment, I learned of the investments described in this declaration. I have reviewed records produced by BCI, HJ Capital and Johnson, bank records for BCI, Panacea Partners, LLC, HJ Capital, Hyatt, and Johnson, documents produced by investors, and other accounting and financial records. I have also spoken with HJ Capital investors. Based on my review of these records and the Commission's files, as well as conversations with investors and Commission personnel, I am informed and believe and, therefore, state the information set forth below in this Declaration.

## Overview

4.　　From 2003 through 2007, Jason R. Hyatt ("Hyatt"), Jay Johnson ("Johnson) and their company, Hyatt Johnson Capital, LLC ("HJ Capital") (collectively, "the Defendants"), offered and sold to investors membership shares in at least ten Limited Liability Corporations ("LLCs") controlled and managed by HJ Capital. From

2

approximately 2003 through approximately 2007, Defendants Hyatt, Johnson, and HJ Capital raised at least $24.5 million from approximately 120 investors in at least 12 states.

5.      The Defendants told investors that investor funds were to be used to purchase securities sold by LLCs managed by BCI Aircraft Leasing, Inc. ("BCI") on behalf of the HJ Capital LLCs.

6.      The Defendants represented to investors that the BCI LLCs would in turn use investor funds, along with other sources of funds, to purchase commercial aircraft on lease to commercial airlines.

7.      The Defendants represented to investors that in exchange for an "Asset Management Fee," HJ Capital would manage the HJ Capital LLCs as a fiduciary, with the authority to make investment decisions on behalf of each LLC.

8.      Investors were told that the BCI LLCs would make monthly payments to the HJ Capital LLCs from monthly lease income.  HJ Capital would then distribute monthly payments to the individual investors from these payments.  Investors were also told that they would receive a percentage of the profits from the sale or refinance of the aircraft.

9.      In addition, through the sale of a promissory note, the Defendants raised another $2 million from an individual investor, representing to that investor that his funds would be invested in a joint venture with BCI that would use the funds to purchase a group of commercial aircraft.

**Misappropriation Of Approximately $3.6 Million In Investor Funds**

3

10.    In February 2006, Johnson and HJ Capital offered and sold a promissory note to an investor ("Note Investor") for $2 million. *See* April 18, 2008 Declaration Exhibit 1 (Note Investor Promissory Note)

11.    Johnson and HJ Capital told the Note Investor that his $2 million would be invested in a BCI – HJ Capital joint venture called Chicago Aviation Partners. Defendants Johnson and HJ Capital told the Note Investor that Chicago Aviation Partners would, in turn, use the investor funds to purchase a group of commercial aircraft. *See* April 18, 2008 Declaration Exhibit 1

12.    Hyatt, through HJ Capital, did not invest the money in Chicago Aviation Partners but instead diverted this money to a company named Panacea Partners LLC that owns a Latin themed restaurant in Chicago named De La Costa. *See* April 18, 2008 Declaration Exhibit 2 (HJ Finance Series C Bank Statements) and Exhibit 3 (Panacea Partners LLC Bank of America Account Summary)

13.    Hyatt used the Note Investor's $2 million to fund nearly all of the startup costs of the restaurant, which opened in July 2006. *See* April 18, 2008 Declaration Exhibit 3

14.    These startup costs included over $400,000 for interior decorating and furniture and over $1,000,000 in construction costs. *See* April 18, 2008 Declaration Exhibit 3

15.    Johnson later became aware of Hyatt's misappropriation, but he never took any steps to inform the Note Investor about the misappropriation of his $2 million

4

investment. *See* April 18, 2008 Declaration Exhibit 4 (Notes Regarding HJ Finance Series C)

16.    From July 2006 through April 2007, Hyatt, Johnson, and HJ Capital raised approximately $1.6 million in investor funds from 15 investors through two HJ Capital offerings named HJ United 2005 LLC and HJ T2 2005 LLC. *See* April 18, 2008 Declaration Exhibit 5 (Hyatt Johnson T2 2005 Investor List) and April 18, 2008 Declaration Exhibit 6 (Hyatt Johnson United 2005 Investor List)

