**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES SECURITIES | ) | |
| AND EXCHANGE COMMISSION, | ) | |
| | ) | Case No. 1:08-cv-2224 |
| Plaintiff, | ) | |
| v. | ) | Honorable George W. Lindberg |
| | ) | |
| JASON R. HYATT, JAY JOHNSON, and | ) | Magistrate Judge Michael T. Mason |
| HYATT JOHNSON CAPITAL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION FOR AUTHORITY TO SELL AIRCRAFT FREE AND CLEAR PURSUANT
TO PURCHASE AGREEMENT AND TO PAY SECURED DEBT AT CLOSING**

Robert Handler, Esq. (the "Receiver"), through his undersigned counsel, respectfully requests that this Court enter an Order, substantially in the form submitted to chambers in accordance with this Court's standing order and served separately on the parties, authorizing the Receiver (i) to sell (the "Sale") pursuant to the Purchase Agreement by and among BCI-2005-1, LLC ("Assignor"), HJC Asset Holdings, LLC ("HJC Holdings") and Pineapple, Ltd. ("Assignee") dated as of June 30, 2008 (the "Purchase Agreement"), a copy of which is attached as Exhibit A, one Boeing 737-528 Airframe Bearing Manufacturer's Serial Number 27424 (the "Aircraft") or the beneficial ownership interests in a trust that holds title to the Aircraft and (ii) upon closing of the Sale pay the debt of Deutsche Bank AG New York Branch ("Deutsche"), which debt is secured with a mortgage on the Aircraft ("Debt").

In support of this Motion, the Receiver states as follows:

**<u>Introduction</u>**

1.      On May 5, 2008, at the request of the plaintiff U.S. Securities Exchange Commission (the "SEC"), this Court entered an Agreed Order appointing the Receiver over

Hyatt Johnson Capital, LLC ("HJ Capital").  On June 11, 2008, at the request of the Receiver, this Court entered an Order, *inter alia*, expanding the Receiver's authority so as to become receiver of HJC Asset Holdings Manager, Inc. ("HJC Manager"), the manager of HJC Holdings, and authorizing him to pursue sale of the various aircraft indirectly owned by HJC Holdings.

2.     The investors solicited by HJ Capital and its principals (the "Investors") were generally made members of various limited liability companies formed by HJ Capital or its principals, including Assignor, (the "HJ LLCs").  The Investors are the parties that the SEC seeks to protect through this proceeding.  Presently, the known assets of the HJ LLCs are solely their membership interests in HJC Holdings and bank accounts.  HJC Holdings holds indirect title to six (6) commercial aircraft subject to existing leases, including the Aircraft.  These aircraft and leases are indirectly the principal assets of value of HJC Holdings and, therefore, of the HJ LLCs in which certain Investors have ownership interests.

**<u>Authority to Sell the Aircraft</u>**

3.     Since his appointment in this proceeding, the Receiver has been actively engaged in marketing and selling the Aircraft.  The Receiver retained two brokers that specialize in sale of aircraft, both of whom had been engaged in marketing the sale of the Aircraft prior to the commencement of this proceeding.  Weekly advertisements ran for four weeks in *Speednews*, a well-read trade publication in the aircraft industry, and *Plane Mart*, another industry publication.  The brokers sent approximately three hundred (300) emails to prospective aircraft investors.  The sale books were sent out to approximately eleven parties, all of whom previously executed confidentiality agreements with the Receiver.  Two of these parties (other than Assignee) submitted letters of intent, and four of these parties sent emails containing bids.

4.      After arms-length negotiations, the Receiver and the Assignee, through their respective counsel, have negotiated the terms of the attached Purchase Agreement, which provides for an assignment to Assignee of the beneficial interests in the trust that holds title to the Aircraft.

5.      Pursuant to the Purchase Agreement, Assignee agreed to pay $9.8 million (the "Purchase Price") for the Aircraft, free and clear of any and all liens, charges and encumbrances, and subject to certain adjustments relating to Aircraft lease payments as set forth in Section 3(c)(i) of the Purchase Agreement.  Assignee has deposited $600,000 toward the Purchase Price (the "Escrow Deposit") with an escrow agent.

6.      Consummation of the Sale in accordance with the Purchase Agreement is contingent upon this Court entering an Order substantially in the form attached hereto, (i) finding that the Purchase Price is fair and adequate value for the Aircraft, (ii) finding that, except as provided under the Purchase Agreement, the Assignee is not liable to the Receiver, HJ Capital's estate, HJC Holdings (or any of HJC Holdings' creditors or equity holders), or Assignor (or any of Assignor's creditors or equity holders) with respect to the Sale, and (iii) authorizing the Receiver, without further Order of this Court, to return the Escrow Deposit to the Assignee in the event of termination of the Sale pursuant to Sections 3(e) or 14(a) of Purchase Agreement.

7.      As the Aircraft was adequately exposed to the marketplace and the Purchase Agreement was subject to arm's length negotiations, the Purchase Price is fair and adequate consideration for the Aircraft, particularly because it is an all cash offer.  In the business judgment of the Receiver, who acted in reliance on his professional advisers that are experienced in the value of the Aircraft, the Purchase Price is a fair value for the Aircraft.  The Receiver has no knowledge, with respect to the Sale, of any liabilities of Assignee to him, HJ Capital's estate,

HJC Holdings (or any of its creditors or equity holders), or Assignor (or any of Assignor's creditors or equity holders).

8.      It is in the best interests of the Investors and all parties in interest in this case that this Court authorizes the Receiver to sell the Aircraft or beneficial interest in the trust holding title to the Aircraft in accordance with the Purchase Agreement.  The Sale will generate substantial net proceeds for HJ Capital's estate to pay expenses in further liquidations of assets, to locate additional estate assets, and to pay claimants.  For all these reasons, the Sale should be approved pursuant to the terms of the Purchase Agreement.

**Authority to Pay Deutsche Debt**

9.      To finance the acquisition of the Aircraft, Deutsche advanced the principal sum of $9,050,000 and acquired a mortgage on the Aircraft to secure the obligations.  To sell the Aircraft or interest in the trust holding title to the Aircraft, the Receiver must use the sale proceeds to pay Deutsche the current amount of the Debt.

10.      Deutsche has asserted in the Pay-Off letter, a copy of which is attached as Exhibit B, that the amount of the Debt is $6,447,233.02.  The Receiver believes approximately $135,000 of the Pay-Off amount may be an unwarranted prepayment penalty and the Receiver is examining the Debt agreements to determine if it is due and owning.  As such, the exact amount of the Debt is not yet agreed to as of the filing of this Motion.

11.      The Receiver, therefore, requests that this Court authorize the Receiver to pay the amount of the Debt (not to exceed the amount set forth in the Pay-Off Letter) agreed to by the Receiver in full satisfaction of Deutsche's mortgage on the Aircraft so that upon closing the Aircraft shall be free and clear of all liens and encumbrances.

WHEREFORE; Robert Handler, Esq. respectfully requests that this Court enter an Order, substantially in the form submitted to chambers in accordance with this Court's standing order and served separately on the parties, (i) authorizing the Receiver to consummate the Sale in accordance with the Purchase Agreement; (ii) authorizing the Receiver to pay Deutsche the amount, not to exceed the amount set forth in the Payoff Letter, of the Debt as agreed to by the Receiver in full satisfaction of Deutsche's interest in the Aircraft, and (iii) for such other and further relief that this Court deems necessary and proper.

Respectfully submitted,

**ROBERT HANDLER**

By:    */s/ Paula K. Jacobi*
       One of his attorneys

Paula K. Jacobi, Esq.
Sugar, Friedberg & Felsenthal LLP
30 North LaSalle Street, Suite 3000
Chicago, Illinois 60602
(312) 704-9400

130707-3

5

# EXHIBIT A

**PURCHASE AGREEMENT [27424]**

by and among

**BCI 2005-1, LLC**
**as the Assignor,**

**HJC ASSET HOLDINGS, LLC,**
**as the Parent of Assignor,**

**and**

**PINEAPPLE, LTD.,**
**as the Assignee,**

**Dated as of June 30, 2008**

Purchase of the Beneficial Interest in the Trust Agreement Relating to

One Boeing 737-528 Airframe Bearing
Manufacturer's Serial Number 27424

NEWYORK/#197430.5

## PURCHASE AGREEMENT [27424]

THIS PURCHASE AGREEMENT [27424] (this "Agreement") is made as of June 30, 2008, by and among (a) BCI 2005-1, LLC, a Delaware limited liability company (the "Assignor"), (b) HJC ASSET HOLDINGS, LLC, a limited liability company organized under the laws of Illinois ("HJC", and along with Assignor, the "Assignor Parties"), as the parent of Assignor, and (c) PINEAPPLE, LTD., a company organized under the laws of the Cayman Islands (as the designee of Jet Trading and Leasing, LLC) (the "Assignee"). Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Lease (as defined below). WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION has acknowledged and consented to this Agreement as provided in Sections 3(f) and 20 hereof.

### RECITALS

WHEREAS, HJC is the owner of, or investment advisor with full discretionary power over, 100% of the membership interests in BCI Investment 2005-1, LLC, a Delaware limited liability company;

WHEREAS, BCI Investment 2005-1, LLC, in turn, is the owner of 100% of the membership interests in BCI 2005-1;

WHEREAS, the Assignor is the owner of 100% of the beneficial interests in the trust estate (the "Trust Estate") created by that certain Trust Agreement, dated as of March 17, 2005 (as amended and in effect from time to time, the "Trust Agreement"), by and among the Assignor, as the trustor, and Wells Fargo Bank Northwest, National Association, as trustee (in its capacity as trustee under the Trust Agreement, the "Owner Trustee"), which relates to the Aircraft;

WHEREAS, each of Assignor and Owner Trustee are hereby acting upon the direct or indirect instruction of HJC, who, in turn, is being directed by and through the receiver of HJC's manager (the "HJC Receiver") in the receivership proceedings (the "Receivership Proceedings") commenced by the Securities and Exchange Commission in the United States District Court for the Northern District of Illinois (the "Court");

WHEREAS, the Aircraft is leased by the Owner Trustee, as lessor, to British Airways Plc, as lessee (the "Lessee"), pursuant to that certain Amended and Restated Aircraft Lease Agreement, dated March 17, 2005 (the "Original Lease"), between Fairing Leasing Co., Ltd., as previous lessor, Lessee, as lessee, as novated, amended and supplemented by that certain Aircraft Lease Novation, dated March 17, 2005 (the "Novation Agreement"), among Fairing Leasing Co., Ltd., as previous lessor, Lessee, as lessee, and Owner Trustee, as new lessor, in accordance with which the Owner Trustee became the owner and lessor, and as further amended by that certain Amendment to Amended and Restated Aircraft Lease Agreement, dated August 3, 2005, and as supplemented by the Participation Agreement (the "Lease Amendment") (such Original Lease, as novated, amended and supplemented by the Novation Agreement, and as further amended pursuant to the Lease Amendment, and as further modified by the Participation Agreement, and, collectively, as in effect as of the date hereof, the "Lease"); and

WHEREAS, the Assignor desires to sell, assign and transfer to the Assignee, and the Assignee desires to purchase, all of Assignor's interest in and to the Trust Estate, including (a) 100% of the beneficial interests in and to the Aircraft and (b) 100% of the beneficial interests (including, without limitation, all of the owner participation interests) in, to and under the Trust Agreement and the Trust Estate, upon the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of their mutual covenants and agreements set forth herein, the parties hereto hereby agree as follows:

1.     **Definitions and Rules of Interpretation**

(a) In this Agreement, including the Preamble and Recitals, unless the context otherwise requires:

"Affiliate" of any Person means any other Person (i) directly or indirectly controlling, directly or indirectly controlled by or under direct or indirect common control with such Person, or (ii) that is a director, executive officer or manager (including a managing member) of such Person. For purposes of this definition, "control" when used with respect to any specified Person shall mean the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"After-Tax Basis" means that any payments called for by this Agreement to be made on an After-Tax Basis shall be made in an amount which, after reduction by the amount of all Taxes, required by any applicable Law to be paid by, or withheld against, the payee in respect of the receipt or accrual of such amount (taking into account any credits or deductions attributable to the event or circumstance giving rise to the requirement that the original payment be made), shall be equal to the payment otherwise required hereunder.

"Aircraft" means collectively (a) the Airframe; (b) the Engines; (c) all technical records related thereto and (d) the vendor or manufacturers warranties and service life policies or agreements in existence with respect to any of the foregoing that accrues to the benefit of the Owner Trustee and/or Assignor.

"Airframe" means that certain Boeing 737-528 airframe bearing manufacturer's serial number 27424 and registration mark G-GFFE, together with related instruments, appliances, appurtenants, accessories, components, other equipment and parts installed thereon or appurtenant.

"Assignee" has the meaning set forth in the recitals hereto.

"Assignee Indemnitees" means, collectively, the Assignee, its successors and permitted assigns.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2(b).

"Assignor" has the meaning set forth in the recitals hereto.

"Assignor Indemnitees" means, collectively, the Assignor, and its respective successors and permitted assigns.

"Assignor's Taxes" shall mean (a) all Taxes measured by the net or gross income, gross receipts or capital gains of the Assignor; (b) all Taxes relating to any sale, lease, rental, or charter of the Transferred Interests (or any part thereof) prior to the Closing Time, excluding any Tax assessed or levied as a result of the sale, transfer or delivery of the Aircraft to Assignee as contemplated hereby; (c) all Taxes relating to the use, storage or location of the Transferred Interests (or any part thereof) prior to the Closing Time; (d) all Taxes in the nature of property taxes and registration fees relating to the Transferred Interests (or any part thereof) for periods assessed prior to the Closing Time; (e) any and all other Taxes relating to the ownership, use, operation, storage, or location of the Transferred Interests (or any part thereof) prior to the Closing Time; and (f) all other Tax liabilities of Assignor not indemnified by Assignee pursuant to Section 9(a) hereof. For avoidance of doubt, Assignor's Taxes shall exclude (i) taxes based on, measured by, or with respect to net or gross income or capital of Assignee, Owner Trustee or the Trust Estate, (ii) franchise, excess profits, or doing business taxes levied on any of Assignee, Owner Trustee or the Trust Estate, or (iii) taxes levied or assessed on the use, manufacture, consumption, or disposition of the Aircraft by Assignee, Owner Trustee or the Trust Estate.

