# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,    ) ) ) | |
| Plaintiff,    ) ) | |
| v.    ) ) | No. 08 C 2224 |
| JASON R. HYATT, JAY JOHNSON, and HYATT JOHNSON CAPITAL, LLC,    ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants.    ) | |

## MEMORANDUM OPINION AND ORDER

Jason R. Hyatt ("Hyatt") and Jay Johnson ("Johnson") formed a limited liability company, Hyatt Johnson Capital, LLC ("HJ Capital"), and from 2003 through 2008, conducted a securities fraud scheme in which they solicited capital contributions from investors purportedly for the purchase of commercial aircraft. In fact, Hyatt and Johnson never purchased aircraft with the investors' contributions, instead diverting much of the money to their own purposes and using investors' funds to repay other investors as purported returns. In 2008, at the request of the Securities and Exchange Commission ("SEC"), Judge George Lindberg of this court appointed Robert Handler ("Handler" or "Receiver") as receiver over the estates of HJ Capital, its co-owners, and other related entities. The Receiver has succeeded in recovering and distributing the investors' capital contributions and now seeks approval of his Final Distribution Plan for disbursing the Receivership estate's remaining assets.

The Receiver's proposed plan has drawn one objection—that of Michael Demnicki, general counsel to BCI Aircraft Leasing, Inc. ("BCI"). BCI, the company supposedly responsible for managing the aircraft, was itself a participant in the fraudulent scheme. Demnicki, who is HJ Capital's sole remaining creditor and also a creditor of Hyatt, believes that he and the other creditors of Hyatt are entitled to receive distributions from the Receivership estate, and that the Receiver's refusal to provide distributions to these creditors is inequitable. In addition to his

objection in this case, Demnicki issued a citation against the Receiver to impose a lien on the assets of Hyatt pursuant to Demnicki's related state court judgment against Hyatt. The Receiver has moved to quash the citation. For the reasons explained here, the court overrules Demnicki's objections [873] and approves the Receiver's Distribution Plan [873]. The Receiver's motion to quash Demnicki's citation [889] is granted, as well.

## BACKGROUND

### A.    Background Facts[1]

Defendant HJ Capital was a privately held company with its principal place of business in Downers Grove, Illinois. (Compl. [1] ¶ 26.) Defendants Hyatt and Johnson were the managers, co-founders, and co-owners of HJ Capital. (*Id.* ¶¶ 23-25.) From 2003 to 2007, HJ Capital, Hyatt, and Johnson engaged in a fraudulent scheme under which HJ Capital solicited and obtained more than $21 million from approximately 120 investors for investments in commercial aircraft. (*Id.* ¶¶ 2-4.) In exchange for their contributions, the investors received membership shares in one of ten limited liability companies managed and operated by HJ Capital (the "Aircraft LLCs"). (*Id.* ¶ 1.) In the private placement memorandum and offering agreement for each Aircraft LLC (the "Aircraft LLC contracts"), HJ Capital represented that each Aircraft LLC would hold an investment in a limited liability company managed by BCI (the "BCI LLCs"). (*Id.*) According to the Aircraft LLC contracts, the BCI LLCs would purchase specifically identified aircraft, lease the aircraft to commercial airlines, and then make monthly payments to the Aircraft LLCs from the aircraft lease income. (*Id.* ¶ 2.) HJ Capital would distribute these monthly payments to the individual investors. (*Id.*) The Aircraft LLC contracts further provided that investors would receive a share in any profits if the aircraft owned by the Aircraft LLC was sold. (*Id.* ¶¶ 2, 33.) For the most part, the names of the Aircraft LLCs reflect the year they were

---

[1]    The court previously entered final judgments against Defendants Hyatt and Johnson, and granted the SEC's motion for voluntary dismissal of its claims against HJ Capital. [598] [772] [694] [766] [772] Pursuant to these orders, Defendants have agreed not to contest the allegations set forth in the SEC's complaint, including allegations that Defendants violated federal securities laws. [595] [692-1]

established and the purported commercial airline lessor of the aircraft: Hyatt Johnson A3 2003 LLC, Hyatt Johnson SAS 2003 LLC, Hyatt Johnson BA 2005 LLC, Hyatt Johnson Continental 2005 LLC, Hyatt Johnson United 2005 LLC, Hyatt Johnson T2 LLC, Hyatt Johnson USA 2004 LLC, Hyatt Johnson USA 2005 LLC, Brown HJ D26 LLC, and Hyatt Johnson 26 LLC. (Agreed Order Appointing Receiver over HJ Hyatt Capital [34] at 2-3.)

The Aircraft LLC contracts provided for further profits for Defendants, as well. Specifically, once the investors had received distributions equal to their initial capital contributions, Defendants had the right to a portion of the Aircraft LLC's remaining assets, *i.e.*, the aircraft itself and any income received therefrom. The contracts for four of the Aircraft LLCs—Hyatt Johnson Continental, Hyatt Johnson BA 2005, Hyatt Johnson United 2005, and Hyatt Johnson 26—provided that HJ Capital had the right to 20% of the LLC's remaining assets after each investor's original capital contributions had been repaid. (Demnicki Obj. [878] at 8-10; [823], Exs. 6, 9, 10, 11, 12.) The contracts for two other Aircraft LLCs—Hyatt Johnson USA 2004 and Hyatt Johnson USA 2005—contained similar provisions, but gave HJ Capital the right to recovery of one-third of the LLC assets once the investors' original capital contributions had been repaid. (*Id.* at 10; Exs. 13, 14, 15, 16.) The remaining contracts—Hyatt Johnson T2, Hyatt Johnson SAS, and Hyatt Johnson A3—provided HJ Capital with the right to 30%, 60%, and 100%, respectively, of the LLC's remaining assets after the return of the investors' original contributions.[2] (Demnicki Obj., Ex. A.)

Defendants were successful in attracting $21 million in investments to HJ Capital between 2003 and 2007. But neither HJ Capital nor BCI (ostensibly the manager of the Aircraft LLCs) ever purchased any aircraft on behalf of the Aircraft LLCs, nor did HJ Capital or BCI provide the Aircraft LLCs with an ownership interest in any limited liability company that owned or leased aircraft. (Compl. ¶ 5; Receiver Distribution Plan (hereinafter "Plan") [873] at 2.)

---

[2] The offering agreement and private placement memorandum for the last Aircraft LLC, Brown HJ D26, was not provided to the court.

Instead, Defendants commingled the investors' money and misappropriated it for unrelated purposes, including helping to fund a Latin-themed restaurant, De La Costa, which was co-owned by Hyatt; mortgage payments and home improvements for two of Hyatt's homes; and the purchase of several vehicles for Hyatt, as well as the purchase of aircraft to be owned exclusively by BCI. (Compl. ¶¶ 1, 5.) Defendants and BCI also used investors' money to make payments to other investors as purported returns. (*Id.* ¶¶ 5, 39.)