17.    The Defendants represented to investors in HJ United 2005 LLC and HJ T2 2005 LLC that their funds would be invested in BCI LLCs known as BCI United 2005-20 LLC and BCI TUI LLC, respectively. *See* April 18, 2008 Declaration Exhibit 7 (Hyatt Johnson T2 Private Placement Memorandum) and April 18, 2008 Declaration Exhibit 8 (Hyatt Johnson United Private Placement Memorandum)

18.    Between July 2006 and April 2007, instead of investing the money with the BCI LLCs, the approximately $1.6 million in investor funds was wired to UAL BCI 2006-1 LLC and TUI BCI 2005-17 LLC. Hyatt created these entities in July 2006 and controlled the bank accounts that received these funds. *See* April 18, 2008 Declaration Exhibit 9 (UAL BCI 2006-1 Bank of America Account Summary) and April 18, 2008 Declaration Exhibit 10 (TUI BCI 2005-17 Bank of America Account Summary)

19.    Between July 2006 and April 2007, the vast majority of this nearly $1.6 million was transferred from UAL BCI 2006-1 LLC and TUI BCI 2005-17 LLC to Defendant Hyatt's personal bank account at Earthmover Credit Union. *See* April 18, 2008 Declaration Exhibit 11 (Jason Hyatt Earthmover Credit Union Account Summary)

20.     Hyatt then spent this nearly $1.6 million on personal expenditures. *See*
April 18, 2008 Declaration Exhibit 11

21.     Because this nearly $1.6 million was never invested in BCI LLCs, BCI's
monthly distributions were insufficient to support these investors' monthly returns.

22.     Hyatt made monthly payments from his personal account at Earthmover
Credit Union to HJ Capital to make up this shortfall. *See* April 18, 2008 Declaration
Exhibit 12 (Checks from Hyatt to HJ Capital for Shortages)

**Undisclosed Commissions**

23.     Defendant Hyatt personally received $2.5 million in commissions from BCI
in connection with the capital invested by HJ Capital LLCs in BCI offerings. *See* April
18, 2008 Declaration Exhibit 18 (BCI Aircraft Commission Payment Accounting
Summary)

24.     Defendants Hyatt and HJ Capital directly received commissions from BCI
in connection with seven of the ten offerings HJ Capital made to investors, in exchange
for HJ Capital's placement of its investors' pooled funds in BCI offerings. *See* April 18,
2008 Declaration Exhibit 18

25.     According to BCI's accounting and tax records, these commissions were
taken from the HJ Capital investors' funds. *See* April 18, 2008 Declaration Exhibit 19
(2004 Forms K1 for HJ A3 2003 and HJ SAS 2003)

26.     In five of these offerings, the Defendants disclosed to investors that HJ
Capital would receive "organization fees," i.e. commissions, of 5.5% of the total
investment, and in the other five offerings, the Defendants did not disclose that any

6

commissions would be taken from investors funds. *See* April 18, 2008 Declaration

Exhibits 7, 8 and 18, Exhibit 20 (HJ A3 2003 Offering Materials) and April 18, 2008

Declaration Exhibit 21 (HJ SAS 2003 Offering Materials)

27.     Based on the amounts disclosed to investors and the amount of HJ Capital

investor funds invested in BCI LLCs, HJ Capital was at most able to receive

approximately $770,000 in total "organization fees" or commissions between 2003 and

2006. *See* April 18, 2008 Declaration Exhibit 22 (HJ Capital Potential Disclosed

Commission Summary)