"Bill of Sale" means the Bill of Sale to be executed by the Assignor substantially in the form attached hereto in Exhibit C or such other form as consented to by the Assignee.

"Business Day" means a day, other than a Saturday or a Sunday, on which banks are open for business in New York, New York.

"Closing" means a meeting (held via telephone conference and electronic transmission) to be held on the Closing Date, at which the transactions contemplated by this Agreement or any part thereof shall be consummated.

"Closing Date" means, subject to the provisions of Section 3(e), with respect to Transferred Interests, a date on which the Closing occurs, which shall be no later than August 15, 2008. The parties anticipate the Closing Date to be July 15, 2008, and such date (or as soon thereafter as reasonably practicable) shall be the Closing Date unless delayed due to (a) satisfying the requirements of Sections 5(k) and 6(i) hereunder, (b) satisfying the requirements of Sections 5(j) and 6(q) hereunder, and (c) satisfying the requirements of Section 6(p) hereunder.

"Closing Time" means the time on the Closing Date that the transfer of the Transferred Interests from Assignor to Assignee is effected.

"Court" has the meaning set forth in the recitals hereto.

"Deposit" means $600,000 paid by Buyer to the Escrow Agent pursuant to the Purchase Proposal and the Escrow Agreement, along with interest accrued thereon, if any.

"Dollars" and the sign "$" means the lawful currency of the United States of America.

"Engines" means the two CFM 56-3C-1 engines bearing, respectively, manufacturer's serial numbers 859189 and 726365 together with related instruments, appliances, appurtenants, accessories, components, other equipment and parts installed thereon or appurtenant thereto.

"Escrow Agent" means Insured Aircraft Title Service, Inc., in its capacity as the escrow agent under the Escrow Agreement.

"Escrow Agreement" means that certain Escrow Agreement, dated as of June 24, 2008, among (a) Wells Fargo Bank Northwest, National Association, as the Owner Trustee, (b) HJC, as the indirect owner of the Assignor, (c) Assignee (as the designee of Jet Trading and Leasing, LLC), and (d) Escrow Agent.

"Governmental Entity" means any department, commission, board, bureau, court, legislature, agency, instrumentality or authority or any national government or any political subdivision thereof.

"HJC" has the meanings set forth in the opening paragraph of this Agreement.

"HJC Receiver" has the meaning set forth in the recitals hereto.

"Lease" has the meaning set forth in the recitals hereto.

"Lessee" has the meaning set forth in the recitals hereto.

"Lien" means any security interest, pledge, hypothecation, mortgage, charge, lien, debt, claim, option, interest, tax claim, right of first offer, license to use, right of first refusal, lease, security agreement, conditional sale agreement or other title retention agreement, restriction or other encumbrance of any kind or nature whatsoever, including, without limitation:

    (a)    the Lessor's Security Interests (as defined in the Lease), and

    (b)    any Lien held by the Assignor's (or any of its Affiliate's) lender(s) that encumber the Aircraft or any of the Transferred Interests.

Notwithstanding anything contained herein to the contrary, a Lien excludes (a) the Lease and (b) any Permitted Security Interest (as defined in the Lease) that are not of the type specified in (a) or (b) above in this definition of "Lien".

"Operative Documents" means the documents listed on Schedule A attached hereto.

"Original Lease" has the meaning set forth in the recitals hereto.

"Owner Trustee" has the meaning set forth in the recitals hereto.

"Participation Agreement" has the meaning set forth in Schedule A hereto

"Person" means any natural person, corporation, limited liability company, trust, association, company, partnership, joint venture, statutory trust, business trust or other entity including any Governmental Entity.

"Purchase Price" means, $9,800,000.00 (Nine Million Eight Hundred Thousand Dollars), as such amount may be adjusted pursuant to Section 3(c)(i) of this Agreement.

"Purchase Price Remainder" means $9,200,000.00 ((Nine Million Two Hundred Thousand Dollars), which is $9,800,000.00 (Nine Million Eight Hundred Thousand Dollars) (the Purchase Price prior to any adjustment pursuant to Section 3(c)(i)) less the Deposit.

"Purchase Proposal" means that certain Purchase Proposal, dated as of June 20, 2008, by and among HJC, the HJC Receiver and Jet Trading and Leasing, LLC.

"Receivership Proceedings" has the meaning set forth in the recitals hereto.

"Sale Approval Order" means an order of the Court in the Receivership Proceedings that shall be in form and substance reasonably satisfactory to Purchaser (in its sole, reasonable discretion) that approves the sale of the Aircraft (or 100% of the beneficial ownership interests in the trust that owns the Aircraft) to the Purchaser as provided herein, which order shall provide, *inter alia*, (a) a finding of fact regarding adequacy of the Purchase Price, (b) that Purchaser is not liable to HJC (or any of HJC's creditors or equity holders), the Owner Participant (or any of the Owner Participant's creditors or equity holders), the HJC Receiver or the HJC Receiver's estate (other than as expressly provided herein or in the Purchase Agreement) and (c) in the event that the Deposit is to be returned to Purchaser in accordance with the terms of the Purchase Proposal or the Escrow Agreement, the Deposit may be released without any further order of the Court and is not subject to the Receivership Proceedings.

"Sale Documents" has the meaning set forth in Section 2(b).

"Side-Letter Agreement" means that certain Side-Letter Agreement in the form annexed hereto as Exhibit D.

"Supplemental Participation Agreement" means, if and as required by the Lessee, the Supplemental Participation Agreement to be executed by Lessee, Owner Trustee and Assignee substantially in the form attached hereto in Exhibit B or such other form as consented to by Assignee, *provided however*, that all parties acknowledge and agree that the provision in the Supplemental Participation Agreement providing for the Lessee to name BCI-2005-1 as an additional insured under any insurance policy effected under Section 14 of the Original Lease for a two year period from and after the date hereof may be eliminated if Lessee does not agree to include such provision in the Supplemental Participation Agreement; it being understood that Assignee shall use its commercially reasonable efforts to cause the Lessee to include such provision.

"Taxes" means any and all taxes (including, without limitation, franchise, excise, stamp, value added, gross receipts, sales, use, property, personal and real, tangible and intangible taxes, but excluding any tax in the nature of income tax), levies, imposts, duties, charges,

assessments, or withholdings of any nature whatsoever imposed by any Taxing Entity, and any penalties, additions to tax, fines, or interest thereon or additions thereto.

"Taxing Entity" means and includes all domestic and foreign taxing authorities, including those from England, the Cayman Islands, the United States, any State thereof, any political subdivision thereof or any local jurisdiction therein.

"Termination Date" means August 15, 2008.

"Total Loss" with respect to the Aircraft, shall have the meaning ascribed to the term "Casualty Occurrence" in the Lease.

"Transferred Interests" means all of the Assignor's present and future right, title and interest in and to the following: (i) the Operative Documents; (ii) Assignor's 100% beneficial interest in the Trust Estate; (iii) Assignor's interest in the transactions contemplated by the Operative Documents; (iv) any and all rights of Assignor in, to and under, either directly or indirectly through the Owner Trustee, any and all Operative Documents relating to the Aircraft; (v) any payment of Rent Payments (as each term is defined in the Lease), whether scheduled, periodic or otherwise, that is an obligation of the Lessee under the Lease accruing for or with respect to any rent period or portion thereof occurring with respect to the Aircraft, on or after the Closing Date; and (vi) any indemnification or other payment payable to the Assignee under any Operative Document or otherwise (including the proceeds of any claim under any insurance policy) relating to any liability or alleged liability of the Assignee incurred by the Assignee under any of the Operative Documents, in each instance, in connection with any Total Loss occurring or that becomes known after the Closing Time; provided further that the Transferred Interest in all circumstances includes 100% of the beneficial interest in the Trust Estate; "Transferred Interests" excludes the following rights (collectively, the "Excluded Property"): (1) any payment of Rent Payments (as that term is defined in the Lease) that is an obligation of the Lessee under the Lease accruing for or with respect to any rent period or portion thereof occurring with respect to the Aircraft, on or before the Closing Date; (2) any indemnification or other payment payable to Assignor (including the proceeds of any claim under any insurance policy), that accrues under the terms of any Operative Document or otherwise or relates to any personal liability or alleged liability of Assignor under any of the Operative Documents or otherwise, payable to Assignor or any Assignor Indemnitees under any Operative Document or otherwise (but excluding amounts attributable to the value of the Aircraft, either of the Engines and other physical assets comprising the Aircraft); (3) any right of Assignor to receive proceeds of liability insurance maintained by the Lessee in respect of the Aircraft relating to claims arising out of events occurring or circumstances existing prior to the Closing Date (but excluding amounts attributable to the value of the Aircraft, either of the Engines and other physical assets comprising the Aircraft); (4) any rights of Assignor against Lessee in respect of any indemnification of fees and expenses, including attorneys' fees, incurred by Assignor in connection with the Operative Documents; (5) any payment of Supplemental Rent (as defined in the Lease) in respect of any of the items and matters set forth in subclauses (1) through (4) above; and (6) any right to enforce the payment of any amount described above.

"Trust Agreement" has the meaning set forth in the recitals hereto.

"Trust Estate" has the meaning set forth in the recitals hereto.

(b)    The following rules of interpretation shall apply to this Agreement:

(i)    Section headings are inserted for convenience of reference only and shall be ignored in the interpretation of this Agreement.

(ii)    In this Agreement, unless the context otherwise requires:

(1)    references to Sections, Schedules and Exhibits are to be construed as references to the sections of, schedules to and exhibits to, this Agreement and references to this Agreement include its Schedules and Exhibits, which form a part hereof;

(2)    references to (or to any specified provision of) this Agreement or any other document shall be construed as references to this Agreement, that provision or that document as in force for the time being and as amended, supplemented or otherwise modified in accordance with the terms thereof, or as the case may be, with the agreement of the relevant parties;

(3)    words importing the plural shall include the singular and vice versa; and

(4)    "include" and "including" are not limiting.

## 2.    Purchase and Sale of Transferred Interests

(a)    On the terms and subject to the conditions contained herein, in consideration of the payment of the Purchase Price to the Assignor for the Transferred Interests, on the Closing Date, the Assignor shall sell, assign, transfer and convey to the Assignee, and the Assignee shall purchase and assume from the Assignor all right, title and interest in the Transferred Interests, free and clear of any and all Liens; and

(b)    With respect to the Transferred Interests, upon payment in full of the Purchase Price in the manner specified in Section 3(b)(i), at the Closing, the Assignor shall sell, assign, transfer and convey the Transferred Interests to the Assignee by instructing the Escrow Agent to deliver and release to Assignee the Assignment and Assumption Agreement substantially in the form attached hereto as <u>Exhibit A</u> for the Transferred Interests (the "<u>Assignment and Assumption Agreement</u>"), the Supplemental Participation Agreement, the Bill of Sale, the Side-Letter Agreement and such other documents reasonably requested by Assignee and necessary to effectuate the transactions hereunder, and the other agreements, certificates and instruments to be executed in connection therewith (collectively, all such documents, including the Assignment and Assumption Agreement, the Supplemental Participation Agreement and the Bill of Sale, the "<u>Sale Documents</u>"). At the Closing, the Assignee shall assume, and agree to perform, the obligations of the Assignor under the Operative Documents by means of the Assignment and Assumption Agreement.

(c)      Assignor shall deliver, or cause to be delivered, to the Escrow Agent within 2 business days of the date hereof originals (in triplicate) of each of the following documents, which documents shall be held in escrow by the Escrow Agent in accordance with the terms of the Escrow Agreement (each such signature page to be delivered in triplicate): (i) the Assignment and Assumption Agreement as executed by the Assignor and the Owner Trustee; and (ii) any other Sale Document to which it or its Owner Trustee is a party as executed by it and the Owner Trustee, as applicable.

(d)      Assignee shall deliver to the Escrow Agent within 2 business days of the date hereof originals (in triplicate) of each of the following documents, which documents shall be held in escrow by the Escrow Agent accordance with the terms of the Escrow Agreement (each such signature page to be delivered in triplicate):  (i) the Assignment and Assumption Agreement as executed by the Assignee; (ii) any other Sale Document to which it is a party as executed by it.

(e)      HJC shall deliver, or cause to be delivered, to the Escrow Agent within 2 business days of the date hereof originals (in triplicate) of each of the following documents, which documents shall be held in escrow by the Escrow Agent in accordance with the terms of the Escrow Agreement (each such signature page to be delivered in triplicate):  (i) the Side-Letter Agreement.

**3.      Closing**

(a)      Subject to satisfaction or waiver of the conditions precedent set forth in Sections 5 and 6 hereof, the Closing for the Transferred Interests shall be held via electronic transfers and transmissions in New York, New York on the Closing Date, at a time to be determined by the Assignor and the Assignee based upon the scheduled location of  the Aircraft, or such other place or time to which the Assignor and the Assignee shall mutually agree.

(b)      Each party shall agree to irrevocably authorize the Closing mechanics as set forth in Section 3.A of the Escrow Agreement.