In July 2007, unbeknownst to the Aircraft LLC investors, BCI issued a $21 million note to HJ Capital in exchange for the Aircraft LLCs' interests in the BCI LLCs (the "BCI Note"). (Receiver Decl. [886] ¶ 9.) One month later, in August 2007, the SEC commenced an enforcement action against BCI and its owner, Brian Hollnagel. The court in that case issued a preliminary injunction against BCI, ordering BCI to repay its investors, which included HJ Capital and the Aircraft LLCs, within 60 days.[3] (Compl. ¶ 7); *Hollnagel*, 503 F. Supp. 2d at 1054. Prompted by the court's order, in September 2007, BCI and Defendants entered into an agreement to cancel the BCI Note (the "settlement agreement") in order to repay the Aircraft LLC investors as ordered. (Receiver Decl. ¶ 10.) The settlement agreement provided that, in exchange for cancellation of the BCI Note, BCI would make a cash payment of approximately $3.5 million to Hyatt Johnson Capital Asset Holdings, LLC ("HJ Asset Holdings"), a company created by HJ Capital as part of the settlement agreement, and collectively owned by the ten Aircraft LLCs. (*Id.* ¶ 11; Compl. ¶ 69.) Each Aircraft LLC's percentage ownership interest in HJ Asset Holdings corresponded to the amount of that LLC's original investment with HJ Capital: Hyatt Johnson A3 2003 LLC (9.54155%), Hyatt Johnson SAS 2003 LLC (2.57343%), Hyatt Johnson BA 2005 LLC (11.67627%), Hyatt Johnson Continental 2005 LLC (22.42303%), Hyatt

---

[3] Approximately 102 individuals or entities invested in the BCI LLCs, *U.S. S.E.C. v. Hollnagel*, 503 F. Supp. 2d 1054, 1056 (N.D. Ill. 2007), and approximately 120 individuals or entities invested in the Aircraft LLCs. (Compl. ¶ 4.) Although the Aircraft LLCs themselves were investors in the BCI LLCs, the extent to which there is additional overlap among the investor victims of these two fraudulent schemes is unclear from the record in this case or the related court proceedings.

Johnson United 2005 LLC (8.68017%), Hyatt Johnson T2 LLC (20.68328%), Hyatt Johnson USA 2004 LLC (5.49257%), Hyatt Johnson USA 2005 LLC (8.41161%), Brown HJ D26 LLC (7.01047%), and Hyatt Johnson 26 LLC (3.50762%).  [545-1]

Pursuant to the operating agreement of HJ Asset Holdings, which Hyatt and HJ Capital drafted in conjunction with the settlement agreement, the company would provide a pro rata distribution of its assets to the Aircraft LLCs based on each Aircraft LLC's percentage ownership in HJ Asset Holdings.  (Receiver Decl. ¶ 11.)  Of the $3.5 million cash paid to HJ Asset Holdings, however, only $1.1 million was transferred to the Aircraft LLCs; the remaining $2.4 million was diverted by Defendants to repay a loan made by Hyatt's friend and business associate, Robert Biedron, to Chicago Aviation Partners, a joint BCI–HJ Capital entity unrelated to the aircraft investments.  The funds loaned by Biedron were diverted by Hyatt to his restaurant, De La Costa.  (Compl. ¶¶ 57-58, 71-75; Plan at 2.)  As part of the settlement agreement, BCI also provided HJ Asset Holdings with the title to six commercial aircraft owned by BCI—aircraft unrelated to those which, according to the Aircraft LLC contracts, the Aircraft LLCs had purported investments.  (Compl. ¶ 65.)

Since 2008, when the SEC filed its complaint in this case, Defendants Hyatt and Johnson have been charged criminally.  Both pleaded guilty to charges of wire fraud and other violations of federal law for their role in the aircraft investment scheme.  (Demnicki Obj. [878], Ex. E.)  On May 3, 2011, Judge Charles Kocoras of this court sentenced Hyatt to 120 months in prison and ordered him to pay $2,194,926.28 in restitution.  *United States v. Hyatt*, 08-cr-469 (Doc. # 101).  Based on Hyatt's assistance in the prosecution of BCI and its owner, Brian Hollnagel, the government moved to reduce Hyatt's sentence to 81 months' imprisonment, and the court granted that motion.  *Id.* (Docs. # 133, 136).  Judge Charles Norgle of this court sentenced Jay Johnson to 12 months in prison on March 2, 2012, and ordered Johnson to pay $612,567 in restitution.  (Demnicki Obj. at 14); *United States v. Johnson*, 10-cr-01030 (Doc. # 43).

On March 14, 2012, a jury convicted BCI and Hollnagel of wire fraud and obstruction of justice for their participation in the scheme. *See United States v. Hollnagel*, 955 F. Supp. 2d 830 (N.D. Ill. 2013). BCI and Hollnagel moved for a judgment of acquittal and for a new trial. In denying that motion, the court noted evidence that BCI defrauded the Aircraft LLC investors, as well as other investors of BCI, by, among other things, failing to purchase the aircraft it had agreed to purchase with the investors' money, and using the investors' funds for other purposes, such as the purchase of aircraft to be owned exclusively by BCI and the procurement of a bank loan that singularly benefited BCI. *Id.* at 850-55. The court further found that, as is typical of a Ponzi scheme, BCI repaid investors with either the investors' own money or with money invested by others in similar fraudulent deals. *Id.* at 857. On December 17, 2014, the court also entered a judgment against BCI and Hollnagel in the SEC enforcement action filed against them and ordered BCI and Hollnagel to pay $1.5 million in civil penalties. *S.E.C. v. Hollnagel et al.*, 1:07-cv-04538 (Doc. # 442).