28.     During the period 2003 to 2006, BCI paid over $2.5 million in total

commissions to Defendants Hyatt and HJ Capital, the vast majority of which was paid

directly to Hyatt. Thus, nearly $1.8 million of the commissions received from BCI were

not disclosed to investors. *See* April 18, 2008 Declaration Exhibits 18, 22

29.     Defendant Hyatt transferred approximately $780,000, from his personal

account to the HJ Capital account, keeping most of the $1.8 million in excess

commissions for himself. *See* April 18, 2008 Declaration Exhibits 11, 18

30.     Hyatt has been severely delinquent in paying two of his credit cards since

April 2007, has a current outstanding balance of $113,000, and continues to accumulate

late payment charges and finance charges on the accounts.  *See* April 18, 2008

Declaration Exhibit 26 (Jason Hyatt March 2008 Credit Card Statements)

31.     Hyatt used investor funds to fund mortgage payments and substantial home

improvements for two homes that he owns, and to fund most of the startup costs of his

Chicago restaurant, De La Costa. *See* April 18, 2008 Declaration Exhibits 3, 11

32.     Hyatt also used investor funds to purchase at least $155,000 worth of art

and antiques, a Maserati, a Mercedes, a Hummer H2, a Yukon Denali and other vehicles,

and to make payments to the St. Charles Country Club.

33.     At a hearing on April 14, 2008, in SEC v. Hollnagel, 1:07-cv-4538 (Judge

Bucklo), concerning a motion for contempt regarding the lack of production of

documents pursuant to subpoena, counsel for HJ Capital represented to the Court that a

forensics consultant hired by HJ Capital had examined two computers used by Defendant

Hyatt for HJ Capital business, and that this forensics consultant discovered that

"scrubbing software," which is used to "wipe" or permanently erase files contained on

computer hard drives, had been installed on those computers.

34.     Since October 2007, the SEC has been attempting to obtain information

from the Defendants regarding a HJ Capital computer used by Defendant Hyatt.

Beginning in October 2007, former counsel to HJ Capital repeatedly represented to the

SEC and Judge Bucklo that there was no such third computer.  The SEC recently

reiterated to Defendant Hyatt's counsel evidence the SEC has of the existence of this

third computer, which was purchased in 2003 using HJ Capital funds and subsequently

carried as an asset of HJ Capital on its tax returns through at least 2007.  This week, for

the first time, Defendant Hyatt's counsel confirmed that such a computer did in fact exist,

but that since 2005, Defendant Hyatt has been unaware of the location of the computer

and therefore cannot produce it to the SEC.

35.     Foreclosure proceedings were recently begun against two of Defendant

Hyatt's homes.  On March 5, 2008 American Home Mortgage commenced foreclosure

8

proceedings on Hyatt's home at 38W387 Clubhouse Dr. St. Charles, IL and on March 6, 2008 American Home Mortgage began foreclosure proceedings on Hyatt's home at 330 S River Ln. Geneva, IL  See Exhibit A, Notice of foreclosure proceedings.

36.    In July of 2007, Hyatt borrowed funds purportedly for the benefit of Panacea Partners secured with the homes purchased by him with misappropriated investor funds.  A portion of those funds were used to pay down prior mortgages on the homes and to pay real estate taxes.  In addition $198,400 of the funds were taken directly by Hyatt and deposited into his personal bank accounts.  Panacea Partners is currently repaying these loans which, in part, benefited Defendant Hyatt personally.

37.    Panacea Partners is currently expending substantial resources defending against allegations that the company and Defendant Hyatt in particular, committed fraud against, and violations of fiduciary duties to, investors in Panacea Partners.  See Exhibit B, Complaint and Answer.

I, Scott J. Hlavacek, declare under penalty of perjury that the foregoing is true and correct.  Executed on the 6th day of June, 2008.