(c)      At the Closing on the Closing Date for the Transferred Interests, the Assignee shall, concurrently with the Assignee's performance set forth in subclause 3(d) below:

(i)      pay to the Assignor in accordance with the wire-instructions annexed hereto as Schedule B: (a) an amount equal to the Purchase Price Remainder, less (b) any Rent Payments (as defined in the Lease) that are payable to Assignee as part of the Transferred Interests; such payment shall be made by Assignee by wire transfer of immediately available funds pursuant to wire instructions provided in Schedule B hereto, less any adjustment (to the extent not duplicative of section 3(c)(i)(b) above) required under section 3(c)(iii) below;

(ii)      irrevocably authorize the Escrow Agent to deliver originals of all of the Sale Documents to the Assignor's counsel (Katten Muchin Rosenman LLP, 1025 Thomas Jefferson St., NW, Suite 700, East Lobby, Washington, DC, 20007,

Attention: Jane Cavanaugh), with a copy of all such documents by e-mail (jane.cavanaugh@kattenlaw.com);

(iii)    to the extent that the Assignor (or any of its Affiliates) has received the monthly Rent Payment due under the Lease after the Closing Date, receive a credit for such amount of Rental Payment and the Purchase Price shall be reduced by such amount; and

(iv)    irrevocably authorize the Escrow Agent to release the Deposit to the Assignor in accordance with the wire-instructions annexed hereto as Schedule <u>B</u>;

(d)    At the Closing on the Closing Date for the Transferred Interests, the Assignor shall, concurrently with the Assignee's performance set forth in subclause 3(c) above:

(i)    irrevocably authorize the Escrow Agent to deliver, upon the Assignor's confirmation of its receipt of the Purchase Price Remainder and the Deposit, originals of all of the Sale Documents to the Assignee's counsel (Vedder, Price, Kaufman & Kammholz, P.C., 1633 Broadway, New York, New York 10019, Attention: Michael Edelman, Esq.), with a copy of all such documents by e-mail (mjedelman@cvedderprice.com);

(ii)    deliver to Assignee a certificate or other evidence from the the jurisdiction of formation, dated as of a date reasonably near the Closing Date, attesting to the existence of Assignor as a limited liability company organized in such jurisdiction;

(iii)    unless excused by the last sentence of Section 4(c) hereof, deliver to Assignee the Supplemental Participation Agreement executed by the Lessee and the Owner Trustee; and

(v)    irrevocably authorize the Escrow Agent to deliver to Assignee the original Bill of Sale executed by the Assignor.

(e)    Unless extended in writing by the parties hereto, if the Closing for any Transferred Interests has not occurred by 5:00 p.m. prevailing time in New York, New York, on the Termination Date (unless caused by a delay in receipt of the Supplemental Participation Agreement as executed by Lessee and Owner Trustee or any delay based on the location of the Aircraft), either party may elect to terminate this Agreement with respect to the Transferred Interests and all of its rights and obligations under the Sale Documents regarding the Transferred Interests by giving written notice to the other party of such termination.  If so terminated, the Deposit shall be returned to the Assignee in accordance with Section 3(B) of the Escrow Agreement.

(f)    Upon the Payment of the Purchase Price for the Transferred Interests, the Owner Trustee (a) acknowledges and consents to the foregoing sale, assignment, transfer and conveyance of all of the Assignor's right, title, interest, obligations and liabilities in, to and under the Trust Agreement and the Operative Documents to the Assignee with respect to such

Transferred Interests under this Agreement, and acknowledges the rights of the Assignee described in this Agreement, and (b) acknowledges and agrees that the Assignee is the sole beneficiary and Trustor under the Trust Agreement and is the 100% owner of all beneficial interests in and to the Trust Estate, except as provided herein with respect to the Excluded Property. Upon the Closing Date for the Transferred Interests and the execution and delivery of the fully executed Assignment and Assumption Agreement, the Owner Trustee and the Assignee agree that, except as provided in the next sentence, the account information for the owner of the beneficial interests under the Trust Estate for the Transferred Interests shall be amended to provide that any and all payments to be made to the Trustor (as defined in the Trust Agreement) after the Closing Date with respect to the Transferred Interests (but in all events, excluding the Purchase Price which shall be solely for the account of the Assignor) pursuant to the Trust Agreement received by the Owner Trustee shall be paid to the Assignee to the account set forth on Schedule B hereto, and that any other payments to be made to the Assignee shall be paid into such account or such other account as the Assignee may from time to time specify in writing to the Owner Trustee. In addition, Assignee and the Owner Trustee agree that any amounts received by either of them in respect of any Excluded Property and/or the Purchase Price or any other amounts payable to the Assignor hereunder shall be promptly paid to Assignor to the account set forth on Schedule B hereto.

**4.    Covenants of the Parties**

(a)    Each of the Assignor Parties covenants and agrees that:

(i)    the Assignor will act in good faith and with due diligence to obtain or otherwise cause the conditions precedent to the obligation of the Assignor to consummate the transactions contemplated by this Agreement not within the control of the Assignee to be satisfied on or prior to 11:00 a.m., prevailing time in New York New York, on the Closing Date;

(ii)    if, on or after the Closing of sale and purchase of any Transferred Interests, the Assignor receives any payment, distribution or other amount which is a part of such Transferred Interests, the Assignor will promptly notify the Assignee of its receipt of, and remit to the Assignee, such payment, distribution or amount; and

(iii)    Assignor shall provide the Lessee with the notice of the transfer contemplated hereunder in accordance with Section 21.3(g) of the Original Lease and Assignor shall in good faith and with due diligence seek to obtain the Lessee's and Owner Trustee's execution of the Supplemental Participation Agreement as soon as practicable after the date hereof (and prior to the Termination Date);

(iv)    Each of the Assignor Parties agrees that it shall, in good faith and with reasonable due diligence, either seek approval of, or support the HJC Receiver's application for, entry of the Sale Approval Order from the Court in the Receivership Proceeding as soon as practicable after the date hereof so as to obtain the entry of the Sale Approval Order prior to the Termination Date;

(iv)    Assignor will execute and deliver the Bill of Sale to the Escrow Agent on or prior to the Closing Date.

(b)    The Assignee covenants and agrees that:

(i)    the Assignee will act in good faith and with due diligence to obtain or otherwise cause the conditions precedent to the obligation of the Assignee to consummate the transactions contemplated by this Agreement not within the control of the Assignor or any party to any Operative Document to be satisfied on or prior to 11:00 a.m., prevailing time in New York, New York, on the Closing Date; and

(ii)    if, on or after the Closing of the sale and purchase of the Transferred Interests, the Assignee receives any payment or distribution which is a part of the Excluded Property, the Assignee will promptly notify the Assignor of its receipt of, and remit to the Assignor, such payment, distribution or amount.

(c)    Each of the Assignor and the Assignee covenants and agrees that it will use its commercially reasonable efforts to cause the Lessee to execute and deliver the Supplemental Participation Agreement to the Escrow Agent prior to the Closing Date. The Assignor and Assignee agree that the requirement for the execution and delivery of the Supplemental Participation Agreement by the Lessee and the parties hereto hereunder shall be excused provided that (i) the Lessee otherwise recognizes that the Assignee is the owner participant under the Trust Agreement and (ii) the Lessee adds the Assignee as an additional insured under any insurance policy effected under Section 14 of the Lease.

Any payment or distribution to be remitted by one of the parties hereto to the other party hereto shall be made by wire transfer of immediately available U.S. dollar funds to an account designated by the party to receive such wire transfer to such account as shall be designed by the party hereto to receive such remittance from time to time.

## 5.    Conditions Precedent – Assignor

The Assignor's obligation to sell the Transferred Interests hereunder is subject to the satisfaction or waiver of the following express conditions precedent on the Closing Date; provided that these conditions are for the Assignor's sole benefit and may be waived by the Assignor at any time in its sole discretion:

(a)    Payment of the Purchase Price Remainder and the Deposit in full in the manner provided in Section 3;

(b)    all representations and warranties of the Assignee contained in this Agreement shall be true, complete and correct in all material respects at and as of the Closing with the same effect as though such representations and warranties were made at and as of the Closing;

(c)　　the Assignee shall have performed and complied with all of the covenants and agreements required by this Agreement to be performed or complied with by the Assignee on or prior to the Closing, including the delivery of all items required to be delivered by the Assignee pursuant to this Section 5;

(d)　　the Assignor shall have received by e-mail all of the documents and instruments as provided in Section 3(c) as fully executed by the parties thereto, as applicable

(e)　　no legal or governmental action, suit or proceeding shall have been instituted or threatened by or before any Governmental Entity, nor shall any order, judgment or decree have been issued or proposed to be issued by any Governmental Entity to set aside, restrain, enjoin or prevent the consummation of this Agreement, the Assignment and Assumption Agreement or the transactions contemplated hereby or thereby;

(f)　　no change shall have occurred after the date of this Agreement in any applicable Law which would make it illegal for the Assignee or the Assignor to perform any of their respective obligations under any Sale Document;

(g)　　all governmental and other licenses, approvals, consents, registrations and filings to be made or obtained by the Assignee that are necessary for any matter or thing contemplated by this Agreement and the Assignment and Assumption Agreement, and any notices to be given by the Assignee pursuant hereto or thereto, for the legality, validity, enforceability or effectiveness hereof or thereof, shall have been obtained or effected on an unconditional basis and shall be in full force and effect;

(h)　　the Assignor shall have received an officer's or director's certificate from Assignee which attaches true and correct copies of the formation certificate of Assignee and, if required under its organizational documents, a true and correct copy of the resolutions of shareholders of the Assignee authorizing the transactions contemplated hereunder, and a list of the officers or directors who have the authority to sign documents on behalf of Assignee together with a specimen signature of each of such directors or officers;

(i)　　to the extent required to be obtained, the Assignor shall have obtained the consent of its existing lender that holds Liens encumbering the Aircraft to (i) the prepayment of the related debt held by such lender and (ii) the release of such Liens at the Closing;

(j)　　unless excused by the last sentence of Section 4(c) hereof, the Assignee shall have received a Supplemental Participation Agreement executed by Lessee;

(k)　　the Sale Approval Order shall have been entered by the Court, which order shall be effective and binding and which shall not be subject to any stay of enforcement or a then pending appeal; and

(l)　　no Total Loss shall have occurred with respect to the Aircraft.

12

If any of the foregoing conditions precedent are not satisfied or waived by the Assignor in writing by the close of business on the Termination Date, then unless such failure is attributable to a breach by the Assignor of its obligations hereunder, the Assignor may terminate its obligation to sell the Transferred Interests pursuant to this Agreement by giving written notice of such termination to the Assignee and, from and after such termination of this Agreement, neither the Assignor nor the Assignee shall have any further liability to the other party under this Agreement, except as expressly set forth herein.  Except as otherwise expressly agreed in writing by the Assignee and the Assignor, if the Closing occurs, the Assignor shall be deemed to have waived any condition that is not satisfied at the time of Closing.

## 6.    Conditions Precedent - Assignee

The Assignee's obligation to purchase the Transferred Interests hereunder is subject to satisfaction or waiver of the following express conditions precedent on the Closing Date; provided that these conditions are for the Assignee's sole benefit and may be waived by the Assignee at any time in its sole discretion:

(a)    all representations and warranties of the Assignor contained in this Agreement shall be true, complete and correct in all material respects at and as of the Closing with the same effect as though such representations and warranties were made at and as of the Closing;

(b)    the Assignor shall have performed and complied with all the covenants and agreements required by this Agreement to be performed or complied with by it on or prior to the Closing, including the delivery of all items required to be delivered by it pursuant to this Section 6;

(c)    the Assignee shall have received by e-mail all of the documents and instruments as provided in Section 3(d) as fully executed by the parties thereto, as applicable;

(d)    the Aircraft shall be in materially the same condition as existed on April 14, 2008 (normal wear and tear excepted);

(e)    both (i) the Lease and (ii) the Assignor's and Owner Trustee's ownership interests in the Aircraft shall be in the same form as existed on April 14, 2008, except that with respect to subclause (ii) above, an entity that is the subject of the Receivership Proceedings possesses (immediately prior to the Closing) the indirect ownership interests and control over the Assignor and the Owner trustee;

(f)    no legal or governmental action, suit or proceeding shall have been instituted or threatened by or before any Governmental Entity, nor shall any order, judgment or decree have been issued or proposed to be issued by any Governmental Entity to set aside, restrain, enjoin or prevent the consummation of this Agreement, either of the Assignment and Assumption Agreement or the transactions contemplated hereby or thereby;

(g)    no change shall have occurred after the date of this Agreement in any applicable Law which would make it illegal for the Assignor or the Assignee to perform any of their respective obligations under any Sale Document, for the Assignee to perform the obligations under the Operative Documents to be assumed by the Assignee, or that would materially and

adversely affect the Assignee with respect to the transactions contemplated by the Sale Documents.

(h)    all governmental and other licenses, approvals, consents, registrations and filings to be made or obtained by the Assignor that are necessary for any matter or thing contemplated by this Agreement and the Assignment and Assumption Agreement, and any notices to be given by the Assignor pursuant hereto or thereto for the legality, validity, enforceability and effectiveness hereof and thereof shall have been obtained or effected on an unconditional basis and shall be in full force and effect, including, without limitation, any consent necessary to be received from Lessee to recognize the Assignee as the sole owner participant under the Trust Agreement;

(i)    the Sale Approval Order shall have been entered by the Court, which order shall be effective and binding and which shall not be subject to any stay of enforcement or a then pending appeal;

(j)    no Total Loss shall have occurred with respect to the Aircraft;

(k)    no Event of Default (as defined in the Lease) shall have occurred and be continuing;

(l)    to the extent an Aircraft is listed in the records in the International Registry, the records in the International Registry with respect to such Aircraft shall reflect information that, in all material respects, is current immediately prior to the Closing and demonstrate that, other than the existing Lien in favor of Deutsche Bank that will be released at the Closing, there are no Liens on the Aircraft or the Transferred Interests;

(m)    the Assignee shall have received a legal opinion from English counsel (at Assignee's sole cost) confirming that the Aircraft is registered in the United Kingdom and that there are no Liens of record with respect to the Aircraft in the United Kingdom;

(n)    the Assignee shall have received an officer's or manager's certificate from the Assignor which attaches true and correct copies of the formation certificate of the Assignor and, if required under its organizational documents, a true and correct copy of the resolutions of member of the Assignor authorizing the transactions contemplated hereunder, and a list of the officers or managers who have the authority to sign documents on behalf of the Assignor together with a specimen signature of each of such managers or officers;

(o)    the Assignee shall have received (i) a certificate from Lessee's independent insurance broker evidencing the insurance required to be maintained pursuant to the Lease and reflecting the transaction contemplated by this Agreement, listing Assignee and its affiliates, officers, members, managers, directors, employees, servants and agents as additional insureds; and (ii) a broker's letter of undertaking, in form and substance reasonably satisfactory to Assignee;

(p)    the parties are able to effect the Closing in a jurisdiction where there are no sales or use taxes with respect to the transactions contemplated under this Agreement and the other Sale Documents; and

(q)    unless excused by the last sentence of Section 4(c) hereof, the Assignee shall have received a Supplemental Participation Agreement executed by Lessee; and

(r)    the Assignee shall have received the Bill of Sale executed by Assignor.