**B.      The State of the Receivership**

This case was filed by the SEC on April 18, 2008. The SEC alleged that the fraudulent aircraft scheme carried out by Defendants Hyatt, Johnson, and HJ Capital constituted securities fraud in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a)(1)-(3); Sections 10(b) and 15(a)(1) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(a)(1); and Sections 206(1), 206(2), and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1)-(4). (Compl. ¶¶ 114-139.) To remedy these violations, the SEC requested an injunction to bar Defendants from engaging in further fraudulent conduct, require disgorgement of profits and payment of civil penalties, and afford emergency relief to prevent dissipation of assets. (*Id.* at 23-24.) Judge William J. Hibbler of this court immediately entered an order temporarily freezing the assets of HJ Capital and Hyatt. [8] Then, on May 5, 2008, Judge George Lindberg appointed Robert Handler as the receiver for HJ Capital, and authorized him to manage and control the assets of the company. [34] The court subsequently appointed Handler as the receiver for the assets of HJ Asset Holdings and Jason

Hyatt, as well. [60] [67] [71] As the receiver, Handler was tasked with identifying, securing, protecting, and recovering assets; conducting an accounting and investigating the basis for the Receivership proceeding; managing the Receivership's assets in order to preserve or enhance their value; analyzing and developing an approach to distribution of the assets; developing and implementing plans for the liquidation of the assets; and reviewing and adjudicating claims against the Receivership estate. [262]

### 1. Liquidation of Receivership Assets

As noted, six commercial aircraft were transferred to HJ Asset Holdings as part of the 2007 settlement agreement between BCI and HJ Capital. Those airplanes made up the majority of the Receivership estate. Pursuant to the authority granted by the court, the Receiver managed the aircraft, collected rent on their leases, and eventually, sold the aircraft. The Receiver sold the first airplane, a British Airways Boeing 737, in July 2008, recovering approximately $3.2 million for the Receivership estate. [113]

In August 2008, Alitalia ("Old Alitalia"), an Italian air carrier that had leased four of the six aircraft, filed for bankruptcy protection in Italy. [212] After the bankruptcy proceedings, the Receiver reached an agreement with the newly-formed company that had acquired Old Alitalia's assets in bankruptcy ("New Alitalia"), whereby New Alitalia assumed the aircraft leases at the original full rates, minus a reduction of certain maintenance costs (approximately $400,000). [220]; (Plan at 3-4.) In 2014, the Receiver sold the New Alitalia-leased planes to a private investment firm, netting approximately $22 million for the estate. [773] In the meantime, the bankruptcy trustee for Old Alitalia filed a lawsuit (the "Alitalia Trustee Case") in Italy against the Receivership estate, seeking the return of $7 million allegedly wrongfully paid by Old Alitalia to the BCI entity that previously owned the aircraft, BCI IRL MSN 477/488-2006, Ltd., for

maintenance costs shortly before Old Alitalia filed for bankruptcy.[4]  (Plan at 4.)  The Italian trial court dismissed that case in April 2014, but the trustee for Old Alitalia appealed.  (*Id.*)  On October 22, 2015, this court approved a proposed settlement agreement between the Receiver and Old Alitalia, pursuant to which the Receiver will pay Alitalia € 5,000,000 (approx. $5,700,000) in exchange for dismissal by Old Alitalia of the appeal.  [888]

In July 2015, the Receiver sold the last of the six airplanes, a US Airways Airbus A319, resulting in the Receivership estate receiving approximately $4.5 million.  [873]

The Receivership estate also included all of Jason Hyatt's assets: three homes, an antique collection, an art collection, several phonographs and pianos, automobiles, and other items of personal property.  [316]  After receiving authorization from the court, the Receiver sold Hyatt's residence in St. Charles, Illinois, and satisfied the claims of its first mortgage, but the costs of the sale exceeded the proceeds.  [170]  Hyatt's other two homes, located in Geneva, Illinois, and Michigan City, Indiana, were both in foreclosure and would have no equity after the mortgages were paid; as a result, the Receiver obtained court authorization to abandon these properties.  [259] [272] [293] [295]  The Receiver also took possession of Hyatt's various collections, his automobiles, and other personal property, and sold these assets.  [262]  Because the cost of selling these assets exceeded the net sale proceeds ($49,237), there was no recovery for the Receivership estate.  [696]  The Receivership was unable to recover any assets from the estates of Defendants Johnson and HJ Capital.

## 2.    Litigation on Behalf of the Estate

In addition to managing the existing assets of the Receivership estate, the Receiver brought several lawsuits to recover additional assets.  In September 2009, the Receiver initiated a state court action against Shefsky & Froelich, LLC, former legal counsel to HJ Capital, alleging

---

[4]        According to the Receiver, the nature of this lawsuit was similar to a preference action under the U.S. Bankruptcy Code, which permits a trustee or debtor in possession to recover payments made shortly before the bankruptcy filing from creditors where the payment gave the creditor(s) more than other similarly situated creditors would get through the bankruptcy process.  (Plan at 5); *see* 11 U.S.C. § 547.

malpractice in the firm's representation of HJ Capital.  [567]  In May 2014, the Circuit Court of Cook County, Illinois, granted summary judgment in favor of Shefsky.  (Plan at 6.)  Counsel for the Receivership appealed the trial court's decision on a contingency-fee basis; the appeal remains pending.  (*Id.*)

In June 2011, the Receiver commenced a federal lawsuit against Robert Biedron and his wife, Christine Biedron, to recover $2.4 million the Biedrons had received in connection with the September 2007 settlement agreement between BCI and HJ Capital.  [567]  As noted earlier, in 2005, Jason Hyatt had borrowed $2 million from Robert Biedron to finance a business owned by Hyatt that was unrelated to the aircraft investments.  The Receiver's complaint alleged that, as part of the 2007 settlement agreement, BCI and Defendants improperly arranged for $2.4 million of the money owed to HJ Asset Holdings to be paid instead to Biedron.  (Plan at 7.)  On August 22, 2013, the Receiver settled the lawsuit against the Biedrons for payment to the estate of $2.067 million and transfer of Robert Biedron's membership interests in six of the Aircraft LLCs. (*Id.*); [732]

In 2011, the Receiver discovered that, in 2007, HJ Capital had paid $2 million to fifteen investors in one of the Aircraft LLCs, Hyatt Johnson A3 2003 LLC ("A3").  The Receiver brought a lawsuit against these investors for recovery of the $2 million, alleging Illinois state law claims of unjust enrichment, constructive fraudulent transfer, and fraudulent conveyance.  *Handler v. Heidenry*, No. 11 C 4494, 2012 WL 2396615, at *1 (N.D. Ill. June 25, 2012).  The $2 million paid by HJ Capital had provided the A3 investors with a full return of their initial investments, while the investors in the remaining nine Aircraft LLCs had recovered approximately 6% of their initial investments.  *Id.*  The Receiver obtained a default judgment against three of the A3 investors, and reached settlement agreements with all but one of the remaining A3 investors.[5]  (Plan at 7.)

---

[5]     The Aircraft LLC investors have since received the entire amount of their initial investment; thus, the one A3 investor with whom the Receiver had not settled or reached a judgment is now in the same position as all other investors.  (*Id.* at 7.)