SCOTT J. HLAVACEK
Securities and Exchange Commission
175 West Jackson Blvd., Suite 900
Chicago, Illinois  60604
Telephone:  312/353-7390

# EXHIBIT A

*AMERICAN HOME MORTGAGE SERVICING INC v. HYATT;JASON R, et al.*

**Law Bulletin Publishing Company**

**\*\*\* THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY \*\*\***

**CIRCUIT COURT OF** KANE COUNTY, <u>**ILLINOIS**</u> - CHANCERY DIVISION

**PLAINTIFF:** AMERICAN HOME MORTGAGE SERVICING INC

**DEFENDANT:** HYATT;JASON R
          BRIDGEVIEW COMMERCIAL FINANCE INC
          BURR HILL CLUB HOMEOWNERS ASSOC INC

**PROPERTY ADDRESS:** 38W387 CLUBHOUSE DR
          SAINT CHARLES, IL 60175

**CASE NAME:** AMERICAN HOME MORTGAGE SERVICING INC v. HYATT;JASON R, et al.

**CASE NUMBER:** 08CH 0000778

**FILING DATE:** 3/5/2008

**TYPE:** FORECLOSURE ACTION - Mortgage

**NOTE AMOUNT:** $ 840,000.00

**BALANCE OWED:** $ 838,832.54

**ATTORNEY:** CODILIS & ASSOCIATES PC
          Telephone No.:630-794-5300

*AMERICAN HOME MORTGAGE SERVICING INC v. HYATT;JASON R, et al.*

**Law Bulletin Publishing Company**

**\*\*\* THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY \*\*\***

**CIRCUIT COURT OF** KANE COUNTY, **ILLINOIS** - CHANCERY DIVISION

**PLAINTIFF:** AMERICAN HOME MORTGAGE SERVICING INC

**DEFENDANT:** HYATT;JASON R
HYATT;JASON
BELLEVUE FINANCIAL CENTER
Formerly Known As FIRST MUTUAL BANK
BRIDGEVIEW BANK GROUP
BRIDGEVIEW COMMERCIAL FINANCE INC

**ASSESSORS PARCEL NUMBER:** 1203481010

**PROPERTY ADDRESS:** 330 S RIVER LN
GENEVA, IL 60134

**CASE NAME:** AMERICAN HOME MORTGAGE SERVICING INC v. HYATT;JASON R, et al.

**CASE NUMBER:** 08CH 0000789

**FILING DATE:** 3/6/2008

**TYPE:** FORECLOSURE ACTION - Mortgage

**NOTE AMOUNT:** $ 360,000.00

**BALANCE OWED:** $ 356,342.12

**ATTORNEY:** CODILIS & ASSOCIATES PC
Telephone No.:630-794-5300

# EXHIBIT B

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| DEVONSHIRE PARTNERS, LLC, and ) | 2008 MAR -4 PM 6: 14 |
| KENT C. ROBERTS, ) | |
| ) | DOROTHY BROWN |
| Plaintiffs, ) | CLERK OF THE CIRCUIT COURT OF COOK COUNTY, IL |
| ) | |
| v. ) | Case No.: 07 CH 27629 |
| ) | |
| PANACEA PARTNERS, LLC, ) | |
| ) | |
| Defendant. ) | |

## DEFENDANT'S ANSWER TO PLAINTIFFS' AMENDED COMPLAINT

Defendant, PANACEA PARTNERS, LLC. ("Defendant") by and through its attorneys, Silver & Mishkin, LLC., for its Answer to Plaintiffs' Amended Complaint (the "Complaint") states as follows:

### Summary of the Case

1. Plaintiffs Devonshire and Roberts are Members of Panacea, an Illinois limited liability company. Since, 2006, Hyatt has acted as, and holds himself out as, the Manager of Panacea. Hyatt, through Panacea, controls and runs an extremely successful restaurant in Chicago called Delacosta.

**ANSWER:** Defendant is without knowledge sufficient to admit or deny whether Devonshire and Roberts are Members of Panacea, and therefore denies same. Defendant admits that Hyatt has acted as a manager of Panacea since 2006. Defendant admits that Panacea controls and runs a restaurant in Chicago called Delacosta. Defendant denies each and every remaining allegation in Paragraph 1 of the Amended Complaint.