If any of the foregoing conditions precedent are not satisfied or waived by the Assignee in writing by the close of business on the Termination Date, then unless such failure is attributable to a breach by the Assignee of its obligations hereunder, the Assignee may terminate its obligation to purchase the Transferred Interests pursuant to this Agreement by giving written notice of such termination to the Assignor and, from and after such termination of this Agreement, neither the Assignor (to the extent that such failure has not been caused by Assignor's breach) nor the Assignee shall have any further liability to the other party under this Agreement, except as expressly set forth herein.  Except as otherwise expressly agreed in writing by the Assignee and the Assignor, if the Closing occurs, the Assignee shall be deemed to have waived any condition that is not satisfied at the time of Closing.

**7.    Representations and Warranties of the Assignor and HJC**

Each of the Assignor Parties represents and warrants to the Assignee that the statements contained in this Section 7 will be true and correct as of the Closing Date:

(a)    The Assignor is a limited liability company duly organized, validly existing and in good standing under the laws of its jurisdiction of formation.  The Assignor has all necessary power and authority to execute and deliver this Agreement, the Assignment and Assumption Agreement, and the other Sale Documents.  The Assignor has taken all action necessary to authorize its execution and delivery of this Agreement and the other Sale Documents, and the performance of its obligations under this Agreement and the other Sale Documents.  The Assignor has duly executed and delivered this Agreement and the other Sale Documents.

(b)    The Sale Approval Order has been entered by the Court in the Receivership Proceeding and, as of the Closing Date, is an order that is not subject to any stay of enforcement or any then pending appeal,

(c)    This Agreement is, and upon their execution and delivery, the other Sale Documents will be, the valid and binding obligations of the Assignor, enforceable against the Assignor in accordance with their respective terms, except to the extent that enforceability is limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or transfer, or other laws relating to the rights of creditors generally or by principles of equity, whether considered in a proceeding at law or in equity.

(d)    Neither the execution or delivery by the Assignor of this Agreement and the other Sale Documents nor the consummation by the Assignor of any of the transactions contemplated hereby or thereby or the performance of any of its obligations thereunder violate or will violate, result or will result in a breach of, or result or will result in a default or event of default under (i) the certificate of formation of the Assignor as restated and/or amended to date, (ii) the Single Purpose Limited Liability Company Agreement of the Assignor as restated and/or amended to date, (iii) subject to obtaining the Supplemental Participation Agreement executed by the Lessee and the Owner Trustee, any agreement, contract, mortgage, indenture, deed of trust, or other

instrument to which the Assignor is a party or to which or by which the Assignor or its assets are subject or are bound or (iv) any Law to which or by which the Assignor or its assets are subject or are bound. The Assignor is not entering into the transactions contemplated under this Agreement in violation of any existing laws to which it is subject and/or with actual intent to hinder, delay, or defraud either present or future creditors.

(e)     Other than the entry of the Sale Approval Order in the Court in the Receivership Proceeding, neither the execution or delivery by the Assignor of this Agreement and the other Sale Documents, nor the consummation by the Assignor of any of the transactions contemplated hereby or thereby or the performance of any of its obligations thereunder, requires the consent, approval, order, or authorization of, the filing or registration with, or the giving of notice to, any Governmental Entity.

(f)     Other than the entry of the Sale Approval Order in the Court in the Receivership Proceeding, neither the execution or delivery or performance by the Assignor of this Agreement and the other Sale Documents nor the consummation by the Assignor of any of the transactions contemplated hereby or thereby nor the performance of any of its obligations thereunder, will require the consent or approval of, the giving of notice to, or the taking of any other action in respect of any third Person.

(g)     No litigation, arbitration or administrative proceeding or claim before any court, arbitrator, governmental, regulatory or administrative agency or authority which might by itself or together with any other proceedings or claims, if determined adversely to the Assignor, which matters would materially and adversely affect the Assignor's ability to observe or perform its obligations under this Agreement and the other Sale Documents, is in progress or pending or, to the knowledge of the Assignor, threatened against the Assignor or any of its assets.

(h)     The Aircraft and the Trust Estate are free and clear of any Liens, or amounts owing or any indebtedness owed by the Trust Estate, arising from any indenture or loan or credit agreement other than Lessor's Security Interest (as defined in the Lease) that the Assignor will cause to be released at Closing. The Owner Trustee holds good title to the Aircraft free and clear of any and all Liens and the Aircraft is registered in England in the name of  the Lessee.  The Assignor holds good title to the beneficial interests in and to the Trust Estate free and clear of any and all Liens.

(i)     Other than the obligations arising under the Lease, the Trust Agreement or the other Operative Documents, there are no other obligations owed under the Transferred Interests.

(j)     The Assignor has the lawful right to sell the Transferred Interests to the Assignee in accordance with the terms of this Agreement, and to convey title thereto to Assignee in accordance with and subject to the terms of this Agreement.

(k)     The Lease remains in full force and effect.

(l)     There are no maintenance reserves and security deposits in effect under the Lease.

(m)    At the Closing, the Assignor will transfer to the Assignee all of its rights, title and interest in and to all of the Transferred Interests, free and clear of Liens of any kind or nature whatsoever, and Assignee shall receive good and marketable title to the Transferred Interests, free and clear of all Liens. The Assignor confirms that the beneficial interests and owner participation interests under the Trust Agreement are not in certificated form.

(n)    No Event of Default (as defined in the Lease) or event, which with the giving of notice, the passage of time or both, would result in the occurrence of an Event of Default, caused by or attributable to the Assignor or any Affiliate thereof has occurred and is continuing, and, to the best of the Assignor's knowledge, no other Event of Default (as defined in the Lease) or event, which with the giving of notice, the passage of time or both, would result in the occurrence of an Event of Default has occurred and is continuing.

(o)    Except as contemplated hereby, as of the completion of the Closing, the Assignor will have no obligation or commitment to sell, assign, encumber, transfer or convey, and no third party has any option, right of first offer, right of first refusal or other right to acquire, the Assignor's right, title and interest in, to or under any or all of the Transferred Interests.

(p)    Schedule <u>A</u> consists of a true, correct, accurate and complete list as of the Closing Date of all of the Operative Documents for the Transferred Interests. Assignor has delivered to the Assignee a true, correct, accurate and complete original (but only to extent that the Assignor is in actual possession, custody and control of originals and, if not, then a true, correct, accurate and complete copy) of each of the Operative Documents set forth on Schedule <u>A</u>, in each case as in effect as of the Closing Date. Except for this Agreement and the Operative Documents listed on <u>Schedule A</u> hereto, as applicable, there are no other documents or agreements relating to the Aircraft or the Trust Estate or the transactions contemplated thereby that affect any right, title, interest or privilege of the Assignor or will bind or result in any liability or obligation of the Assignee after the Closing Date. Except as described on Schedule <u>A</u>, as applicable: (i) each Operative Document to which the Assignor is a party is in full force and effect with respect to the Assignor, and, to the knowledge of the Assignor, each Operative Document to which the Assignor is a party is in full force and effect with respect to each of the other parties thereto, and the Assignor has not received any notice that any other Person or party to any Operative Document has challenged or asserted that any Operative Document is in any manner unenforceable; (ii) there has been no other amendment or modification of or supplement to any of the Operative Documents, (iii) the Assignor has performed all of its obligations under every Operative Document to which it is a party; (iv) the Assignor has not taken any action to terminate or given any notice of default under any Operative Document; and (v) to the knowledge of the Assignor, no other party to any Operative Document has taken any action to terminate, has threatened to terminate or has given any notice of default of or under any Operative Document.

(q)    The Assignor has not made any claims for indemnity or rights to receive indemnity payments from any lessee under the Lease which have not been paid in full or resolved to the satisfaction of the Assignor.

(r)    No rent or other amount that is payable under the Lease or other Operative Documents on any date subsequent to the Closing Date has been prepaid, has been waived, has been compromised or has been forgiven.

(s)    Other than Mercury-ALPS Aviation Management, LLC and ComAirTrading, Inc. (whose fees are solely the responsibility of Assignor and for which Assignor shall indemnify Assignee), no Person acting on behalf of the Assignor is or will be entitled to any broker's fee, commission or finder's fee in connection with the transactions contemplated hereby.

(t)    No remarketing or residual sharing agreement associated with the Transferred Interests, including, without limitation, any fee agreements that would give any person any interest or right to payment with respect to any disposition by the Assignor of any item in the Transferred Interests, is in effect.

(u)    Neither the Owner Trustee nor the Trust Estate owe Lessee any amounts with respect to any cash collateral or deposits arising under the Lease or the other Operative Documents.

(v)    The prior transfers and transactions pursuant to which the Assignor acquired its interests in the Transferred Interests are not, and can not be determined to be, fraudulent conveyances within the scope of Article 10 of the New York's Debtor and Creditor Law, N.Y. Debt. & Cred. §§ 270 *et seq.*, section 548 of title 11 of the United States Code and/or similar statute or applicable law.

(w)    The Purchase Price being paid for the Transferred Interests represents "fair consideration" (as such term is used in the Article 10 of the New York's Debtor and Creditor Law, N.Y. Debt. & Cred. §§ 270 *et seq.*) and "reasonably equivalent value" (as such term is used in 11 U.S.C. § 548), or as analogously provided under similar statute or applicable law, for the transfer of such assets.

(x)    As of the Closing Time, no Total Loss shall have occurred with respect to the Aircraft.

(y)    Both (i) the Lease and (ii) the Assignor's and Owner Trustee's ownership interests in the Aircraft are in the same form as existed on April 14, 2008, except that with respect to subclause (ii) above, an entity that is the subject of the Receivership Proceedings possesses (immediately prior to the Closing) the indirect ownership interests and control over the Assignor and the Owner trustee.

**8.    Representations and Warranties of the Assignee**

The Assignee represents and warrants to the Assignor that the statements contained in this Section 8 will be true and correct as of the Closing Date:

(a)    The Assignee is a company, validly existing and in good standing under the laws of the Cayman Islands. The Assignee has all necessary power and authority to execute and deliver, to perform its obligations under, the Sale Documents and to perform the obligations it assumes under the Operative Documents. The Assignee has taken all action necessary to authorize execution and delivery of, and its performance of its obligations under, this Agreement and the Assignment and Assumption Agreement and its assumption and performance of the obligations of the Assignor pursuant to the Operative Documents. The Assignee has duly executed and delivered this Agreement.

(b)     This Agreement is and, upon the Assignee's execution and delivery of each other Sale Document to which the Assignee is a party, each of the other Sale Documents and the Operative Documents by which the Assignor is bound immediately prior to the Closing will be, the valid and binding obligations of the Assignee, in each case enforceable against the Assignee in accordance with their respective terms, except to the extent that enforceability is limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or transfer, or other laws relating to the rights of creditors generally, or by principles of equity, whether considered in a proceeding at law or in equity.

(c)     On the Closing Date, the Assignee will have a net worth in excess of the net worth requirements in Section 21.3 (d) of the Lease or will have received a written waiver of such net worth requirement from the Lessee.

(d)     Neither the execution and delivery of this Agreement, the Assignment and Assumption Agreement and the other Sale Documents nor the consummation of the transactions contemplated hereby or thereby nor compliance by Assignee with any of the terms and provisions hereof or thereof will violate, result in a breach of, or result in a default or event of default under the articles of organization of the Assignee as restated and amended to date, the operating agreement of the Assignee as amended to date, any agreement, contract, mortgage, indenture, deed of trust, or other instrument to which the Assignee is a party or to which or by which the Assignee or the assets of the Assignee are subject or are bound or any law, statute, rule, regulation, ordinance, order, writ, decree, or injunction to which or by which the Assignee or the assets of the Assignee are subject or are bound. Assignee is not is entering into the transactions contemplated under this Agreement in violation of any existing laws to which it is subject and/or with actual intent to hinder, delay, or defraud either present or future creditors.

(e)     None of the execution, delivery and performance by the Assignee of this Agreement, the execution, delivery and performance by the Assignee of the Assignment and Assumption Agreement, and the consummation by the Assignee of any of the transactions contemplated hereby or thereby, requires the further consent, approval, order, or authorization of, the filing or registration with, or the giving of notice to, any Governmental Entity.

(f)     None of the execution, delivery and performance by the Assignee of this Agreement, the execution, delivery and performance by the Assignee of the Assignment and Assumption Agreement, and the consummation by the Assignee of any of the transactions contemplated hereby or thereby, requires the consent or approval of, the giving of notice to, or the taking of any other action in respect of, the members, or the trustee or holder of any indebtedness of the Assignee.

(g)     No litigation, arbitration or administrative proceeding or claim before any court, arbitrator, governmental, regulatory or an administrative agency or authority which might by itself or together with any other proceedings or claims, if determined adversely to the Assignee, which matters would materially and adversely affect the Assignee's ability to observe or perform its obligations under this Agreement, either of the Assignment and Assumption Agreement or any of the Operative Documents is in progress or pending, or to the knowledge of the Assignee, threatened against Assignee or any of its assets.

19

(h)     Other than Jet Trading and Leasing, LLC (whose fees are solely the responsibility of Assignee and for which Assignor shall indemnify Assignee), no Person acting on behalf of the Assignee is or will be entitled to any broker's fee, commission or finder's fee in connection with the transactions contemplated hereby.