### 3.    Distribution of Receivership Estate Assets

From proceeds of the aircraft leases and sales, as well as recoveries in the A3 and Biedron lawsuits, the Receiver has been able to make nine interim court-approved distributions to investors, in September 2009 ($1,146,229.85) [373], December 2009 ($1,258,930.40)[6], October 2010 ($858,061.42) [448], October 2011 ($1,000,000) [552], May 2012 ($1,000,000) [589], November 2012 ($1,000,000) [680], April 2013 ($1,000,000) [701], November 2013 ($2,500,000) [762], and August 2014 ($4,905,500) [787].  Initially, the Aircraft LLCs received pro rata distributions based on the amount of each company's investment interest in HJ Asset Holdings, and each Aircraft LLC subsequently disbursed the funds to individual investors based on the amount of each investor's investment in the particular Aircraft LLC.[7]  The Receiver withheld approximately $85,000 in distributions on Defendant Johnson's membership interests in the Aircraft LLCs.[8]  (Plan at 9.)

After the Receiver had repaid investors the amount of their initial net investments, the Receiver used the additional aircraft rental income and sale proceeds to pay certain uncontested pre-Receivership creditor claims filed against HJ Asset Holdings.[9]  The Receiver also made a $35,966 interim distribution to Prism Litigation Technology ("Prism") for litigation consulting services that Prism had performed for HJ Capital in 2008.  [814] [822]  Although

---

[6]    Although it is undisputed that the Receiver made a distribution to investors in December 2009, there do not appear to be any filings that directly establish the date of this distribution.

[7]    The Receiver had withheld payments to the A3 investors and Robert Biedron, pending the resolution of these lawsuits.  [787]  The withheld payments have since been credited against or paid to the A3 investors.

[8]    In December 2014, according to the Receiver, Johnson filed for Chapter 7 bankruptcy, and his membership interests became part of the Chapter 7 case.  (*Id.*)  In August 2015, the bankruptcy trustee filed a motion to abandon Johnson's interests in the Aircraft LLCs. (*Id.*)

[9]    These included $238,630 in distributions to JP Europe, Inc., Katten Muchin Rosenman LLP, Mercury-ALPS Aviation Management, and the Illinois Department of Revenue. [787] [790]

Prism had filed its claim against HJ Capital, the Receiver determined that HJ Asset Holdings was legally required to pay the claim because Defendant Johnson had signed the contract with Prism on behalf of HJ Capital and its "affiliates," which included HJ Asset Holdings. (Receiver Resp. at 5.)

### 4. Demnicki's Claim

Apart from the distribution to Prism, the Receiver made no interim distributions to the creditors of HJ Capital or its subsidiaries. Nor did the Receiver make any interim distributions to creditors with claims against Jason Hyatt or Jay Johnson. Michael Demnicki, who was general counsel to BCI—one of the participants in the fraudulent scheme—is the sole remaining creditor of HJ Capital. (Demnicki Mot. for Order Providing Distributions to HJ Capital and Hyatt Creditors, at 4.) Demnicki has claims against the company in the amount of $30,000. (*Id.*) He also has outstanding claims against Hyatt in the amount of approximately $721,371.80. (*Id.*) On February 24, 2015, Demnicki filed a motion to provide for distributions to the creditors of HJ Capital and Hyatt based on the Aircraft LLC contracts, which, as noted earlier, provided HJ Capital and Hyatt with the right to receive a portion of the Aircraft LLCs' assets once the investors' initial contributions were repaid. (*Id.* at 1.) On June 5, 2015, the court terminated Demnicki's motion as premature. [865]

Apparently undeterred, on September 15, 2015, Demnicki issued a citation against the Receiver to impose a lien on the assets of Hyatt in favor of Demnicki. [883] Demnicki had sued Hyatt in state court in 2009 and won a judgment in his favor on October 22, 2012. [883] When Demnicki issued a citation to impose a lien on Hyatt's assets, the Receiver removed the state court citation proceeding to this court and moved to quash the citation. The Receiver asserts that Demnicki failed to seek leave of this court before filing the citation, and in any event, the citation is preempted by federal securities law. [889]

**C.**     **Proposed Final Distribution Plan**

As a result of the Receiver's efforts, described above, the Receivership estate received approximately $43,174,758 from aircraft rent, aircraft sales, and recoveries from lawsuits filed by the Receiver on behalf of HJ Capital Asset Holdings and the Aircraft LLCs. (Plan at 12.) The Receiver paid approximately $25,444,116 in cash disbursements, and the estate has a remaining cash balance of approximately $12 million.[10] (*Id.*) On September 8, 2015, the Receiver moved for entry of a court order (i) approving the Receiver's final plan for distribution of Receivership assets, (ii) authorizing the Receiver to make distributions in accordance with the approved Plan, and (iii) authorizing the establishment of an investor trust upon closing of the Receivership. (Plan at 1.)

The Receiver's proposed Distribution Plan calls for distribution of the remaining assets of the Receivership estate as follows: First, the Receiver will pay all outstanding expenses, costs, and fees owed by the Receivership estate to various parties, including the Receiver and his counsel ("Class I"). (Plan at 12.) Next, the Receiver will pay all outstanding state taxes ("Class II"). (*Id.*) Creditors who have claims against HJ Capital Asset Holdings ("Class III") will then be paid, to the extent these claims have not been previously paid in full. (*Id.* at 13.) After these funds are paid, the Aircraft LLC investors ("Class IVa") will be paid on a pro rata basis; the Aircraft LLCs will receive distributions based on their respective percentage ownership interest in HJ Asset Holdings, with each Aircraft LLC then distributing the funds to each investor in an amount proportional to the investor's initial investment in the LLC. (*Id.*) The Receiver estimates that these distributions will be equivalent to a 3.5 to 5.5% per-year return on the investors' initial investments. (*Id.*)

---

[10]     The Distribution Plan states that the Receivership estate has a remaining balance of $17,730,642; however, the court approved the settlement agreement between the Receiver and Old Alitalia, pursuant to which the Receiver is required to pay Old Alitalia € 5,000,000 out of the Receivership estate, after the Receiver had filed the Distribution Plan. [888] To account for this settlement agreement, the court has reduced the balance of the Receivership estate by $5.7 million.