2. Contrary to duties owed to Plaintiffs, Defendants have failed to provide copies of, or give Plaintiffs access to, the books and records of Panacea. Plaintiffs are entitled to this

information under the Illinois Limited Liability Company Act, 805 ILCS 180/1-1 et seq. (the "Act"), and Panacea LLC Operating Agreement. Exhibit A. Even more disturbing, Panacea claims not to know whether Plaintiffs are Members. Panacea's failure to even acknowledge Plaintiffs' interests in Panacea indicates that Hyatt, contrary to his duties as Manager, is operating Panacea for his own benefit, and not the benefit of its Members. Hyatt's action in causing Panacea to refuse to acknowledge Plaintiffs as Members is intentional and malicious, done to further his own interests and not those of Panacea. Defendants actions and failures to act, including Defendants' refusal to acknowledge Plaintiffs' membership in Panacea, are breaches of the Act, the Operating Agreement and Hyatt's fiduciary duties to Plaintiffs.

**ANSWER:**    To the extent that Paragraph 2 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Defendant denies each and every remaining allegation in Paragraph 2 of the Amended Complaint.

### Parties

3.    Defendant Panacea was formed on September 15, 2004, and does business under the name "Delacosta Restaurant" with its principal place of business in Chicago, Illinois. Panacea was formed upon the filing of its Articles of Organization with the Illinois Secretary of State pursuant to the Act on September 15, 2004. A certified copy of the Articles of Organization are attached as Exhibit B. Hyatt currently acts and holds himself out as Panacea's Manager.

**ANSWER:**    To the extent that Paragraph 3 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Answering further, Defendant admits that a

2

copy of a document entitled "Articles of Organization" is attached to the Complaint as "Exhibit B." Answering further, the Defendant states that the document speaks for itself and Defendant denies each and every allegation in Paragraph 3 of the Amended Complaint inconsistent with the express terms of the document.

4.    Plaintiff Devonshire is an Illinois limited liability company with its principal place of business in Chicago, Illinois and is a member of Panacea. Charles Reynolds ("Reynolds") and Gregory Heraty ("Heraty") own and manage Devonshire. Plaintiff Roberts is a California resident residing at 1146 Oxford Road, San Marino, California 91108, and is a member of Panacea.

**ANSWER:**    Defendant is without knowledge sufficient to form a belief as to the truth of the matters asserted in Paragraph 4 of the Amended Complaint and therefore denies same.

### Jurisdiction and Venue

5.    Jurisdiction is appropriate in that Panacea does business in Chicago, Illinois. The acts from which these claims arise occurred in that same city and state. Venue is appropriate for these same reasons.

**ANSWER:**    Defendant admits the allegations in Paragraph 5 of the Amended Complaint.

### Factual Background

6.    On January 25, 2006, Devonshire, by Reynolds and Heraty, purchased a membership interest in Panacea for a capital contribution of $100,000.00. At about that same time, Roberts also purchased a membership interest in Panacea for a capital contribution of $140,000.00.

**ANSWER:**    Defendant is without knowledge sufficient to form a belief as to the truth

3

of the matters asserted in Paragraph 6 of the Amended Complaint and therefore denies same.

### Records Required by the Act

7.    Section 10-15 of the Act provides that a limited liability company shall provide

members and their agents and attorneys access to its records, including the records to be kept

under Section 1-40 of the Act, the Company's principal place of business or other reasonable

locations specified in its operating agreement. The right of access pursuant to Section 10-15

provides the opportunity to inspect and copy records during ordinary business hours.

**ANSWER:**    Defendant admits that Sections 10-15 and 1-40 of the Illinois Limited

Liability Company Act (the "Act") address the issue of a limited liability company's members'

access to the company's records. Answering further the Defendant states that the Act speaks for

itself and denies each and every allegation in Paragraph 7 of the Amended Complaint

inconsistent with the express provisions of the Act.

8.    Section 1-40 of the Act requires that the company keep its principal place of

business or other reasonable location specified in its operating agreement all of the following:

    a.    A list of the full name and last known address of each member setting forth the amount of cash each member has contributed, a description and statement of the agreed value of other property or services each member has contributed or has agreed to contribute in the future, and the date on which each became a member.

    b.    A copy of the articles of organization, as amended or restated, together with executed copies of any powers of attorney under which any articles, application, or certificate has been executed.

    c.    Copies of the limited liability company's federal, State, and local income tax returns and reports, if any, for the three most recent years.

    d.    Copies of any then effective written operating agreement and any amendments thereto and of any financial statements of the limited liability company for the three most recent years.