(i)     Except in a transaction that is exempt under the transaction exemption set forth in PTE 84-14 (the prohibited transaction class exemption issued by the U.S. Department of Labor for certain transactions effected by independent qualified professional asset managers) or that is exempt under one of the transaction exemptions set forth in PTE 90-1, 91-38, 95-60 or 96-23, no portion of the funds that Assignee uses to purchase the Transferred Interests or any part thereof, whether directly or indirectly, will constitute, constitutes or may be deemed to constitute, under the Employee Retirement Income Security Act of 1974, as amended, or any of the rulings, regulations or court decisions thereunder assets of any plan as defined in Section 4975(e)(1) of the Code.

9.     **Taxes**

(a)     The parties agree that (i) the Assignor shall retain all of the tax liabilities or attributes relating to Assignor's participation in the transactions contemplated by the Operative Documents which arise prior to, or with respect to, any period prior to the Closing Date, except to the extent that any such Tax is in the nature of a sales or use tax assessed, incurred or arising from the transactions contemplated by this Agreement; (ii) Assignor shall be solely liable and responsible for any tax liability for forgiveness of debt income that may be (A) imposed on, or with respect to, the income of, Assignor (or the consolidated or combined group of which the Assignor is a member) if any debt or any obligations arising under the Trust Agreement or other Operative Documents are forgiven or written down in whole or in part at any time prior to the Closing Date, and/or (B) imposed on the Trust Estate if the Trust Estate is, or has been, taxable as corporations on or before the Closing Date of the Transferred Interests (any such tax liability described in this subsection 9(a)(ii), the "FDI Taxes") except to the extent that any such Tax is in the nature of a sales or use tax assessed, incurred or arising from the transactions contemplated by this Agreement; (iii) the Assignee shall be liable for taxes arising under the Trust Agreement as of and after the effective date and time of the Closing Date hereunder, and that no such tax liabilities or attributes are being transferred to, or assumed by, the Assignor; and (iv) to the extent that any sales, use, transfer, transaction or similar taxes or stamp duties of any jurisdiction (other than taxes based on or measured by income) are payable by any party hereto or on or with respect to any of the Transferred Interests as a result of the transactions contemplated hereby that are not paid by the Lessee, or any sale or transfer by Assignee subsequent to the Closing, the Assignee shall pay such taxes and any interest and penalties thereon.  The parties hereto agree, at the expense of the requesting party, to cooperate with each other and use their respective reasonable efforts to minimize the taxes that may be imposed on the other parties hereto provided that such efforts do not negatively affect the interests of such party.

(b)     The Assignee shall be responsible for, and shall, on an After-Tax Basis, indemnify and hold harmless the Assignor Indemnitees against, and shall pay promptly when due, any and all Taxes for which it is responsible pursuant to Section 9(a) hereof.  In the event that the Assignor Indemnitees pay any Taxes which are payable by the Assignee pursuant to this Section 9, the Assignee shall reimburse to the relevant Assignor Indemnitee the full amount thereof within 14

days after receipt from the Assignor of a written request for such reimbursement, accompanied by original receipts or other sufficient evidence of payment of such Taxes.

(c)     The Assignor shall be responsible for, and shall, on an After-Tax Basis, indemnify and hold harmless the Assignee Indemnitees against, and have paid or will pay when due, any and all Taxes that it is responsible for under this Section 9.  In the event that the Assignee Indemnitees pay any Taxes which are payable by the Assignor pursuant to this Section 9(b), the Assignor shall reimburse to the relevant Assignee Indemnitee the full amount thereof within 14 days after receipt from the Assignee of a written request for such reimbursement, accompanied by original receipts or other sufficient evidence of payment of such Taxes.

(d)     The parties further agree to furnish each other with such documents and certificates as they may reasonably request in connection with any claims for exemption from the payment of such Taxes.  Each of the Assignee and the Assignor agrees to notify the other immediately of any claim for Taxes which might affect the Assignee or the Assignor and of which the other becomes aware.  Each of the Assignee and the Assignor will have the right, at its sole cost and expense, to contest the validity, applicability or amount of any Taxes which it is to pay under this Section 9, and each party agrees to contest, or to permit the other party to contest, the validity, applicability or amount of any Taxes or to assist such other party in such protest on such other party's request and at such other party's sole cost and expense.  Each of the Assignee and the Assignor agrees that it shall be a condition precedent to the Assignee's obligation to proceed with the Closing of the sale of the Transferred Interests that, at the time of the Closing, the Aircraft shall, to Assignee's reasonable satisfaction, be located in a jurisdiction that will render the purchase and sale transaction free of all Taxes whatsoever (other than Taxes measured on net or gross income or gross receipts) to the Assignee and Assignor.

**10.    Further Agreements of Assignee**.

(a)     Quiet Enjoyment.  Assignee agrees for the benefit of Lessee that so long as no Event of Default (as defined under the Lease) shall have occurred and be continuing, that neither it nor any Person claiming by, through or in the name of it shall take or cause to be taken any action to interfere with Lessee's rights under the Lease to the continued possession, use, operation and quiet enjoyment of the Aircraft during the term of the Lease in accordance with the terms thereof.

(b)     Lessee's Obligations, etc.  Assignee agrees that none of the Lessee's obligations, liabilities, costs or risks in the use and operation of the Aircraft or under or in respect of the Transferred Interests shall be increased or altered and none of the Lessee's rights and benefits under any of the Operative Documents shall be diminished as a result of any transactions contemplated by this Agreement.

**11.    Release of Assignor; Disclaimer of Warranties**

(a)     Except as otherwise expressly provided, both the Assignor and Assignee hereby expressly agree and acknowledge that, upon the completion of the Closing, Assignor shall have no further duty or obligation under the Operative Documents to which Assignor is a party or under any of the Operative Documents by which Assignor is bound; provided, however, that Assignor shall in no event be relieved from any liability or obligation under any Operative Documents to

which Assignor is a party to the extent such liability or obligation arose or is attributable to or for the period prior to the Closing Time. As between Assignor and Assignee, the assignment by Assignor to Assignee effected hereunder is without recourse or warranty, except as otherwise expressly provided herein in connection with any representation and warranty made hereunder by Assignor.

(b)    EXCEPT AS ARISING FROM THE REPRESENTATIONS, WARRANTIES AND COVENANTS SPECIFICALLY SET FORTH IN THIS AGREEMENT OR IN THE ASSIGNMENT AND ASSUMPTION AGREEMENT, TO THE EXTENT ANY INTEREST THEREIN IS SOLD OR TRANSFERRED TO THE ASSIGNEE HEREUNDER, THE AIRCRAFT, THE ENGINES AND ALL OF THE PARTS, ACCESSORIES, APPLIANCES AND OTHER ITEMS OF EQUIPMENT INSTALLED THEREON OR A PART THEREOF ARE SOLD AND TRANSFERRED IN "AS IS, WHERE IS" CONDITION, AND THE ASSIGNOR MAKES NO REPRESENTATIONS, WARRANTIES OR GUARANTEES AS TO THE CONDITION, AIRWORTHINESS OR COMPLIANCE WITH THE MANUFACTURER SPECIFICATIONS, ANY AIRWORTHINESS DIRECTIVE OR ANY MANUFACTURER'S SERVICE BULLETIN WITH RESPECT TO THE AIRCRAFT, THE ENGINES OR ANY OF THE PARTS, ACCESSORIES, APPLIANCES AND OTHER ITEMS OF EQUIPMENT INSTALLED THEREON OR A PART THEREOF. EXCEPT AS EXPRESSLY SET FORTH HEREIN OR IN THE ASSIGNMENT AND ASSUMPTION AGREEMENT, THE ASSIGNOR MAKES NO WARRANTIES, GUARANTEES OR REPRESENTATIONS OF ANY KIND, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO THE TRANSFERRED INTERESTS. THE ASSIGNEE WAIVES, RELEASES AND RENOUNCES ALL WARRANTIES, OBLIGATIONS AND LIABILITIES OF THE ASSIGNOR, EXPRESS OR IMPLIED, ARISING BY LAW OR OTHERWISE, WITH RESPECT TO ANY NON-CONFORMITY OR DEFECT IN ANY PROPERTY THAT IS A PART OF THE TRUST ESTATE OR ANY PART THEREOF, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF CONDITION, FITNESS FOR USE OR MERCHANTABILITY, ANY LIABILITY ARISING FROM STRICT LIABILITY IN TORT, PRODUCTS LIABILITY, IMPLIED WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, OR LOSS OF USE, PROFIT, OR OTHER CONSEQUENTIAL DAMAGES. Nothing in the foregoing is intended to limit or otherwise affect in any manner Assignor's representations and warranties set forth in Section 7 or in the Assignment and Assumption Agreement or Assignor's indemnity obligations under Section 12(a).

## 12.    Indemnification

(a)    Each of the Assignor Parties covenants and agrees to indemnify, protect, defend, save and keep harmless, each Assignee Indemnitee, on an After-Tax Basis, from and against any and all liabilities, obligations, claims, payments, demands, judgments, penalties, causes of action, damages, costs, losses and expenses (including, but not limited to, reasonable attorneys' fees and expenses) of whatever kind and nature (collectively, "Losses") which may at any time or from time to time be imposed upon any Assignee Indemnitee in any way relating to, arising out of or resulting from: (i) the failure of the Assignor or any of its Affiliates to perform or observe any of its obligations, indemnities, or covenants under or in connection with any Operative Document in respect of or to the extent attributable to the period prior to the completion of the Closing on the Closing Date, or the failure of the Assignor to perform or observe any of its

obligations, indemnities or covenants under or in connection with this Agreement or the Assignment and Assumption Agreement or any other Sale Documents entered into by the Assignor in connection with the transaction contemplated hereby; or (ii) the breach of any representation or warranty of the Assignor set forth in this Agreement and the Assignment and Assumption Agreement.

(b)     The Assignee covenants and agrees to indemnify, protect, defend, save and keep harmless, each Assignor Indemnitee, on an After-Tax Basis, from and against any and all Losses which may at any time or from time to time be imposed upon any Assignor Indemnitee in any way relating to, arising out of or resulting from: (i) the failure of the Assignee or any of its Affiliates to perform or observe any of its obligations, indemnities, or covenants under or in connection with any Operative Document in respect of or to the extent attributable to the period after the completion of the Closing on the Closing Date, or the failure of the Assignee to perform or observe any of its obligations, indemnities or covenants under or in connection with this Agreement or the Assignment and Assumption Agreement or any other Sale Documents entered into by the Assignee in connection with the transactions contemplated hereby; or (ii) the breach of any representation or warranty of the Assignee set forth in this Agreement or of the Assignee in the Assignment and Assumption Agreement.

(c)     The indemnities provided under this Section 12 shall survive and remain in effect after the Closing.

## 13.    Assignment

The terms of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors, transferees and assigns.

## 14.    Termination; Return of Deposit

(a)     In addition to the termination provision in Section 3(e), the Assignee may terminate this Agreement along with its obligations under the Sale Documents by giving written notice to the Assignor if:

(i)     the Aircraft cannot be physically located in a jurisdiction at the Closing so that Taxes (other than Taxes measured on net or gross income or gross receipts) incurred in connection with the transactions under this Agreement are eliminated or minimized;

(ii)     unless excused by the last sentence of Section 4(c) hereof, the Lessee fails to execute the Supplemental Participation Agreement on or before the Termination Date;

(iii)     the Court fails to enter the Sale Approval Order on or before the Termination Date;

(iv)     any Assignor materially breaches its obligations under this Agreement or any of the Sale Documents, including the breach of any representation or warranty; or

(v)     any of the conditions precedent set forth in Section 6 hereof have not been met, satisfied or waived on or before the Termination Date.

(b)     In addition to the termination provision in Section 3(e), the Assignor may terminate this Agreement along with its obligations under the Sale Documents by giving written notice to the Assignee if:

(i)     the Assignee materially breaches its obligations under this Agreement or any of the Sale Documents, including the breach of any representation or warranty and the Assignor is not in breach of this Agreement or any of the Sale Documents at such time;

(ii)     the Lessee fails to execute the Supplemental Participation Agreement on or before the Termination Date;

(iii)     any of the conditions precedent set forth in Section 5 hereof for any Transferred Interests has not been met, satisfied or waived on or before the Termination Date; *provided, however*, that Assignee failure to pay the Purchase Price for the Transferred Interests shall not constitute a failure of Assignee to meet or satisfy such condition precedent if Assignee reasonably demonstrates it is capable of and prepared to wire transfer the Purchase Price Remainder but does not do so due to the failure of any of the conditions precedent set forth in Section 6 to be satisfied or waived (other than for failures caused by Assignee or a breach of Assignee's obligations hereunder).

(c)     If this Agreement is terminated as a result of the failure of any of the conditions precedent set forth in Section 6 to be satisfied on or before the Termination Date and/or is terminated under this Section 14 (other than in either case for failures caused by Assignee or a breach of Assignee's obligations hereunder), (i) the Assignor and Assignee shall promptly notice the Escrow Agent to return the Deposit (along with all interest thereon, if any) to the Assignee, and (ii) notwithstanding any other provision hereunder, the Deposit shall be returned to the Assignee by the Escrow Agent.

(d)     If this Agreement is terminated as a result of the failure of any of the conditions precedent to be satisfied on or before the Termination Date and/or is terminated under this Section 14, in either case as a result of failures caused by Assignee or a breach of Assignee's obligations hereunder that were not caused by Assignor's failures or breaches or events outside of Assignee's control, as the case may be, (i) then in such circumstance, the Assignor and Assignee shall promptly notice the Escrow Agent to send the Deposit (along with all interest thereon, if any) to the Assignor, and (ii) notwithstanding any other provision hereunder, the Deposit shall be sent to the Assignor by the Escrow Agent.

**15.**      **Miscellaneous**

         (a)      No term or provision of this Agreement may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which the enforcement of the change, waiver, discharge or termination is sought.

         (b)      Except for the other agreements referred to herein, this Agreement is the sole agreement between the parties with regard to the subject matter contained herein and supersedes all prior agreements or understandings, written or oral, with respect thereto and shall be effective for all purposes as of the date first above written.