Distributions on Defendant Johnson's interest in the Aircraft LLCs ("Class IVb") will be made in the same manner as the other investors' interests, except that Johnson's distributions will be delivered to the U.S. Attorney for distribution under the restitution order entered in Johnson's criminal case. (*Id.* at 14.) In determining which method to use for calculating the return on the Class IVa and IVb Aircraft LLC investments, the Receiver considered, but rejected, calculating payments based on distributions contemplated by the Aircraft LLC contracts. (*Id.* at 13.) Of the assets he has collected, the Receiver has made no distributions to Defendants HJ Capital or Jason Hyatt. As a result, those Defendants have no assets, and their creditors will receive nothing in the Receiver's proposed plan of distribution. (*Id.*)

The Receiver proposes that distributions to Classes I, II, III, IVa, and IVb be made as soon as practicable. (*Id.* at 15.) If there is any future recovery in the Receiver's lawsuit against Shefsky & Froelich, the Receiver proposes that these funds would be placed in a trust, to be managed by the Receiver, for distribution in accordance with the Plan. (*Id.*)

## DISCUSSION

**A.    The Receiver's Proposed Final Distribution Plan**

The court is afforded wide discretion in approving a plan for distribution of receivership funds. *S.E.C. v. Enterprise Trust Co.*, 559 F.3d 649, 652 (7th Cir. 2009) (individuals whose property is marshaled by a receiver and whose claims are resolved in the receivership proceeding are "like creditors of a debtor in bankruptcy, [and] must accept the distribution that the court believes appropriate"). There are no set rules or specific terms that govern distribution plans in federal equity receiverships. *S.E.C. v. Enterprise Trust Co.*, No. 08 C 1260, 2008 WL 4534154, at *3 (N.D. Ill. Oct. 7, 2008). Rather, in deciding whether to approve a plan for distribution, the court's primary duty is to ensure that the plan is fair and reasonable. *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 322 (7th Cir. 2010).

In this case, Demnicki, a creditor with claims against HJ Capital and Jason Hyatt, contends that the Receiver's Distribution Plan does not meet that standard. (Demnicki Obj. at

5.)  Demnicki specifically objects to the Plan on the grounds that, even though the Aircraft LLC investors have already received distributions equal to their initial investments, the Plan provides these investors with significant additional returns, while providing no money to Demnicki (HJ Capital's sole remaining creditor) or the creditors of Hyatt.  (*Id.*)  As will be discussed in greater detail below, the court disagrees with Demnicki's characterization of the Distribution Plan, and finds that the Plan is both fair and reasonable, despite the fact that it does not provide for distributions to Demnicki or Hyatt's creditors.

### 1.    Demnicki's Status as Former General Counsel for BCI

The Receiver disputes Demnicki's right to receive any payments from the Receivership estate, noting that Demnicki was general counsel to BCI during the time that BCI participated in the Hyatt/Johnson fraudulent aircraft scheme.  (Receiver Resp. [886] at 1.)  Demnicki also co-owned De La Costa, the restaurant to which Hyatt diverted a portion of the investors' initial funds.  (*Id.*)  Demnicki responds by insisting that he himself did not engage in any wrongdoing, and his employment history is therefore irrelevant to the issue of whether the Distribution Plan should compensate him, as well as other creditors with outstanding claims against HJ Capital or Hyatt.  (Demnicki Reply at 2.)

The Receiver's suspicions are understandable: Demnicki held a leadership role at BCI while the company and its owner were fraudulently soliciting millions of dollars from investors. And even if Demnicki did not personally participate in the fraud, the court could still bar distributions to him if, as part of his employment at BCI or elsewhere, he received money generated by the fraudulent scheme that caused the losses at issue.  *See S.E.C. v. Pension Fund of Am. L.C.*, 377 F. App'x 957, 962 (11th Cir. 2010) (affirming district court's refusal to allow former employees of fraudulent fund to recover assets of the receivership estate for commissions and wages earned in furtherance of the fraudulent scheme, regardless of whether the employees personally committed fraud).  Demnicki's restaurant business, De La Costa, did receive funds as part of Defendants' fraudulent conduct, as did Demnicki's employer BCI.  As a

co-owner of De La Costa, Demnicki likely benefited from these illicit funds. The Receiver has not provided the court with any evidence that Demnicki did, in fact, receive a portion of these funds, however, and thus the court declines to deny him distributions on this basis alone.

### 2. Assets of HJ Capital and Hyatt

As stated earlier, in determining how to distribute the remaining Receivership estate proceeds, the Receiver decided that the most equitable approach would be to first pay the costs of the estate, the creditors of HJ Asset Holdings, and all outstanding state taxes. (Plan at 13.) The Receiver then adopted a pro rata approach (distribution in proportion to investors' investments) for distributing money to the defrauded investors. (*Id.*) In choosing a pro rata approach, the Receiver declined to calculate investors' returns based on the terms of the fraudulent Aircraft LLC contracts because, according to the Receiver, doing so would have resulted in investors in six Aircraft LLCs receiving all of the remaining funds and investors in the remaining Aircraft LLCs receiving nothing.[11] (*Id.* at 13-14.) In addition, distributing funds to investors in the six Aircraft LLCs by percentage share would have provided some of these investors with 80% of returns (with 20% of returns going to Defendants), while other investors would have received just 66% of returns (with 33% of returns going to Defendants). (*Id.*; Demnicki Obj., Ex. C.) The Receiver also decided to ignore the Aircraft LLC contracts in calculating disbursements because, according to the Receiver, the contracts were structured to benefit the wrongdoers by providing Defendants themselves with a portion of the Aircraft LLCs' assets. (*Id.*)

---

[11] Demnicki disputes that distribution of the Receivership proceeds in accordance with the Aircraft LLC contracts would result in six of the Aircraft LLCs' receiving all of the remaining funds. (Demnicki Obj. at 19-20; Demnicki Reply at 4-5.) The court is uncertain that Demnicki has any recognizable stake in the question of how estate assets will be distributed to investors. Notably, however, the Receiver has not explained why a distribution pursuant to the language of the agreements would leave certain Aircraft LLCs without any recovery. (Plan at 14.) In light of this dispute, the court accords no weight to the Receiver's statement that four of the Aircraft LLCs would be denied funds if the court were to distribute estate assets pursuant to the terms of the Aircraft LLC contracts.

Demnicki objects to this proposal. In his view, after paying fees, costs, the creditors of HJ Asset Holdings, and outstanding state taxes, the Receiver should distribute the remaining proceeds in accordance with the Aircraft LLC contracts. (Demnicki Obj. at 5-7.) This approach would provide Defendants HJ Capital and Hyatt with approximately $4.15 million in proceeds, which in turn, could be used to pay their creditors.[12] (*Id.* at 5.) Demnicki contends that it would be more equitable to distribute the remaining proceeds in accordance with the terms of the Aircraft LLC contracts, as opposed to using the approach proposed by the Receiver, because the Aircraft LLC investors' initial contributions have already been repaid. To provide these investors with additional money from the Receivership estate, while leaving the creditors of HJ Capital and Hyatt empty handed, would be unfair, he urges.