4

**ANSWER:**    Defendant admits that Section 1-40 of the Act addresses the issue of maintenance of a limited liability company's records. Answering further the Defendant states that the Act speaks for itself and denies each and every allegation in Paragraph 8 of the Amended Complaint inconsistent with the express provisions of the Act.

### Records Required by the Operating Agreement

9.    Exhibit A is a copy of the executed Operating Agreement for Panacea that Plaintiffs received when they became Members. Plaintiffs' have never received a fully executed document superseding the Operating Agreement. Pursuant to the Operating Agreement, Panacea is required to keep complete and accurate books and records consistent with the Act. These books and records are to be maintained in accordance with generally accepted accounting practices and shall be available for examination by a Member or his or her representative at reasonable times during normal business hours.

**ANSWER:**    Defendant admits that a document is attached to the Amended Complaint as "Exhibit A." Answering further, the Defendant states that the document speaks for itself and denies any allegations in Paragraph 9 of the Amended Complaint inconsistent with the express terms of the document.

### General Management Duties of Panacea's Managers

10.    Hyatt, as Panacea's purported Manager, has the duty to maintain Panacea's books and records. Included within this duty is knowing who are the Members of Panacea.

**ANSWER:**    To the extent that Paragraph 10 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Answering further, Defendant states that Hyatt's duties to Panacea are controlled by Panacea's Operating Agreement and Illinois law.

5

Defendant denies each and every allegation contained in Paragraph 10 of the Amended Complaint inconsistent with the express terms of the Operating Agreement or Illinois law.

11.     Hyatt also had a duty, as Panacea's purported Manager, to diligently manage Panacea's business and affairs, including to provide reports to Members about the financial affairs of Panacea. Plaintiffs have never received any such reports, including any tax-related information.

**ANSWER:**     To the extent that Paragraph 11 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Defendant states that Hyatt's duties to Panacea are controlled by Panacea's Operating Agreement and Illinois law. Defendant denies each and every allegation contained in Paragraph 11 of the Amended Complaint inconsistent with the express terms of the Operating Agreement or Illinois law. Defendant is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11 and therefore denies same.

### *Hyatt's Fiduciary Duties*

12.     Hyatt, as the purported Manager of Panacea, owes Panacea and its Members, including Plaintiffs, a duty of loyalty and care.

**ANSWER:**     To the extent that Paragraph 12 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. The Defendant admits that Hyatt's duties to Panacea are controlled by Panacea's Operating Agreement and Illinois law. Defendant denies each and every allegation contained in Paragraph 12 of the Amended Complaint inconsistent with the express terms of the Operating Agreement or Illinois law.

6

13.    Hyatt has a duty of loyalty to account to Panacea and its Members and to hold as trustee for Panacea any property, profit, or benefit derived by the Manager in the conduct of Panacea's business. Hyatt, as Panacea's purported Manager, has a duty of care and loyalty to run Panacea for the Members' best interests, not for his own benefit as, on information and belief, he is currently doing.

**ANSWER:**    To the extent that Paragraph 13 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer.  Defendant admits that Hyatt's duties to Panacea are controlled by Panacea's Operating Agreement and Illinois law.  Defendant denies each and every allegation contained in Paragraph 13 of the Amended Complaint inconsistent with the express terms of the Operating Agreement or Illinois law.  Defendant denies each and every remaining allegation in Paragraph 13 of the Amended Complaint.

14.    Hyatt's actions and failures to act, including the failure to acknowledge Plaintiffs' membership interests in Panacea, constitute gross negligence and intentional misconduct, and a knowing violation of law and contract.