         (c)      Each of the parties hereto shall bear its own expenses in connection with this Agreement and the consummation of the transactions contemplated hereby including, but not limited to, legal and out-of-pocket expenses, whether or not the transactions contemplated hereby are consummated; *provided, however,* that (1) each of (a) the Assignor, on the one hand, and (b) Assignee, on the other hand, shall pay 50% (for a total of 100%) of (i) any and all amounts necessary to be paid to Lessee (including any costs incurred by Lessee that are required, if any, to be reimbursed under the Operative Documents, in connection with obtaining consents of the Lessee as contained in the Supplemental Participation Agreement), (ii) the aggregate $2,500.00 fee payable to the Escrow Agent under the Escrow Agreement; (2) Assignee shall pay any International Registry filing fees; and (3) the Assignor shall pay any transfer fees payable to the Owner Trustee.

         (d)      Each party to this Agreement hereby covenants and agrees, without the necessity of any further consideration, to execute and deliver any and all documents and instruments in addition to the Assignment and Assumption Agreement and take any and all other actions as may be necessary or appropriate to carry out the intent and purposes of this Agreement and to consummate the transactions contemplated hereby.

         (e)      This Agreement may be executed simultaneously in one or more counterparts, each of which may be transmitted by facsimile or electronic (e-mail) transmission, and each of which shall be deemed an original, but all of which together will constitute one and the same agreement, and which shall be sufficiently evidenced by any one of such original counterparts.

         (f)      In the event that any one or more of the provisions of this Agreement shall be invalid, illegal or unenforceable in any respect or in any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein or of the same provisions in any other jurisdiction shall not, in any way, be affected or impaired thereby.

         (g)      To the extent that any conflict exists between the terms and conditions of this Agreement and the terms and conditions of the Assignment and Assumption Agreement, the Supplemental Participation Agreement, the Purchase Proposal, the Escrow Agreement or any other Sale Document in any respect, including with respect to any provisions relating to (i) the liability of the Assignor to perform any of its obligations under any of the Operative Documents prior to the Closing Date and (ii) relating to the rights of the Assignee with respect to any amounts

payable under the terms of the Operative Documents, the terms and conditions of this Agreement will control and prevail.

(h)     Each of the parties to this Agreement shall execute and deliver any and all additional papers, documents, and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of its obligations hereunder and to carry out the intent of the parties set forth in this Agreement (all at the reasonable cost and expense of the requesting party).

(i)     If not completed as of the date hereof, each of Assignor and Assignee shall send its wire information to the other parties hereto in accordance with the notice requirement of Section 16 hereof.

## 16.    Notices

All notices and other communications under this Agreement must be in writing and will be deemed given (a) when delivered personally, (b) on the fifth Business Day after being mailed by certified mail, return receipt requested, (c) the next Business Day after delivery to a recognized overnight courier, or (d) upon transmission and confirmation of receipt by a facsimile operator if sent by facsimile, to the parties at the following addresses or facsimile numbers (or to such other address or facsimile number as such party may have specified by notice given to the other party pursuant to this provision):

(a)     if to the Assignor or HJC:

BCI 2005-1, LLC or
HJC Asset Holdings, LLC
c/o Robert Handler, as the HJC Receiver
Commercial Recovery Associates
205 West Wacker Drive, Suite 1818, Chicago, IL 60606
Telephone No.: (312) 428-4858
Facsimile No.: (312) 893-2220
e-mail:        RHandler@com-rec.com

with a copies to:

Katten Muchin Rosenman LLP
525 W. Monroe
Chicago IL. 60661
Attention:     Zack Wagman
Telephone:    (312) 902-5229
Facsimile:     (312) 577-4638
E-Mail:        zack.wagman@kattenlaw.com

Katten Muchin Rosenman LLP
1025 Thomas Jefferson St., NW, Suite 700, East Lobby
Washington, DC, 20007
Attention:     Jane Cavanaugh, Esq.

Telephone:    (202) 625-3685
Facsimile:    (202) 295-1114
E-Mail:       jane.cavanaugh@kattenlaw.com

(b)    if to the Assignee, to:

Pineapple, LTD.
c/o Strategic Value Partners, LLC
80 Field Point Road
Greenwich, CT 06830
Attention:  General Counsel
Telephone:    203-618-3565
Facsimile:    203-618-3501
E-Mail:       ashin@svpglobal.com

With a copy to:

Vedder Price P.C.
1633 Broadway, 47th Floor
New York, New York 10019
Attention:    Michael J. Edelman, Esq.
Telephone:    (212) 407-6970
E-Mail:       mjedelman@vedderprice.com

## 17.    Governing Law

THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PROVISIONS THEREOF (OTHER THAN THE PROVISIONS OF SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK)).

## 18.    Venue

The Assignee and the Assignor hereby irrevocably submit to the jurisdiction of any State court sitting in the City of New York or Federal court in the Southern District of New York over any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby and each of Assignee and Assignor hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court. Each of Assignee and Assignor hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. Each of Assignee and Assignor agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. EACH OF ASSIGNEE AND ASSIGNOR HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY AND TO THE FULLEST EXTENT

PERMITTED BY LAW WAIVES ANY RIGHTS THAT IT MAY HAVE TO CLAIM OR RECEIVE CONSEQUENTIAL OR SPECIAL DAMAGES IN CONNECTION WITH ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT AND THE TRANSACTIONS CONTEMPLATED HEREBY.

## 19.    Confidentiality

Unless otherwise agreed upon by the parties, this Agreement, the terms and conditions hereof, and all confidential, non-public information of a party provided to, or coming into the possession or knowledge of, the other party by virtue of such party's due diligence examination leading up to the execution and delivery of this Agreement or its performance shall at all times be treated by the parties hereto as confidential and shall not be published, disclosed or circulated except (and only insofar as is necessary) (i) in connection with the performance by the parties hereto of their obligations under this Agreement or for the purpose of legal proceedings relating thereto or to any bank examiner or similar regulatory body or agency, provided, however, that following the Closing Date, Assignee may disclose the content of this Agreement (excluding the Purchase Price) to prospective purchasers of its interests hereunder provided that such parties agree to similarly be bound by the confidentiality provisions hereof; (ii) the parties may disclose that Assignee has acquired the Transferred Interests from Assignor, the parties may disclose the contents hereof to their respective professionals.  In addition, Assignee may disclose the contents hereof to Jet Trading and Leasing, LLC, and Assignor may disclose the contents hereof to Mercury-ALPS Aviation Management, LLC and ComAirTrading, Inc., provided that each such person or entity agrees to abide by the terms of this confidentiality provision.  Notwithstanding the foregoing, the provisions of this Agreement may be disclosed in the course of obtaining the Sale Approval Order, and this Agreement (or synopsis thereof) may be attached as an exhibit to any pleading in the Receivership Proceedings made in connection with obtaining the Sale Approval Order.

## 20.    Owner Trustee; Directions

(a)    The Owner Trustee hereby acknowledges and consents to the assignment and assumption of the Transferred Interests pursuant to the terms of this Agreement and agrees that after the payment of the Purchase Price on the Closing Date for the Transferred Interests the Assignee shall hereafter be a party to the Trust Agreement as the sole "Trustor" thereunder.

(b)    Assignor hereby authorizes and directs the Owner Trustee to execute and deliver this Agreement, and any other document required to effect the transfer of the owner participation interest under the Trust Agreement and the other Operative Documents from the Assignor to the Assignee in accordance with the terms hereof.

## 21.    Limitation of Owner Trustee Liability

It is expressly understood and agreed by the parties that (a) this document is executed and delivered by Wells Fargo Bank Northwest, National Association, not individually or personally, but solely as the Owner Trustee under the Trust Agreement, in the exercise of the powers and authority conferred and vested in it, pursuant to the Trust Agreement, (b) nothing herein contained shall be construed as creating any liability on Wells Fargo Bank Northwest, National Association,

individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any person claiming by, through or under the parties hereto, and (c) under no circumstances shall Wells Fargo Bank Northwest, National Association be personally liable for the payment of any indebtedness or expenses of the Trust Estate or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust Estate under this Agreement or any other related documents.

## 22.     Public Announcements

Except as may be required by applicable Laws, any public announcement or similar publicity with respect to this Agreement, the Assignment and Assumption Agreement or the transactions contemplated hereby or thereby shall be issued, if at all, only at such time and in such manner as the parties mutually agree in writing.

## 22.     Effective Date

This Agreement shall be binding and effective upon the parties hereto upon the execution of the signature page of this Agreement by each of the parties hereto and the delivery of such signature page as so executed to the other parties hereto.

IN WITNESS WHEREOF the parties hereto have entered into this Agreement as of the day and year first above written.

**BCI 2005-1, LLC**, as Assignor

By: _Robert O. Handly_ _____
    Name: _Robert O. Handly_
    Title: _Receiver for HJC Asset Holdings Manager, Inc.,_
        _Manager_

**HJC ASSET HOLDINGS, LLC,**
as the Parent of the Assignor

By: _Robert O. Handly_ _____
    Name: _Robert O. Handly_
    Title: _Receiver for HJC Asset Holdings Manager, Inc.,_
        _Manager_

**PINEAPPLE, LTD.**, as Assignee

By: _____
    Name:
    Title:

ACKNOWLEDGED AND AGREED TO BY
**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,**
as Owner Trustee

By: _____
    Name:
    Title:

30

IN WITNESS WHEREOF the parties hereto have entered into this Agreement as of the day and year first above written.

**BCI 2005-1, LLC,** as Assignor

By: _____
          Name:
          Title:

**HJC ASSET HOLDINGS, LLC,**
as the Parent of the Assignor

By: _____
          Name:
          Title:

**PINEAPPLE, LTD.,** as Assignee

By: _____
          Name: JAMES VAKLEY
          Title: AUTHORIZED SIGNATORY

ACKNOWLEDGED AND AGREED TO BY
**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,**
as Owner Trustee

By:_____
      Name:
      Title:

IN WITNESS WHEREOF the parties hereto have entered into this Agreement as of the day and year first above written.

**BCI 2005-1, LLC,** as Assignor

By: _____
        Name:
        Title:

**HJC ASSET HOLDINGS, LLC,**
as the Parent of the Assignor

By: _____
        Name:
        Title:

**PINEAPPLE, LTD.,** as Assignee

By: _____
        Name:
        Title:

ACKNOWLEDGED AND AGREED TO BY
**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,**
as Owner Trustee

By: _____
        Name:   JOSHUA ELSMORE
        Title:      VICE PRESIDENT

## Schedule A
## Operative Documents for Transferred Interests

As used herein, "Operative Documents" means any and all operative documents relating to the Aircraft, including those operative documents listed below.

(1)  (a)      Bill of Sale, dated March 17, 2005, for one (1) Boeing B737-528 aircraft, bearing MSN 27424 and registration mark G-GFFE, equipped with two CFMI CFM56-3C1 engines bearing manufacturer's serial numbers 859189 and 859190, respectively (or such replacement engines as permitted pursuant to the Lease Agreement (as described below)), along with all related equipment and parts and records and documents related thereto (the "Aircraft") from Fairing Leasing Co., Ltd to Wells Fargo Bank Northwest, National Association ("Wells Fargo"), not in its individual capacity, but solely as owner trustee under the Trust Agreement.

(b)      Bill of Sale, dated March 17, 2005, for one (1) CMF International CFM56-3C1 engine bearing manufacturer's serial number 726365 (as a replacement for the engine bearing manufacturer's serial number 859190), together with all manuals and technical records pertaining thereto, from Lessee to Wells Fargo, as Lessor.

(2)  Trust Agreement, dated as of March 17, 2005 (as amended and in effect from time to time, the "Trust Agreement"), by among BCI 2005-1, LLC, as the trustor, and Wells Fargo, as trustee.

(3)  Amended and Restated Aircraft Lease Agreement, dated March 17, 2005, by and between Fairing Leasing Co., Ltd., as lessor, and British Airways Plc, as lessee.

(4)  Aircraft Lease Novation, dated March 17, 2005, by and among Fairing Leasing Co., Ltd., as previous lessor, Wells Fargo Bank Northwest, National Association, as owner trustee and new lessor, and British Airways Plc, as lessee.

(5)  Amendment, dated August 3, 2005, to an Amended and Restated Aircraft Lease Agreement, dated March 17, 2005 by and between Wells Fargo Bank Northwest, National Association, as owner trustee and new lessor, and British Airways Plc, as lessee.

(6)  Participation Agreement, dated as of March 17, 2005 (the "Participation Agreement"), between BCI 2005-1, LLC, as the owner participant, and British Airways Plc, as lessee.

## <u>SCHEDULE B</u>

## <u>WIRE INSTRUCTIONS</u>

A.    For Assignor:

        Bank:
        Address:

        Swift:
        ABA #:
        Beneficiary:
        Beneficiary Acct #:
        REF:
        Attention:

B.    For Assignee:

        Bank:
        Address:

        Swift:
        ABA #:
        Beneficiary:
        Beneficiary Acct #:
        REF:
        Attention:

# EXHIBIT A

**Assignment and Assumption Agreement**

## ASSIGNMENT AND ASSUMPTION AGREEMENT [MSN 27424]

ASSIGNMENT AND ASSUMPTION AGREEMENT [27424] (this "Agreement") is made as of [_____], 2008, by and among (a) BCI 2005-1, LLC, a Delaware limited liability company, as assignor (the "Assignor"), (b) HJC ASSET HOLDINGS, LLC, a Delaware limited liability company, as parent of Assignor, and (c) PINEAPPLE, LTD., a company organized under the laws of the Cayman Islands (as the designee of Jet Trading and Leasing, LLC) (the "Assignee"). Capitalized terms used but not defined herein or in the Purchase Agreement (as defined below), shall have the meaning ascribed to such terms in the Lease (as defined below).