This case is somewhat unusual; the goal in most receivership proceedings is to distribute limited assets fairly, recognizing that most investors will not be made whole. In this case, the investors in this case have already recovered their losses, such that the distributions provided to them under the Plan will be investment returns. Meanwhile, the Receiver's Plan does not provide any money to the creditors of HJ Capital and Hyatt, resulting in losses for these individuals or entities.

Despite this result, the court agrees with the Receiver that a pro rata distribution of the remaining Receivership estate proceeds to the Aircraft LLC investors, and non-payment to HJ Capital and Hyatt's creditors, is the most equitable approach. *See U.S. S.E.C. v. Quan*, No. 11-723 ADM/JSM, 2013 WL 1703499, at *5 (D. Minn. Apr. 19, 2013) ("[A] Receiver may propose, and the Court has broad authority to approve, a distribution plan governed by equitable principles rather than [an entity's] operating documents.") First, courts generally consider pro rata distribution to investors to be the "most fair and most favored" approach in receivership cases. *S.E.C. v. Byers*, 637 F. Supp. 2d 166, 176 (S.D.N.Y. 2009); *see S.E.C. v. Infinity Group*

---

[12] Hyatt's 50% ownership in HJ Capital would provide him with the right to approximately one-half ($2.06 million) of HJ Capital's distributions pursuant to the Aircraft LLC contracts, Demnicki contends. (Demnicki Obj. at 5.)

*Co.*, 226 Fed. App'x 217, 218 (3d Cir. 2007) ("[T]he Courts of Appeals repeatedly have recognized that pro rata distribution of a defrauder's assets to multiple victims of the fraud is appropriate and that District Courts act within their discretion in approving such distributions."). In *S.E.C. v. Credit Bancorp, Ltd.*, the Second Circuit held that pro rata distribution is particularly appropriate in a Ponzi scheme case or in other situations where the funds of defrauded investors were commingled and the victims were similarly situated with respect to the wrongdoing.  290 F.3d 80, 88-89 (2d Cir. 2002).

    In one sense, this case differs from a traditional Ponzi scheme, in which "earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity," *Credit Bancorp,* 290 F.3d at 89 (internal citations and quotations omitted): the Aircraft LLC investors did ultimately obtain investment interests in aircraft (albeit prompted by court order and not in the manner that had been represented in the Aircraft LLC contracts).  Like a typical Ponzi scheme, however, investors' returns were paid from the contributions of other investors, and none of the investors' contributions actually went towards any legitimate investment activity.  There is also no dispute that the investors' funds were commingled.  *See Credit Bancorp,* 290 F.3d at 88-89.  The investors invested their money in the Aircraft LLCs with the purpose of purchasing specifically identified aircraft, but the money never was used for that purpose.  Instead, Defendants misappropriated the investors' funds, directing it to unrelated purchases and uses.  The investor victims were also similarly situated "in relationship to the fraud, in relationship to the losses, in relationship to the fraudsters, and in relationship to the nature of their investments, so that a . . . pro rata distribution is equitable." *Commodity Futures Trading Comm'n v. Walsh*, 712 F.3d 735, 748 (2d Cir. 2013) (internal quotations and citations omitted).  Although the Aircraft LLC investors initially contributed different amounts of capital, each investor's initial contribution has now been repaid.  In other words, whatever initial investments they may have been owed, the investors now stand on

equal footing with one another and should receive equal returns in proportion to their initial investments.

In light of the fact that the investors' money was never invested in the aircraft identified in the Aircraft LLC contracts, moreover, it makes little sense to calculate the investors' returns based on the terms of contracts drafted by the defrauders.[13] *See Walsh*, 712 F.3d at 749 ("[A] receiver devising a distribution plan is not required to apportion assets in conformity with misrepresentations and arbitrary allocations that were made by the defrauder, 'otherwise, the whim of the defrauder would . . . control[ ] the process that is supposed to unwind the fraud.'" (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 238 n.7 (2d Cir. 2011))). Calculating distributions based on the investor contracts would be particularly unfair in this case, as it would result in some investors receiving more money than others simply because the fraudulent contract they signed entitled them to a greater return on their investment. *S.E.C. v. Byers*, 637 F. Supp. 2d 166, 177 (S.D.N.Y. 2009) (finding that alternatives to pro rata distribution would "create unfair results by rewarding certain investors over others based on arbitrary factors," such as investment risk). Enforcing the terms of the investor contracts would be inequitable as it would "elevate the position of [certain] victims on the basis of the actions of the defrauders." *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996) (internal quotations and citation omitted). No case law requires the Receiver to distribute receivership funds in

_____

[13]     In his sur-reply, Demnicki disputes that the Aircraft LLC contracts limited each Aircraft LLC to investment in a specific BCI-managed aircraft. In support, Demnicki cites to investment materials, which provided that BCI could substitute the particular aircraft described in the Aircraft LLC contracts for any other aircraft "meeting the Targeted Aircraft Profile." (Demnicki Sur-reply [920] at 3-4.) The term "Targeted Aircraft Profile," however, is a vague term, and it is clear from the Aircraft LLC contracts, as well as the names of the Aircraft LLCs, that each Aircraft LLC had been intended to fund an aircraft for leasing to a specific air carrier. Further, even assuming that substitution of aircraft was permitted under the Aircraft LLC contracts, no "substitution" of aircraft occurred; in fact, BCI never purchased any aircraft on behalf of the Aircraft LLCs. Although, through HJ Asset Holdings, the Aircraft LLCs each obtained ownership interests in six aircraft as part of the Defendants-BCI 2007 settlement agreement, the Aircraft LLCs all owned a portion of these six aircraft (as opposed to each Aircraft LLC owning one aircraft), none of which were managed by BCI on behalf of the Aircraft LLCs.

accordance with the Aircraft LLC contracts; to the contrary, "the remedies which . . . investors might have been entitled to under other law may be suspended under [the] equitable remedy" fashioned as part of a receivership proceeding. *Liberte Capital Grp., LLC v. Capwill*, 229 F. Supp. 2d 799, 805 (N.D. Ohio 2002) (citing *United States v. Vanguard Inv. Co., Inc.*, 6 F.3d 222 (4th Cir. 1993); *S.E.C. v. Elliott*, 953 F.2d 1560, 1569 (11th Cir. 1992)). In *Quilling v. Trade Partners, Inc.*, for example, the Sixth Circuit approved a pro rata distribution plan for individuals who had acquired interests in life insurance policies purchased by the defendant. 572 F.3d 293, 301 (6th Cir. 2009). One claimant objected to the receiver's plan, arguing that the Purchase Agreement he had signed with defendant entitled him to distributions of his "vested interest" in one particular life insurance policy. *Id.* at 295, 297. The Sixth Circuit rejected this argument, noting that, regardless of what had been provided in the Purchase Agreement, the claimant did not end up in a different position from any of the other claimants, and thus equity did not entitle him to different treatment. *Id.* at 298. Further, as noted earlier, in Ponzi scheme cases, courts routinely approve distribution plans that call for distributions to be made to defrauded investors on a pro rata basis, thereby ignoring the contracts entered into between the victims and defendants. *See, e.g.*, *Credit Bancorp*, 290 F.3d at 90 (ignoring fraudulent investor agreements and finding that pro rata distribution was appropriate).