**ANSWER:**    To the extent that Paragraph 14 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer.  Defendant denies each and every remaining allegation in Paragraph 14 of the Amended Complaint.

## COUNT I
## BREACH OF OPERATING AGREEMENT

15.    Plaintiffs repeat and reallege Paragraphs 1 through 14 as if fully restated herein.

**ANSWER:**    Defendant repeats and realleges its answers to Paragraphs 1 through 14 of

7

the Amended Complaint, for its Answer to Paragraph 15 of Count I of the Amended Complaint as if fully set forth herein.

16.    The Operating Agreement is a valid and enforceable contract supported by consideration. Pursuant to that Operating Agreement, Plaintiffs purchased membership interests in Panacea. For example, attached as part of Exhibit A is the signature page to the Operating Agreement by which Devonshire became a Member of Panacea. Roberts also agreed to and signed the Operating Agreement. Plaintiffs have performed all of their respective obligations under the Operating Agreement.

**ANSWER:**    Defendant objects to the allegation in Paragraph 16 of the Amended Complaint that the Operating Agreement is a valid and enforceable contract supported by consideration as a legal conclusion to which no Answer is required, and therefore denies same. Defendant is without knowledge sufficient to form a belief as to the truth of the remaining allegations in Paragraph 16 of the Amended Complaint and therefore denies same.

17.    In breach of the Operating Agreement, Defendants have failed to respond to Plaintiffs' repeated demands to examine the books and records of Panacea.

**ANSWER:**    To the extent that Paragraph 17 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Defendant denies each and every remaining allegation in Paragraph 17 of the Amended Complaint.

18.    In breach of the Act and Operating Agreement, Defendants have failed to provide Plaintiffs with annual reports about Panacea's financial condition.

**ANSWER:**    To the extent that Paragraph 18 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant

8

Panacea and Panacea therefore makes no answer. Defendant denies each and every remaining allegation in Paragraph 18 of the Amended Complaint.

19.     In breach of the Operating Agreement, Defendants have filed to provide Plaintiffs with tax information.

**ANSWER:**     To the extent that Paragraph 19 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Defendant denies each and every remaining allegation in Paragraph 19 of the Amended Complaint.

20.     Instead of providing Plaintiffs with access to the requested books and records of Panacea, Defendants have denied knowledge that Plaintiffs are actually Members of Panacea and have asked Plaintiffs to "prove" that they are in fact members. This action has been taken in bad faith to allow Hyatt to continue to run Panacea for his own benefit, and not the benefit of Plaintiffs or other Members.

**ANSWER:**     To the extent that Paragraph 20 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Defendant denies each and every remaining allegation in Paragraph 20 of the Amended Complaint.

21.     Defendants have breached their obligations under the Operating Agreement and the Act by, among other things, failing to:

    a.    Allow Plaintiffs to examine the books and records of Panacea,

    b.    Maintain complete and accurate records of the members,

    c.    Provide the reports required by the Operating Agreement, and

    d.    Provide the tax information required pursuant to Section 8.4 of the

9

Operating Agreement.

**ANSWER:**   To the extent that Paragraph 21 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Defendant denies each and every remaining allegation in Paragraph 21 of the Amended Complaint.

22.   Defendants' breaches of the Operating Agreement have damaged Plaintiffs in an amount to be proven at trial.

**ANSWER:**   To the extent that Paragraph 22 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Defendant denies each and every remaining allegation in Paragraph 22 of the Amended Complaint.

WHEREFORE, Defendant, PANACEA PARTNERS, LLC, denies that Plaintiffs are entitled to any judgment in their favor, or to any of the relief prayed for in Count I of the Amended Complaint, and move this Court to dismiss Count I of the Amended Complaint with prejudice, with an award of Defendant's costs, and for all other relief this Court deems just and proper under the circumstances.