### PRELIMINARY STATEMENTS

WHEREAS, the Assignor is the owner of 100% of the beneficial interests in the trust estate (the "Trust Estate") created by that certain Trust Agreement, dated as of March 17, 2005 (as amended and in effect from time to time, the "Trust Agreement"), by and among the Assignor, as the Trustor, and Wells Fargo Bank Northwest, National Association, as owner trustee (in its capacity as owner trustee under the Trust Agreement, the "Owner Trustee"), which relates to the Aircraft;

WHEREAS, the Aircraft is leased by the Owner Trustee, as lessor, to British Airways Plc, as lessee (the "Lessee"), pursuant to that certain Amended and Restated Aircraft Lease Agreement, dated March 17, 2005 (the "Original Lease"), between Fairing Leasing Co., Ltd., as previous lessor, Lessee, as lessee, as novated, amended and supplemented by that certain Aircraft Lease Novation, dated March 17, 2005 (the "Novation Agreement"), among Fairing Leasing Co., Ltd., as previous lessor, Lessee, as lessee, and Owner Trustee, as new lessor, in accordance with which the Owner Trustee became the owner and lessor, and as further amended by that certain Amendment to Amended and Restated Aircraft Lease Agreement, dated August 3, 2005 (the "Lease Amendment"), as novated, amended and supplemented by the Novation Agreement (such Original Lease, as novated, amended and supplemented by the Novation Agreement, and as further amended pursuant to the Lease Amendment, and as in effect as of the date hereof, the "Lease");

WHEREAS, the Aircraft is leased by the Owner Trustee to Lessee (as defined herein) pursuant to the Lease (as defined herein); and

WHEREAS, pursuant to the Purchase Agreement [27424], dated as of June 30, 2008 among Assignor, Assignor's parent and Assignee (the "Purchase Agreement"), Assignor has agreed to sell, transfer and assign to Assignee all present and future right, title and interest in, to and under the Transferred Rights related to the Aircraft, including the Trust Agreement; and

WHEREAS, Lessee has consented to the assignment of the Transferred Rights.

NOW THEREFORE, in consideration of their mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Definitions.**    The following terms, as used herein, have the following respective meanings:

"*Aircraft*" means collectively (a) the Airframe; (b) the Engines; (c) all technical records related thereto and (d) the vendor or manufacturers warranties and service life policies or agreements in existence with respect to any of the foregoing that accrues to the benefit of the Owner Trustee and/or Assignor.

"*Airframe*" means that certain Boeing 737-528 airframe bearing manufacturer's serial number 27424 and registration mark G-GFFE, together with related instruments, appliances, appurtenants, accessories, components, other equipment and parts installed thereon or appurtenant.

"*Assumed Obligations*" has the meaning ascribed to such term in Section 3 hereof

"*Closing Date*" means the date and time on which each of Assignor and Assignee has delivered to the other party an executed copy of this Agreement.

"*Engines*" means the two CFM 56-3C-1 engines bearing, respectively, manufacturer's serial numbers 859189 and 726365 together with related instruments, appliances, appurtenants, accessories, components, other equipment and parts installed thereon or appurtenant thereto.

"*Lease*" has the meaning ascribed to such term in the recitals hereto.

"*Lessee*" has the meaning ascribed to such term in the recitals hereto.

"*Lessor*" means the Owner Trustee.

"*Operative Documents*" means the documents listed on Schedule A attached hereto.

"*Owner Trustee*" has the meaning ascribed to such term in the recitals hereto.

"*Transferred Rights*" means the Transferred Interests (as defined in the Purchase Agreement).

"*Trust Agreement*" has the meaning ascribed to such term in the recitals hereto.

"*Trust Estate*" has the meaning ascribed to such term in the recitals hereto.

2.     **Assignment.**    On and as of the date hereof, Assignor hereby irrevocably sells, assigns, transfers and conveys the Transferred Rights to Assignee, and Assignee hereby accepts such Transferred Rights from Assignor.

2

**3.    Assumption.** (a) On and as of the date hereof, Assignee hereby accepts the foregoing assignment and agrees to assume, and be bound by all of the terms of, and to undertake and perform all of the obligations and liabilities of the Assignor in respect of the interest being conveyed arising on or after the date hereof under the Trust Agreement, to the same extent as if Assignee were a party to the Trust Agreement (as so assumed, the "Assumed Obligations") and, with respect to the Assumed Obligations and the Transferred Rights, during all periods from and after the date hereof, Assignee confirms that it shall be deemed to be a party to the Trust Agreement.

(b)  On and as of the date hereof all notices to be delivered to any "Trustor" under the Trust Agreement shall be sent to the Assignee at:

> Pineapple, LTD.
> c/o Strategic Value Partners, LLC
> 80 Field Point Road
> Greenwich, CT 06830
> Attention:  Albert Shin
> Telephone:    203-618-3565
> Facsimile:    203-618-3501
> E-Mail:    ashin@svpglobal.com

(c)  As of the date hereof, the Assignor is released from all of the Assumed Obligations.  Notwithstanding anything contained in this Agreement to the contrary, in no event will Assignee be obligated or liable for or required to perform or discharge any of the obligations and liabilities of Assignor under the Operative Documents or otherwise arising, accruing, or arising or accruing as a result of any act or event occurring prior to the date hereof or that arose or arises out of a breach of the Operative Documents by the Assignor.

**4.    Consent of Owner Trustee.**    The Owner Trustee acknowledges and consents to the foregoing sale, assignment, transfer and conveyance of all of the Assignor's right, title, interest, obligations and liabilities in, to and under the Trust Agreement and the Operative Documents to the Assignee under this Agreement, and acknowledges the rights of the Assignee described in this Agreement.  The Owner Trustee and the Assignee agree that, except as provided in the next sentence, the account information for the owner of the beneficial interest under the Trust Estate shall be amended to provide that any and all payments to be made to the Trustors (as defined in the Trust Agreement) attributable to periods from and after the date hereof pursuant to the Trust Agreement received by the Owner Trustee shall be paid to the Assignee to the account set forth on Schedule B hereto.

**5.    Counterparts.**    This Agreement may be executed in one or more counterparts, each of which may be transmitted by facsimile or electronic (e-mail) transmission, and each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**6.    Successors and Assigns.**    The terms of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto, the other parties to the Operative Documents to which Assignee is deemed to become a party and their respective successors and assigns.

3

7.    <u>**GOVERNING LAW.**</u>  THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PROVISIONS THEREOF (OTHER THAN THE PROVISIONS OF SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK)).

8.    <u>**Amendment**</u>.  No waiver, modification or amendment of any provision of this Agreement shall be effective unless it is in writing and signed by the party against which it is sought be enforced.

9.    <u>**Further Assurances.**</u>  Each party agrees that from time to time after the date hereof, it shall execute and deliver or cause to be executed and delivered such instruments, documents and papers, and take all such further action as may be reasonably required in order to consummate fully the purposes of this Agreement and to implement the transaction contemplated hereby.

NEWYORK/#197430.5

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered on the day and year first above written.

**ASSIGNOR:**

**BCI 2005-1, LLC**, as Assignor

By: _____
    Name:
    Title:

**ASSIGNEE:**

**PINEAPPLE, LTD.**, as Assignee

By: _____
    Name:
    Title:

**OWNER TRUSTEE:**

**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION,** not in its individual capacity, but solely as Owner Trustee under the Trust Agreement

By: _____
    Name:
    Title:

5

**SCHEDULE A**
**Operative Documents for Transferred Interests**

As used herein, "Operative Documents" means any and all operative documents relating to the Aircraft, including those operative documents listed below.

1.  (a)    Bill of Sale, dated March 17, 2005, for one (1) Boeing B737-528 aircraft, bearing MSN 27424 and registration mark G-GFFE, equipped with two CFMI CFM56-3C1 engines bearing manufacturer's serial numbers 859189 and 859190, respectively (or such replacement engines as permitted pursuant to the Lease Agreement (as described below)), along with all related equipment and parts and records and documents related thereto (the "Aircraft") from Fairing Leasing Co., Ltd to Wells Fargo Bank Northwest, National Association ("Wells Fargo"), not in its individual capacity, but solely as owner trustee under the Trust Agreement.

    (b)    Bill of Sale, dated March 17, 2005, for one (1) CMF International CFM56-3C1 engine bearing manufacturer's serial number 726365 (as a replacement for the engine bearing manufacturer's serial number 859190), together with all manuals and technical records pertaining thereto, from Lessee to Wells Fargo, as Lessor.

2.  Trust Agreement, dated as of March 17, 2005 (as amended and in effect from time to time, the "Trust Agreement"), by and among BCI 2005-1, LLC, as trustor, and Wells Fargo Bank Northwest, National Association, as trustee.

3.  Amended and Restated Aircraft Lease Agreement, dated March 17, 2005, by and between Fairing Leasing Co., Ltd., as lessor, and British Airways Plc, as lessee.

4.  Aircraft Lease Novation, dated March 17, 2005, by and among Fairing Leasing Co., Ltd., as previous lessor, Wells Fargo Bank Northwest, National Association, as owner trustee and new lessor, and British Airways Plc, as lessee.

5.  Amendment, dated August 3, 2005, to an Amended and Restated Aircraft Lease Agreement, dated March 17, 2005 by and between Wells Fargo Bank Northwest, National Association, as owner trustee and new lessor, and British Airways Plc, as lessee.

6.  Participation Agreement, dated as of March 17, 2005 (the "Participation Agreement"), between BCI 2005-1, LLC, as the owner participant, and British Airways Plc, as lessee.

6

## **SCHEDULE B**

## **WIRE INSTRUCTIONS**

A.    For Assignee:

                            Bank:
                            Address:

                            Swift:
                            ABA #:
                            Beneficiary:
                            Beneficiary Acct #:
                            REF:
                            Attention:

7

# EXHIBIT B

**Supplemental Participation Agreement**

## SUPPLEMENTAL PARTICIPATION AGREEMENT
### [27424]

This Supplemental Participation Agreement [27424] (this "Agreement") is entered into as of July [___], 2008, by and among (a) Pineapple, Ltd., a company organized under the laws of the Cayman Islands, as the new owner participant ("New Owner Participant"); (b) Wells Fargo Bank Northwest, National Association, a national banking association, not in its individual capacity but solely as the owner trustee under that certain Trust Agreement referred to below ("Owner Trustee"); and (c) British Airways Plc, a corporation organized under the laws of England, as lessee (the "Lessee").

### RECITALS

A.      Wells Fargo Bank Northwest, National Association, a national banking association, not in its individual capacity but solely as the Owner Trustee under an equipment trust (the "Trust") created by that certain Trust Agreement, dated as of March 17, 2005 (as amended and in effect from time to time, the "Trust Agreement"), by and among BCII 2005-1, as the original owner participant ("Original Owner Participant") and Wells Fargo Bank Northwest, National Association, as owner trustee, is the lessor of one (1) Boeing 737-528 aircraft bearing manufacturer's serial number 27424 and registration mark G-GFFE, along with two related CFM 56-3C-1 engines bearing, respectively, manufacturer's serial numbers 859189 and 859190 together with related instruments, appliances, appurtenants, accessories, components, other equipment and parts installed thereon or appurtenant thereto and documents related thereto (collectively, the "Aircraft").

B.      The Aircraft is leased by the Owner Trustee, as lessor (the "Lessor"), to Lessee, as lessee, pursuant to that certain Amended and Restated Aircraft Lease Agreement, dated March 17, 2005 (the "Original Lease"), between Fairing Leasing Co., Ltd., as original lessor, Lessee, as lessee, as novated, amended and supplemented by that certain Aircraft Lease Novation, dated March 17, 2005 (the "Novation Agreement"), among Fairing Leasing Co., Ltd., as original lessor, Lessee, as lessee, and Owner Trustee, as new lessor, in accordance with which the Owner Trustee became the owner and lessor, and as further amended by that certain Amendment to Amended and Restated Aircraft Lease Agreement, dated August 3, 2005 (the "Lease Amendment"), as novated, amended and supplemented by the Novation Agreement (such Original Lease, as novated, amended and supplemented by the Novation Agreement, and as further amended pursuant to the Lease Amendment, and as in effect as of the date hereof, the "Lease"), pursuant to which Lessee leases the Aircraft from Owner Trustee. Any capitalized term in this Agreement that is not defined in this Agreement, shall have the meanings assigned to that term in the Lease.

C.      Immediately prior to the date hereof, 100% of the beneficial interest in the trust estate (the "Trust Estate") created by that Trust Agreement was owned by BCI 2005-1, LLC, a Delaware limited liability company, as the owner participant under the Trust and the Trust Agreement.

D.      Pursuant to that certain Participation Agreement, dated as of March 17, 2005 (the "Participation Agreement"), between Original Owner Participant and Lessee, Lessee recognized

Original Owner Participant as the owner participant under the Trust and, among other things, required, as a condition precedent to the transfer of the owner participant interest in the Trust from the Original Owner Participant to a subsequent owner trustee, that any assignee of Original Owner Participant's interest in the Trust Estate execute a form of participation agreement in substantially the same form as the Participation Agreement (such additional participation agreement, a "Supplemental Participation Agreement").

E.     Concurrently with the execution of this Agreement, New Owner Participant purchased 100% of the beneficial interests in the Trust Estate from the Original Owner Participant and is now the owner participant under the Trust Agreement and the Trust.

C.     This Agreement is the Supplemental Participation Agreement required for effecting a transfer of the owner participant interest in the Trust from the Original Owner Participant to the New Owner Participant.