For the same reasons, the court agrees with the Receiver that he is not required to honor the terms of the investment contracts by making distributions to Defendants HJ Capital and Hyatt. To find that Defendants have the right to a portion of the aircraft proceeds based on the terms of the contracts they created to benefit themselves would be to endorse the fraudulent scheme that led to the investors' losses. Courts in both this circuit and others agree. *See, e.g.*, *S.E.C. v. Basic Energy & Affiliated Res.*, 273 F.3d 657, 660 (6th Cir. 2001) (affirming distribution plan that prohibited defendants from receiving any receivership assets); *Byers*, 637 F.Supp.3d at 184 ("The Receiver's proposal to treat differently those involved in the fraudulent scheme when distributions are being made is eminently reasonable and is supported by caselaw.");

*S.E.C. v. Enter. Trust Co.*, No. 08 C 1260, 2008 WL 4534154, at *3 (N.D. Ill. Oct. 7, 2008) ("Disqualifying those who took the business over the edge is the most common feature, and the least contested aspect, of distribution plans."). Moreover, even if the court were to recognize Defendants' rights to a portion of the Aircraft LLCs' assets based on the terms of the Aircraft LLC contracts, the amount of Defendants' assets would be zero. As stated earlier, according to the terms of the Aircraft LLC contracts, the Aircraft LLCs were supposed to receive assets in the form of investments in specifically identified aircraft. Defendants never invested in these aircraft, however. Accordingly, the assets contemplated in the Aircraft LLC contracts never existed, and neither HJ Capital nor Hyatt are entitled to a portion of such assets.

Demnicki urges the court to look past that concern and consider the rights of unpaid creditors of HJ Capital and Hyatt. (Demnicki Obj. at 13.) If HJ Capital and Hyatt receive investment proceeds, Demnicki reasons, he and other creditors of these Defendants may recover some of their losses. Indeed, on the surface, it may seem that providing additional money to the Aircraft LLC investors, while leaving Demnicki with nothing, is an unfair result. Importantly, however, all of the Receivership estate's remaining assets were generated from sales of the assets of HJ Assets Holdings, an entity created to compensate the Aircraft LLC investors for Defendants' fraud. Because the investors, thus, indirectly owned the aircraft, the investors are entitled to receive the proceeds generated from these aircraft, even if the result is that individuals with unrelated claims against Defendants will not be paid.

The court further notes that Demnicki is the only creditor of either HJ Capital or Hyatt who has objected to the Receiver's proposed Distribution Plan. The loans that Demnicki provided to HJ Capital and Hyatt were not related to Defendants' fraudulent aircraft investment scheme, and equity does not require the court to include these unrelated claims against Defendants' creditors in the distribution of proceeds that came from aircraft sold on behalf of, and intended to benefit, defrauded investors. *See United States v. Petters*, No. Civ. 08-5348 ADM/JSM, 2011 WL 281031, at *9 (D. Minn. Jan. 25, 2011) (approving receivership distribution

plan that did not provide payment to trade creditors because the receivership was intended to benefit and protect investors); *S.E.C. v. Homeland Comm. Corp.*, No. 07–80802 CIV, 2010 WL 2035326, at *6 (S.D. Fla. May 24, 2010) (holding that because "[t]he receivership does not extend to all victims of all purported frauds that involved any defendant to this case," the receiver was not required to compensate individuals for losses unrelated to the fraudulent scheme at issue in the case). Demnicki contends that his claims are related to Defendants' fraudulent scheme because, in making loans to HJ Capital and Hyatt, he relied on Hyatt's representations that Hyatt had valuable investments in aircraft. (Demnicki Reply at 7.) The court disagrees; the loans made by Demnicki to Hyatt were intended for Hyatt's personal use, as well as to fund the restaurant business that Demnicki and Hyatt owned together. In sum, the declines to adopt Demnicki's proposal to distribute proceeds to Demnicki and Hyatt's other creditors, as opposed to individual Aircraft LLC investors whose money was responsible for creating the proceeds, simply because Demnicki would otherwise not receive compensation for his unrelated claims against Defendants.

### 3. Distribution Payments to Defendant Johnson and Prism

Demnicki further contends that the Distribution Plan is inequitable because it prefers other creditors' claims over Demnicki's claims. (Demnicki Obj. at 5.) Demnicki specifically notes that the Plan provides distributions on Defendant Johnson's investment interests in the Aircraft LLCs, which will be used to pay Johnson's creditors. (*Id.*) Demnicki asserts, further, that because the Receiver already paid the claims of one of HJ Capital's creditors, Prism Litigation Technology, it would be unfair to deny HJ Capital's other creditors, such as Demnicki, the same treatment. (*Id.* at 21.)

With respect to the proposed Plan's distributions to the creditors of Defendant Johnson, the court disagrees with Demnicki that the Receiver's distributions to these creditors are inconsistent with the Receiver's treatment of Demnicki. Johnson was a participant in the fraud,

but unlike Hyatt, he also invested his own funds in the Aircraft LLCs.[14]  (Receiver Reply at 6.) The Distribution Plan provides for payments to Johnson's membership interest in the Aircraft LLCs in the same manner as the other Aircraft LLC investors' membership interests.  The Plan's payments to Johnson can be distinguished from the distributions that Demnicki urges this court to make to Hyatt.  Under Demnicki's theory, Hyatt, who invested none of his own funds in the Aircraft LLCs, is nevertheless entitled to receive distributions under the Plan based on his 50% ownership interest in HJ Capital, which is contractually entitled to a portion of the Aircraft LLCs' assets.[15]  But the Receiver's proposal provides Johnson with distributions only on the basis of his status as an Aircraft LLC investor, not his ownership interest in HJ Capital.  Had the Receiver recovered any proceeds from the sale of Hyatt's real or personal property, it may well have been appropriate for him to use that money to pay Hyatt's creditors.  There were no net proceeds from the sale of Hyatt's property, however.  There is nothing inconsistent or arbitrary about the fact that Hyatt's creditors recover nothing in these circumstances.