## COUNT II
## BREACH OF ILLINOIS LIMITED LIABILITY COMPANY ACT

23.   Plaintiffs repeat and reallege Paragraphs 1, 3, 4, 5, 6-8, 10-11, and 12-14 as if fully restated herein.

**ANSWER:**   Defendant repeats and realleges its Answers to Paragraphs 1, 3, 4, 5, 6-8, 10-11, and 12-14 of the Amended Complaint as its Answers to Paragraph 23 of Count II of the Amended Complaint as if fully set forth herein.

10

24.    As an alternative to Count I, Panacea is, and was, at all times relevant to this Count, an Illinois limited liability company that operated without a valid and fully executed operating agreement. In 2006, Hyatt became the Managing Member of Panacea and assumed responsibility for running Panacea as a limited liability company for the benefit of its Members, which included Roberts and Devonshire.

**ANSWER:**    To the extent that Paragraph 24 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Defendant denies each and every remaining allegation in Paragraph 24 of Count II of the Amended Complaint.

25.    Under the Act and common law, Hyatt had duties and obligations to Panacea's Members, including those set forth in paragraphs 10-14, above. Specifically, Section 15-5 of the Act provides that in the absence of an operating agreement provision, the Act governs the relations among the Members, Managers and Company. Section 10-15 of the Act provides that a limited liability company shall provide members and their agents and attorneys access to its records, including the following records required to be kept under Section 1-40 of the Act:

        a.    A list of the full name and last known address of each member setting forth the amount of cash each member has contributed, a description and statement of the agreed value of other property or services each member has contributed or has agreed to contribute in the future, and the date on which each became a member.

        b.    A copy of the articles of organization, as amended or restated, together with executed copies of any powers of attorney under which any articles, application, or certificate has been executed.

        c.    Copies of the limited liability company's federal, State, and local income tax returns and reports, if any, for the three most recent years.

        d.    Copies of any then effective written operating agreement and any amendments thereto and of any financial statements of the limited liability

11

company for the three most recent years.

**ANSWER:**    To the extent that Paragraph 25 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Answering further, Defendant admits that Sections 10-15 and 1-40 of the Illinois Limited Liability Company Act (the "Act") address the issue of a limited liability company's members' access to the company's records. Defendant further admits that Section 15-5 of the Act addresses the absence of an operating agreement for an Illinois limited liability company. Answering further the Defendant states that the Act speaks for itself and denies each and every allegation in Paragraph 25 of Count II of the Amended Complaint inconsistent with the express provisions of the Act.

26.    Contrary to duties owed to Devonshire and Panacea, and in violation of the Act, Panacea and Hyatt have denied Devonshire and Roberts access to the books and records of Panacea, and Hyatt has failed to cause Panacea to keep proper books and records, including information sufficient for Panacea to identify its Members. Defendants' failure to maintain records and allow Plaintiffs to inspect them, as described in this Count, constitutes a breach of Section 10-15 and 1-40 of the Act.

**ANSWER:**    To the extent that Paragraph 26 of the Amended Complaint contains allegations against Jay Hyatt individually, those allegations are not directed to Defendant Panacea and Panacea therefore makes no answer. Defendant denies each and every remaining allegation in Paragraph 26 of Count II of the Amended Complaint.

WHEREFORE, Defendant, PANACEA PARTNERS, LLC, denies that Plaintiffs are entitled to any judgment in their favor, or to any of the relief prayed for in Count II of the Amended Complaint, and move this Court to dismiss Count II of the Amended Complaint with

12

prejudice, with an award of Defendant's costs, and for all other relief this Court deems just and proper under the circumstances.

## COUNT III
## BREACH OF FIDUCIARY DUTIES

The allegations in Count III of the Amended Complaint are not directed toward Defendant and therefore, no answer from Panacea Partners, LLC to the allegations is required. On January 2, 2008, the Court dismissed Count III of the Amended Complaint against Jay Hyatt.

Respectfully submitted,

PANACEA PARTNERS, LLC

One of its attorneys

Lawrence D. Mishkin
Timothy E. Hirsch
Silver & Mishkin, LLC
400 Skokie Boulevard
Suite 850
Northbrook, Illinois 60062
(847) 504-1450
Attorney No.: 43027

13