NOW, THEREFORE, based upon the premises and promises herein contained and for other good and valuable consideration, and subject to the mutual covenants, terms and conditions herein contained, Lessee and New Owner Participant hereby agree as follows:

1.     <u>Agreements</u>.

a.     New Owner Participant hereby warrants to the Lessee the terms of Section 3.4 of the Lease as if New Owner Participant were the Lessor thereunder.

b.     New Owner Participant hereby agrees (i) to procure the performance by the Lessor of all the obligations of the Lessor under or in respect of the Lease ignoring for this purpose any limitation on the liability of the Owner Trustee or the Lessor and (ii) to procure the performance by the New Lessor (as defined in the Novation Agreement) of all the obligations of the New Lessor (as defined in the Novation Agreement) under or in respect of the Novation Agreement ignoring for this purpose any limitation on the liability of the Owner Trustee or the New Lessor (as defined in the Novation Agreement).

c.     Provided that the Lease has not terminated or expired and that the Lessee is a party to the Lease, New Owner Participant agrees that any transfer or assignment of any of its interest in the Trust Estate under and as defined in the Trust Agreement, including the Aircraft, or the Lease, shall comply with the terms of Section 21.3 of the Lease, and if such transfer or assignment complies with the terms of Section 21.3 of the Lease, prior to such permitted transfer or assignment, the transferee or assignee will execute a Participation Agreement in substantially the same form as this Agreement.

d.     Pursuant to Sections 14.3 and 15.9 of the Original Lease, Lessee shall add New Owner Participant as an additional insured under any insurance policy effected under Section 14 of the Lease.  [In addition, Lessee agrees to name Original Owner Participant as an additional insured under any insurance policy effected under Section 14 of the Lease for a two year period from and after the date hereof.][NOTE:  PRIOR SENTENCE TO BE KEPT IN ONLY TO EXTENT LESSEE AGREES TO SUCH CLAUSE]

2

2.      Representations and Warranties.

New Owner Participant hereby represents and warrants to the Lessee the following as of the date hereof:

a.      New Owner Participant has the power to enter into, and to perform and observe the terms and conditions of and has taken all necessary company action to authorize the entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement;

b.      New Owner Participant has duly authorized the execution and delivery of this Agreement and the performance and observance of the terms and conditions of this Agreement and that its obligations under this Agreement will constitute its legal, valid and binding obligations; and

c.      The entry into and performance by New Owner Participant of, and the transactions contemplated by, this Agreement do not and will not:  (i) conflict with any existing applicable laws binding New Owner Participant; or (ii) conflict with the organizational documents of New Owner Participant; or (iii) conflict with or result in default under any agreement or instrument which is binding upon New Owner Participant or any of its assets nor result in the creation of any lien over any of its assets.

3.      Miscellaneous.

New Owner Participant hereby incorporates by reference *mutatis mutandis*, Sections 22.2 and 22.4 of the Lease.   New Owner Participant hereby appoints Vedder Price P.C., 1633 Broadway, 47th Flooor, New York, New York 10019, Attention:  Ron Schienberg, Esq. & Michael J. Edelman, Esq. as its authorized agent for the purposes of accepting service of process for all purposes in connection with this Agreement.

4.      Notices.

All notices, requests, demands or other communications to or upon the respective parties hereto shall be in writing, and shall be forwarded by certified mail, return receipt requested, postage prepaid, or by overnight courier, or by facsimile, and addressed as follows:

(a)      If to New Owner Participant:

PINEAPPLE, LTD.
c/o Strategic Value Partners, LLC
80 Field Point Road
Greenwich, CT 06830
Attention:  Albert Shin
Telephone No.:        203-618-3565

3

Facsimile No.: 203-618-3501
E-Mail:     ashin@svpglobal.com

With a copy to:

Vedder Price P.C.
1633 Broadway, 47th Floor
New York, NY 10019
Attention: Ron Scheinberg, Esq. & Michael Edelman, Esq.
Telephone No.:          (212) 407-7700
Facsimile No.:          (212) 407-7799

(b)     If to Lessee:

British Airways Plc
Waterside (HAA3)
P.O. Box 365
Harmondsworth UB7 OGB
England
Facsimile: 44 (0)20 8738 9637
Attention: Aircraft Trading Manager

5.      Termination.

This Agreement shall terminate upon expiration or other termination of the Lease.

6.      Counterparts and Facsimile Signatures.

A facsimile signature on any counterpart of this Agreement is deemed an original for all purposes.  This Agreement may be executed in multiple counterparts, each of which may be transmitted by facsimile or electronic (e-mail) transmission, and each of which shall be deemed an original, but all of which together shall constitute one and the same instrument

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

4

IN WITNESS WHEREOF, the parties hereto have executed this Participation Agreement as of the date first above written.

**PINEAPPLE, LTD., as the New Owner Participant**

By: _____
Name:
Title:


**WELLS FARGO BANK NORTHWEST, NATIONAL ASSOCIATION, as Owner Trustee**

By: _____
Name:
Title:


**BRITISH AIRWAYS Plc, as the Lessee**

By: _____
Name:
Title:

5

# EXHIBIT C

**Bill of Sale**

## BILL OF SALE

**KNOW ALL MEN BY THESE PRESENTS** that the undersigned, BCI 2005-1, LLC, a Delaware limited liability company (the "Seller"), is the owner of full legal and beneficial title to the Transferred Interests (as defined in that certain Purchase Agreement [27424], dated as of June 30, 2008, among Seller, as Assignor, HJC Asset Holdings, LLC, as Assignor's parent, and Pineapple, Ltd., as Assignee, which Transferred Interests include, without limitation, 100% of the beneficial interests (the "Owner Participant Interests") in the trust estate created by that certain Trust Agreement, dated as of March 17, 2005, by and among Seller, as the trustor, and Wells Fargo Bank Northwest, National Association, as owner trustee, which relates to that certain Boeing 737-528 aircraft bearing manufacturer's serial number 27424 and registration mark G-GFFE, together with two CFM 56-3C-1 engines bearing, respectively, manufacturer's serial numbers 859189 and 726365, each together with related instruments, appliances, appurtenants, accessories, components, other equipment and parts installed thereon or appurtenant thereto.

For and in consideration of the sum of One United States Dollar ($1.00) and other good and valuable consideration, Seller does this [____] day of [_____], 2008 grant, convey, transfer, bargain and sell, deliver and set over all of its rights, title, and interest in and to the above described Transferred Interests (which includes, without limitation, the Owner Participant Interests) unto Buyer, its successors and assigns forever.

Seller hereby warrants to the aforesaid Buyer, its successors and assigns, that there is hereby conveyed to said Buyer good and marketable title to the aforesaid Transferred Interests (which includes, without limitation, the Owner Participant Interests) free and clear of all liens, encumbrances and rights of others and that the Seller will warrant and defend such title forever against all claims and demands whatsoever.

This Bill of Sale shall in all respects be governed by and construed in accordance with the laws of the State of New York.

**IN WITNESS WHEREOF**, Seller has caused this Bill of Sale to be executed by its duly authorized officer this [____] day of [_____], 2008.

**BCI 2005-1, LLC**, as Seller

By: _____
      Name:
      Title:

# EXHIBIT D

**Side-Letter Agreement**

# LETTER AGREEMENT

This letter agreement (this "Letter Agreement") dated as of June 30, 2008 is an agreement by and between (a) BCI 2005-1, LLC, as assignor ("Assignor"), and HJC Asset Holdings, LLC, as the parent of Assignor ("Assignor Parent", and along with Assignor, the "Seller Parties"), each by and through Robert Handler, solely in his capacity as the receiver appointed in the receivership proceedings commenced under the caption *Untied States Securities and Exchange Commission v. Jason R. Hyatt, Jay Johnson and Hyatt Johnson Capital, LLC*, Case No. 08 Civ. 2224, pending in the United States District Court for the Northern District of Illinois, Eastern Division (the "HJC Receiver"), which HJC Receiver is the receiver of the entity that is the manager of Assignor Parent, and (b) Pineapple, Ltd. (as designee of Jet Trading and Leasing, LLC) ("Purchaser"), each a "Party" and collectively known as the "Parties". This Letter Agreement is related to (y) the Aircraft Purchase Proposal (the "Proposal") dated as of June 20, 2008 between the Assignor Parent, HJC Receiver and Purchaser, and (z) the Purchase Agreement, dated as of June 30, 2008 (the "Purchase Agreement"), by and among Assignor, as assignor, Assignor Parent, as Assignor's parent, and Purchaser, as purchaser, which was acknowledged and agreed to by Wells Fargo Bank Northwest, National Association, both of which (the Purchase Proposal and the Purchase Agreement) relate to one (1) Boeing B737-528 aircraft bearing manufacturer's serial number 27424 and registration mark G-GFFE (the "Aircraft") or the beneficial ownership interests pertaining thereto (the "Property"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Purchase Agreement. In case of any conflict between this Letter Agreement and the Proposal or the Purchase Agreement (as defined in the Purchase Proposal), the terms of this Letter Agreement shall prevail.

For good and valuable consideration, the Parties agree as follows:

1. On the Closing Date, Seller Parties shall segregate two hundred fifty thousand U.S. dollars (US$250,000.00) (the "Special Escrow Funds") from the Purchase Price to be paid by Purchaser and deposit such amount into an escrow account with a reputable bank of Assignor Parent's choosing (such bank the "Escrow Bank" and such account, the "Special Escrow Account").

2. Seller Parties, Purchaser and the Escrow Bank shall enter into an escrow agreement (the "Special Escrow Agreement") prior to the Closing Date which shall outline the respective rights and obligations of the parties hereunder.

3. The Special Escrow Funds may be disbursed from the Special Escrow Account to Purchaser to reimburse Purchaser for reasonable fees, costs and expenses of legal counsel and other reasonable out-of-pocket expenses incurred in defending challenges to Purchaser's ownership of the Property arising directly from a third party's allegation of fraudulent conveyance in applicable bankruptcy or receivership proceedings of BCI Aircraft Leasing, Inc.

4. In addition, Purchaser may make a demand for reimbursement from the Special Escrow Fund:

   (i) in the case of a claim described in Paragraph 3 hereof, by issuing a written demand to the Seller Parties (at the address and in the manner specified in the Purchase

Agreement), together with a copy of the proceedings in which such challenges are made together with invoices for such legal fees incurred, which invoices are subject to approval by Seller Parties, acting reasonably, or

(ii) in connection with a material breach by either of the Seller Parties of any representation or warranty set forth in the Purchase Agreement, by issuing a written demand to Seller Parties (at the address and in the manner specified in the Purchase Agreement) declaring such a breach and, to the extent that Purchaser and Seller Parties cannot agree on a damage amount for such breach, Purchaser institutes a lawsuit against either of the Seller Parties and obtains a final, unappealable judgment evidencing such breach. (Purchaser agrees to commence such suit within 15 days of the Seller Parties sending written notice to Purchaser (at the address and in the manner specified in the Purchase Agreement) that a consensual resolution cannot be reached. Purchaser also acknowledges that it must act in good faith in sending any such written demand.)

5.  Except as otherwise provided herein, the Special Escrow Funds, or the balance thereof in the event there has been a disbursement under the terms of the Special Escrow Agreement, shall be retained in the Special Escrow Account until the later of six-months from the Closing Date (as defined in the Purchase Agreement), or, in the event that on the date that is six-months after the Closing Date there are (i) ongoing proceedings concerning a challenge to Purchaser's ownership as described in Paragraph 3 hereof, or (ii) a written demand or litigation concerning any allegation of a breach as described in paragraph 4 hereof, the date of (1) the final, unappealable resolution of such written demand, challenge or litigation or (2) a consensual resolution in writing among the parties hereto.

6.  In the event any disbursements are made to Purchaser from the Special Escrow Account, Seller Parties shall have no obligation to replenish such disbursed amounts.

7.  Counterparts. This Letter Agreement may be executed in one or more counterparts, each of which may be transmitted by facsimile or electronic (e-mail) transmission and shall have the same effect as if the signatures thereto and hereto were upon the same instrument, and each of which counterparts shall be deemed an original, but all of which together shall constitute one and the same instrument.

8.  Governing Law. This Letter Agreement and the rights and obligations of the Parties hereunder shall be governed by, and construed and interpreted in accordance with, the law of the State of New York applicable to contracts made and to be performed in such state, without reference to principles of conflicts of law other than Section 5-1401 of the New York General Obligations law.

9.  Confidentiality. This Letter Agreement is subject to the same confidentiality restrictions as set forth in the Purchase Agreement. Notwithstanding the foregoing, the provisions of this Letter Agreement may be disclosed in the course of obtaining the Sale Approval Order.

[**Rest of page intentionally left blank – Signature page follows**]

IN WITNESS WHEREOF, the parties hereto have caused this Letter Agreement to be executed by their duly authorized officers on the day and year first written above.


**HJC ASSET HOLDINGS, LLC**                    **PINEAPPLE, LTD.**


By _____        By _____
Name:                               Name:
Title:                              Title:

**BCI 2005-1, LLC**


By _____
Name:
Title:

# EXHIBIT B

Deutsche Bank ◰

July 2, 2008

HJC Asset Holdings, LLC
c/o Robert Handler as the HJC Receiver
Commercial Recovery Associates
205 West Wacker Drive, Suite 1818
Chicago, IL 60606

Re: Secured Promissory Note dated March 17, 2005 (the "Note")

Ladies and Gentlemen:

Reference is made to the (i) Note, (ii) the Loan Agreement dated as March 17, 2005 (the "Loan Agreement") between Wells Fargo Bank Northwest, N.A., as owner trustee ("Owner Trustee"), BCI 2005-1, LLC, as owner participant and Deutsche Bank AG New York Branch, as lender ("Lender") and (iii) the Mortgage and Security Agreement, dated as of March 17, 2005 (the "Mortgage") between Owner Trustee, as mortgagor and Lender, as mortgagee. Each of the Note, Loan Agreement and Mortgage are related to the lease of one (1) Boeing 737-528 aircraft, Manufacturer's serial number 27424, together with two (2) CFM International Model CFM56-3C-1 engines, manufacturer's serial numbers 859189 and 859190 (collectively, the "Aircraft"), leased to British Airways Plc under the Amended and Restated Lease Agreement dated as of March 17, 2005 between Fairing Leasing Co. Ltd., as lessor, and Lessee (the "Lease Agreement").

Lender agrees that if it receives on July 15, 2008, in immediately available funds, the amount of Six Million Four Hundred Forty Seven Thousand Two Hundred Thirty Three and 02/100 Dollars (US$6,447,233.02) (the "Prepayment Amount"), Lender shall execute and deliver to Owner Trustee, at Owner Trustee's sole cost and expense, such documents as prepared by Owner Trustee or its counsel, as may be necessary or advisable to release and terminate Lender's mortgage and lien on the Aircraft and Lease Agreement. The Prepayment Amount may change for any payment date other than July 15, 2008.

Very truly yours,

Albert Nigro
Director – DB Equipment Leasing, Inc.