Nor is the court troubled by the fact that the Receiver previously paid $35,966 to Prism for its outstanding claim against HJ Capital.  Prism filed its claim against HJ Capital, but the Receiver determined that HJ Asset Holdings was legally obligated to pay the claim because Defendant Johnson had signed Prism's engagement contract on behalf of HJ Capital and its affiliates.  (Receiver Reply at 5.)  In other words, the Receiver paid Prism's claim against HJ

---

[14]    According to the Receiver, the books and records show that Hyatt invested $10.00 in two Aircraft LLCs, but the Receiver was unable to locate any proof of this payment.  In any event, any repayment to Hyatt's creditors based on Hyatt's $20 investment would be nominal.  (Receiver Resp. to Demnicki Sur-reply [923] at 6.)

[15]    HJ Capital itself invested $21,000 in the Aircraft LLCs, $4,641 of which was paid back to HJ Capital prior to the Receivership.  (Receiver Resp. to Demnicki Sur-reply at 3.)  To the extent HJ Capital has any funds in its estate, however, HJ Capital is required to use this money to pay outstanding costs of the Receivership proceeding.  (*Id.*)  The costs of the Receivership proceeding exceed the total distributions that HJ Capital would receive based on its status as an investor; thus, HJ Capital's creditors would not receive any money from HJ Capital, regardless of whether the Distribution Plan provided distributions to HJ Capital based on its initial investment in the Aircraft LLCs.

Capital because it was also a claim against HJ Asset Holdings.[16]  No creditors in the same position as Demnicki—with claims against HJ Capital or Hyatt, but not against HJ Asset Holdings—have been paid for their outstanding claims.

        **4.**        **Request to Stay Portion of Receiver's Distribution Pending Resolution of Appeal**

Demnicki asks the court to withhold sufficient funds for distributions to the creditors of HJ Capital and Hyatt pending the resolution of all appeals of this order.  (Demnicki Obj. at 22.) Demnicki is concerned that, if this court were to allow the Receiver to distribute the remaining Receivership proceeds immediately, there will be no funds available to pay the creditors of HJ Capital or Hyatt, should the court's ruling be reversed on appeal.  The Receiver has not expressly opposed Demnicki's request to withhold funds, and because all of the Aircraft LLC investors have received a full return on their initial investments, the court sees no harm in granting Demnicki's request.  The withholding of these funds, however, does not preclude the Receiver from immediately making the distributions that would be paid regardless of any potential future distributions to the creditors of HJ Capital or Hyatt.  The Receiver may immediately pay all outstanding expenses, costs, and fees to the Receivership estate (Class I). The Receiver may also immediately pay the state for any outstanding taxes (Class II), as well as creditors with outstanding claims against HJ Asset Holdings (Class III).  Distributions to the Aircraft LLC investors (Class IVa), including Defendant Johnson (Class IVb), however, should be withheld in the event that Demnicki successfully appeals the court's order approving the Receiver's Distribution Plan.

---

[16]    Demnicki asserts that the motion filed by the Receiver at the time he sought court approval of the $35,966 payment to Prism shows that the Receiver intended to pay the claim on behalf of HJ Capital, not HJ Asset Holdings.  (Demnicki Reply at 8.)  Although the Receiver in his motion stated that Prism had filed its claim against HJ Capital, he also stated that he had "determined that some of the Creditor Claims [filed against HJ Capital] were for the benefit of [HJ Asset Holdings]."  (Receiver Mot. for 10th Distribution [814] at 10.)  In the Distribution Plan, the Receiver clarified that the Receivership paid Prism's claim against HJ Capital on behalf of HJ Asset Holdings.  The court is satisfied by this explanation.

**B.      Receiver's Motion to Quash Demnicki's Citation**

Under Illinois law, a judgment creditor may pursue the assets of a judgment debtor by serving a citation on a third party to discover assets.  735 ILCS § 5/2–1402(a).  Under the Illinois statute, tproper service of a citation to discover assets creates a lien on "all personal property belonging to the judgment debtor in the possession or control of that third party, or which thereafter may be acquired or come due the judgment debtor and comes into the possession or control of the third party to the time of the disposition of the citation."  *Id.* § 5/2–1402(m).  In this case, Demnicki issued a citation against the Receiver to discover the assets of Hyatt following a favorable judgment against Hyatt in a related state court case, which Demnicki had filed against Hyatt after commencement of the Receivership proceedings.  After removing the matter to this court, the Receiver moved to quash Demnicki's citation.

By filing the citation, Demnicki seeks to impose a lien on Hyatt's assets.  Yet, at the time Demnicki filed his state court action against Hyatt in 2009, the Receiver already had a lien on Hyatt's assets that was superior to all unfiled liens.   810 ILCS § 5/9-102(52); 11 U.S.C. § 101(36); *see also Duff v. Central Sleep Diagnostics, LLC*, 801 F.3d 833, 842 (7th Cir. 2015) ("A receivership court can certainly use its equitable powers to give the receiver's judgment priority over a state-court lien obtained by a claimant *subsequent* to that judgment." (emphasis original)).  Indeed, Demnicki does not dispute the Receiver's status as a lien creditor or priority creditor.  (Demnicki Resp. to Mot. to Quash [894] at 3.)  He thus acknowledges that he cannot obtain a lien on any assets that have already passed into the hands of the Receiver to be distributed in accordance with the Distribution Plan.  Rather, Demnicki seeks, through the citation, to "secure [his] right to distributions on Hyatt's [assets] should this court agree . . . with Demnicki's objections to the Receiver's final distribution plan."  (*Id.*)  Because the court has overruled those objections, the Receiver's motion to quash Demnicki's citation is granted.

## **CONCLUSION**

The Receiver's Motion for Approval of a Final Distribution Plan [873] is granted. The Receiver's decision to provide investors of the Aircraft LLCs with distributions on a pro rata basis achieves a fair and reasonable result for the victims of Defendants' fraud. Although Demnicki and other creditors with claims against Hyatt or HJ Capital will not receive payments as part of this proceeding, they have the right to pursue their claims through other remedies at law. Michael Demnicki's motion for leave to file a sur-reply [920] is granted, but his objection to the Receiver's Plan [873] is overruled, and Demnicki's renewed motion for distributions to the creditors of HJ Capital and Hyatt is denied as moot. The Receiver is authorized to make distributions as soon as practicable to Classes I, II, and III and to establish an investor trust for outstanding claims in accordance with the Plan. The Receiver shall not make any distributions to Classes IVa and IVb, however, until final resolution of any and all appeals of this court's order approving the Distribution Plan. For the reasons explained above, the Receiver's motion to quash the citation to discover assets of Defendant Jason Hyatt [889] is also granted.

ENTER:

Dated:        May 13, 2016         _____
                                   REBECCA R. PALLMEYER
                                   United States District Judge